UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 05-30105-KPN

_____
                                                    )
ELECTRICAL CONTRACTORS, INC.                        )
    Plaintiff,                             )
                                                    )
v.                                                  )
                                                    )
BARGMANN, HENDRIE & ARCHETYPE, INC.,                )
GWATHMEY, SIEGEL ASSOCIATES ARCHITECTS,             )
LLC, AND SCENIC TECHNOLOGIES a division             )
of PRODUCTION RESOURCE GROUP, LLC                   )
                           Defendants.   )
_____)

## MOTION FOR SUMMARY JUDGMENT OF THE DEFENDANTS, BARGMANN, HENDRIE & ARCHETYPE, INC., GWATHMEY SIEGEL ASSOCIATES ARCHITECTS, LLC AND SCENIC TECHNOLOGIES

The defendants, Bargmann, Hendrie & Archetype, Inc., Gwathmey Siegel Associates Architects, LLC and Scenic Technologies (collectively, the "Architect") hereby move for summary judgment as to both counts (Chapter 93A and Chapter 93, §13) asserted in the Complaint by the plaintiff, Electrical Contractors, Inc. ("ECI").   ECI's claims against the Architect for restraint of trade and unfair trade practices arise from services the Architect performed pursuant to an agreement executed nearly eight years ago, in September 1997. Although ECI had notice of these claims as early as July 2000, ECI did not initiate this action until April 27, 2005, well beyond the four-year statute of limitations that expired, at the latest, in November of 2004.  Because there is no genuine issue of material fact as to any of the points raised above, summary judgment should enter in favor of the Architect on both counts.

WHEREFORE, this Court should grant summary judgment in favor of the defendants, Bargmann, Hendrie & Archetype, Inc., Gwathmey Siegel Associates Architects, LLC and Scenic Technologies, on both claims brought against them by the plaintiff, Electrical Contractors, Inc.

## CERTIFICATE PURSUANT TO LOCAL RULE 7.1

The undersigned certify that counsel have conferred and attempted in good faith to resolve or narrow the issue presented by the instant motion by requesting that ECI, withdraw its claims against the Architect.

Respectfully submitted,
Bargman, Hendrie & Archetype, Inc.,
Gwathmey Siegel Associates Architects, LLC
and Scenic Technologies
By its attorneys,


*/s/* Kenneth B. Walton
David J. Hatem, BBO #225700
Kenneth B. Walton, BBO #562174
Donovan Hatem LLP
Two Seaport Lane
Boston, MA 02110
Dated:  September 15, 2005      (617) 406-4524

## CERTIFICATE OF SERVICE

I, Kenneth B. Walton, hereby certify that on this 15th day of September 2005, I served a copy of the foregoing pleading by mailing postage pre-paid to:

Christopher W. Huck, Esq.
Steven B. Kaplan, Esq.
Michelson, Kane, Royster & Barger, P.C.
93 Oak Street
Hartford CT 06106

*/s/* Kenneth B. Walton

22017.2/00941434

Ex. A

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

---

| | | |
|---|---|---|
| **ELECTRICAL CONTRACTORS, INC.** | ) | **CIVIL ACTION NO.** |
| | ) | 03 · 30231 - MAP |
| **v.** | ) | |
| | ) | |
| **PEABODY CONSTRUCTION CO., INC.** | ) | |
| **& THE CITY OF SPRINGFIELD** | ) | **SEPTEMBER 24, 2003** |

---

## COMPLAINT

I.    JURISDICTION

1.    The Plaintiff, Electrical Contractors, Inc. (hereinafter "ECI"), brings this action against the Defendants, Peabody Construction Co., Inc. (hereinafter "Peabody") and The City of Springfield, alleging breaches of a construction contract by Peabody, violations of Mass.G.L. c. 30, §39M(b),  and violations of Mass.G. L. c. 30, §39F by the City.  The Plaintiff brings this action to recover money due for work it performed on a municipal construction project located in Springfield, Massachusetts knows as the "Naismith Memorial Basketball Hall of Fame" (hereinafter "the Project").

2.    The jurisdiction of this Court is invoked pursuant to 28 U.S.C. §1332.  This Court has original jurisdiction over the above-captioned action inasmuch as there is complete diversity between the parties and the amount in controversy exceeds $75,000.00.

3.    Pursuant to 28 U.S.C. §1391, venue is appropriate in the District of Massachusetts because the events and omissions giving rise to the claim occurred in Springfield, Massachusetts.

II.    **PARTIES**

4.    The Plaintiff, ECI, is a corporation organized and existing under the laws of the State of Connecticut, with its principal place of business in Hartford, Connecticut.

5.    The Defendant, Peabody, is a corporation organized under the laws of the Commonwealth of Massachusetts, with its principal place of business located in Braintree, Massachusetts.

6.    The Defendant, City of Springfield (hereinafter "the City"), is a municipal corporation organized under the laws of the Commonwealth of Massachusetts

III.    **STATEMENT OF THE CLAIMS**

**FIRST COUNT**

7.    By written contract dated July 25, 2000, following a competitive public bid per Mass. G.L. c. 30, §39M, Peabody, as general contractor, entered into a contract with the City, as the owner/awarding authority, for the construction of the Hall of Fame Project. The original amount of the general contract was $32,652,595.00; with approved change orders to date, the adjusted contract amount is approximately $34,700,000.00.

2

8.    By written contract dated July 21, 2000, ECI entered into a subcontract with Peabody whereby ECI, as the filed electrical subcontractor, agreed to perform the electrical work for the Hall of Fame Project. The original subcontract amount was $4,138,810.00; with approved change orders to date, the adjusted subcontract amount is $4,740,111.50.

9.    The contract start date for ECI's work was on or about July 21, 2000, with 570 calendar days allotted for a completion date of February 10, 2002.

10.    Due to acts, errors, and omissions of Peabody and the City and other events that were beyond the control of ECI, plaintiff was unable to substantially complete its work until on or about July 31, 2002, and could not complete all of its work until on or about October 25, 2002. In total, ECI's work took approximately 741 calendar days for completion.

11.    Despite repeated demand for payment, ECI is still owed approximately $107,460.00 in retainage/contract balances, which defendant Peabody has wrongfully failed and refused to pay.

12.    Moreover, throughout the prosecution of ECI's work on the Project, Peabody ordered ECI on numerous occasions to provide extra labor and materials for a variety of work beyond the scope of ECI's subcontract, which ECI provided in expectation of being paid and for which ECI submitted individualized change order requests. Peabody either has failed to pay the full amount due to ECI, or has failed to pay ECI any amount at all for many of these numerous items of extra work. These unpaid amounts total $247,907.48, and despite repeated demand by ECI, Peabody has wrongfully failed and refused to pay such amounts to ECI.

3

13.    In addition to the foregoing, ECI has repeatedly requested direction from Peabody as to whether the City wants ECI to provide certain attic stock ("spare materials") that is specified in the contract. ECI has offered a credit in the amount of $71,804.00—the value of these materials—if Peabody/the City no longer required this attic stock.

14.    Peabody has breached its obligations under the subcontract by failing to pay ECI the foregoing sums.

SECOND COUNT:

7-10.    The allegations contained in paragraphs 7 through 10 of the First Count are hereby incorporated herein as paragraphs 7 through 10 of this Second Count as if fully set forth herein.

11.    Throughout the prosecution of ECI's work on the Project, Peabody ordered ECI on numerous occasions to provide extra labor and materials for a variety of work beyond the scope of ECI's subcontract.

12.    ECI provided this extra labor and materials in furtherance of Peabody's obligations to the City, with the expectation of being paid for same, and Peabody has benefited by and accepted said extra work without paying the reasonable value of same.

13.    The amount still owed to ECI as the reasonable value for said extra work totals $247,907.48, and despite repeated demand by ECI, Peabody has wrongfully failed and refused to pay such amounts to ECI.

14.    Peabody has been unjustly enriched by accepting the benefit of this extra work and failing to pay ECI for its reasonable value.

THIRD COUNT:

7-10.    The allegations contained in paragraphs 7 through 10 of the First Count are hereby incorporated herein as paragraphs 7 through 10 of this Third Count as if fully set forth herein.

11.    The Project specifications and plans were developed by the City, and its agents, and were furnished to ECI by the City for purposes of bidding and performing the electrical work on the Project.

12.    The Project specifications and plans were made part of the subcontract between ECI and Peabody.

13.    The Project specifications and plans were subject to the requirements and provisions of Mass.G.L.c.30, §39M.

14.    In §2.27, ¶AD, at pp. 16000-92 & 93, the specifications require, in part, the following:

> 1. LED-based lighting fixtures to use Chromacore™ Technology, shall be of one manufacturer to insure compatibility. It shall be manufactured by Color Kinetics, Inc. or an approved equal.

5

15.    The specifications for the LED-based lighting fixtures was in fact an illegal "proprietary" specification that violated the provisions of Mass.G.L. c.30, §39M(b), including but not limited to the following:

(a)    The specifications were not written so as to provide for full competition for each item of material to be furnished under the contract;

(b)    The specifications failed to provide for either a minimum of three named brands of material or a description of material which can be met by a minimum of three manufacturers;

(c)    The specifications failed to provide sufficient information by which the electrical subcontractor could submit and procure an "equal" product, as defined under the statute;

(d)    The awarding authority failed to provide sound reasons in the public interest, stated in writing in its public records after reasonable investigation, for failing to adhere to the statutory prescriptions.

16.    Commencing in November 2000, and thereafter, ECI complained to Peabody, and the City, on several occasions that the listed manufacturer for the LED lighting, Color Kinetics, was creating problems in procurement and imposing demands at variance with the contract specifications.    ECI specifically requested that it be allowed to pursue alternate manufacturers of these products that could accomplish the same design intent.

17.    ECI was instructed by Peabody and the City, through its project architect, in no uncertain terms that no substitution for the Color Kinetics products would be entertained, and that any such attempt by ECI would be summarily rejected.

18.    As a result, ECI was forced to purchase the LED lighting from Color Kinetics, through its distributor and sole manufacturer's representative, at a substantially increased price,

from what it would have cost ECI to either procure a comparable product from another manufacturer, or what it would have cost to purchase the same Color Kinetics system if there had been open competition on these items.

19.    As a further result of the illegal "proprietary" specification for the Color Kinetics products, the manufacturer's representative for this product was enabled and permitted to act as a sole source of procurement for the product, and also refused to break out separate pricing for the Color Kinetics product apart from the entire lighting fixture package, which included dozens of other products as well.   In essence, as a result of the foregoing, all of the light fixtures specified for the Project were subject to an illegal, sole source procurement mechanism through the factory representative for Color Kinetics, thereby causing ECI to unnecessarily expend hundreds of thousands additional dollars to purchase the fixtures.

20.    In other sections of Division 16 of the specifications, and in the contract electrical plans, involving other light fixtures and electrical materials required under the ECI subcontract, the specifications and plans also violated the provisions of Mass.G.L. c.30, §39M(b) in one or more of the ways listed in ¶15 above.

21.    ECI likewise was told by Peabody and the City, through its project architect, that substitutions would not be allowed on numerous electrical items, and in fact many of ECI's attempts to substitute "equal" products were wrongfully rejected by Peabody and the City.

7

22.    In many other instances, when ECI attempted to submit and purchase items that had been explicitly listed in the specifications and plans, these items were wrongfully rejected by Peabody and the City because they were not the "first" listed or "preferred" item.

23.    Moreover, in many instances Peabody and the City forced ECI to provide additional features to the lighting fixtures that were not called for in the contract specifications or plans.

24.    As a result of the foregoing, ECI incurred additional costs of procuring and providing the lighting fixtures for the Project in the amount of approximately $396,902.00.

## FOURTH COUNT:

7-10.    The allegations contained in paragraphs 7 through 10 of the First Count are hereby incorporated herein as paragraphs 7 through 10 of this Fourth Count as if fully set forth herein.

11.    Numerous errors, deficiencies, and incomplete elements of the design for the Project required ECI to expend substantially more labor hours than it reasonably anticipated in order to complete its work.  These design problems included, but were not limited to:

    (a) Main building electrical service and associated site conduits and related work;
    (b) Precast concrete for the electrical installations;
    (c) Garage lighting;
    (d) Plaque systems;
    (e) Exhibit power systems;
    (f) Exhibit audio visual systems;
    (g)  Scoreboard system;
    (h) Roof panel systems and related lighting systems;
    (i) Theater systems;

8

(j) Structural steel installation;

(k) Building foundations;

(l) Unforeseen site conditions.

12.    Moreover, Peabody and the City repeatedly failed to review and approve ECI's submittals for products and materials in a timely fashion, and also failed and refused to follow the statutory and contractually prescribed requirements for specifying and approving products and materials, as per Mass.Gen.L. c.30, §39M(b), and as more particularly set forth in Count Three *supra*.

13.    Peabody and the City also added scores of change orders to ECI's contract work, and also required ECI to perform numerous items of work beyond the scope of its subcontract without issuing or approving change orders for same.

14.    Also, in August 2001, vandals broke into the Project and damaged a significant amount of ECI's work in place, as well as stealing or destroying important project documents.

15.    On numerous occasions, ECI requested that Peabody extend the time period for completing ECI's work as a result of the foregoing items. Peabody wrongfully failed to issue any time extension whatsoever to ECI to complete either its original contract work, or the work added by this plethora of problems and changes to ECI's original contract work.

16.    As a result of the foregoing, ECI was forced to expend approximately 7900 additional labor hours to complete the work than it had originally anticipated, at an increased cost of approximately $394,873.13.

17.     Despite repeated demand for payment of same, Peabody has wrongfully failed and refused to pay ECI this sum.

## FIFTH COUNT:

7-17.   The allegations contained in paragraphs 7 through 17 of the Fourth Count are hereby incorporated herein as paragraphs 7 through 17 of this Fifth Count as if fully set forth herein.

18.     Peabody and the City knew, or should have known, that the Project plans and specifications were incomplete and deficient when they were put to bid, and that there would be numerous delays and interruptions to ECI's work as a result.  Notwithstanding same, Peabody and the City failed to extend the time for ECI to complete its work, failed to provide ECI with reasonable and sufficient access to the site so that it could perform its work in a timely fashion, forced ECI to perform its work out of sequence, repeatedly interrupted ECI in the reasonable prosecution of its work,  and effectively interfered with  the reasonable prosecution of ECI's work.

19.     Peabody's and the City's actions were willful, arbitrary and capricious in this regard.

20.     As a result of the foregoing, ECI was forced to accelerate and compress the performance of both its original contract work and the work added by Peabody and the City,

10

thereby causing it to incur additional labor costs of approximately $394,873.13 and extended, unabsorbed home office expenses of approximately $189,361.00.

## SIXTH COUNT:

7-14.    The allegations contained in paragraphs 7 through 14 of the First Count are hereby incorporated herein as paragraphs 7 through 14 of this Sixth Count as if fully set forth herein.

15.-18.    The allegations contained in paragraphs 11 through 14 of the Second Count are hereby incorporated herein as paragraphs 15 through 18 of this Sixth Count as if fully set forth herein.

19.-32    The allegations contained in paragraphs 11 through 24 of the Third Count are hereby incorporated herein as paragraphs 19 through 32 of this Sixth Count as if fully set forth herein.

33.-39    The allegations contained in paragraphs 11 through 17 of the Fourth Count are hereby incorporated herein as paragraphs 33 through 39 of this Fourth Count as if fully set forth herein.

40.-42.    The allegations contained in paragraphs 18 through 20 of the Fifth Count are hereby incorporated herein as paragraphs 40 through 42 of this Sixth Count as if fully set forth herein.

43.    Per Mass.G.L. c.149, §29, Peabody, as principal, and Travelers Casualty and Surety Company of America, as surety, provided a labor and materials payment bond in the amount of $32,907,395.00, Bond No. 103316476, whereby Peabody and Travelers jointly guaranteed payment for all labor performed and materials used or employed in the Project.

44.    ECI is a proper claimant under said payment bond.

45.    By claim dated December 19, 2002, ECI properly submitted its claim to Peabody and Travelers against the payment bond as to all of the foregoing damages, totaling at the time $1,589,771.20.

46.    Peabody (and Travelers) wrongfully denied ECI's claims, and failed and refused to pay ECI most of the foregoing sum, of which there remains due and owing $1,336,504.20.


SEVENTH  COUNT (As to the City of Springfield)

7-14.   The allegations contained in paragraphs 7 through 14 of the First Count are hereby incorporated herein as paragraphs 7 through 14 of this Sixth Count as if fully set forth herein.

15.-18.  The allegations contained in paragraphs 11 through 14 of the Second Count are hereby incorporated herein as paragraphs 15 through 18 of this Sixth Count as if fully set forth herein.

19.-32    The allegations contained in paragraphs 11 through 24 of the Third Count are hereby incorporated herein as paragraphs 19 through 32 of this Sixth Count as if fully set forth herein.

33.-39    The allegations contained in paragraphs 11 through 17 of the Fourth Count are hereby incorporated herein as paragraphs 33 through 39 of this Fourth Count as if fully set forth herein.

40.-42.    The allegations contained in paragraphs 18 through 20 of the Fifth Count are hereby incorporated herein as paragraphs 40 through 42 of this Seventh Count as if fully set forth herein.

43.    Pursuant to Mass. G.L. c. 30, §39F, ECI issued a Demand for Direct Payment to the City on December 19, 2002.  Pursuant to that Demand, and in compliance with the applicable provisions of the statute, ECI indicated the following:

(a)  It had substantially completed its work on or about July 31, 2002, and had completed all of its work  on or about October 25, 2002;

(b)  It was owed $225,249.06 in retainage (contract balances); $314,189.68 for a multitude of unresolved change orders (extra labor and materials); and $1,050,332.60 for extra costs, consisting of $383,371.97 for added labor, $466,098.00 in added fixture costs, $11,501.16 for small tools, and $189,361.47 in additional home office overhead.  The total amount claimed as being owed by ECI for work performed under the subcontract was $1,589,771.20.

44.    At no time since receipt of ECI's Demand for Direct Payment has the City made any payment directly to ECI or deposited any funds into an interest-bearing joint account in the names of ECI and Peabody.

45.    By its acts and omissions, the City violated the provisions of Mass.G.L. c. 30, §39F, including but not limited to the following:

(a)    Within fifteen days after receipt of the Demand, it failed to make direct payments of any amount to ECI, whether for the balance due under the subcontract or for any amount due for extra labor and materials furnished by ECI to the general contractor;

(b)    Thereafter, and up to the present time, it has failed to failed to make direct payments of any amount to ECI, whether for the balance due under the subcontract or for any amount due for extra labor and materials furnished by ECI to the general contractor;

(c)    It has wrongfully failed to deposit any amount at any time into an interest-bearing joint account in the names of ECI and Peabody in regard to amounts claimed by ECI for direct payment;

(d)    It wrongfully considered statements by Peabody, the general contractor, that did not comport with the requirements of the statute, as a basis for not making the requisite direct payments to ECI or establishing the requisite joint account;

(e)    It wrongfully asserted as a basis for the foregoing failures that the amounts claimed due by ECI were not subject to the statute because the City had not yet determined that they were "due";

(f)    It made payments directly to Peabody in derogation of its statutory obligation to either make such payments directly to ECI or deposit such amounts into an interest- bearing joint account in the names of ECI and Peabody.

14

46.    To date, ECI is still owed approximately $107,460.25 in retainage (contract balances); $247,907.48 for a multitude of unresolved change orders (extra labor and materials); and $981,136,60 for extra costs, consisting of $383,371.97 for added labor, $396,902.00 in added fixture costs, $11,501.16 for small tools, and $189,361.47 in additional home office overhead. This totals $1,336,504.20.

IV.    <u>PRAYER FOR RELIEF</u>

WHEREFORE, the Plaintiff requests the following relief:

1.    Money damages;

2.    Interest and costs;

3.    Under the Sixth Count, money damages, interest, costs, and reasonable attorney's fees, as per Mass.G.L. c.149, §29;

4.    Under the Seventh Count, orders requiring the City of Springfield to pay to ECI the balance due under the subcontract including any amount due for extra labor and materials furnished to the general contractor, plus interest, as per Mass. G. L. ch. 30 § 39F, and/or to immediately establish a joint account in the names of ECI and Peabody as to any properly disputed sums; and

5.    Such further relief at law or equity as this Court deems just and proper.

Dated at Hartford, Connecticut this  24th  day of  September, 2003.

PLAINTIFF,   ELECTRICAL CONTRACTORS, INC.

By: _____
        Christopher W. Huck
        BBO #567259
        Steven B. Kaplan
        Federal Bar # CT 06366
        Michelson, Kane, Royster & Barger, P.C.
        93 Oak Street
        Hartford, CT 06106
        Tel:    (860)522-1243
        Fax:    (860)548-0194
        Email: cwhuck@snet.net
                sbkaplan@snet.net

16

Ex. B

# United States District Court
## District of Massachusetts (Springfield)
## CIVIL DOCKET FOR CASE #: 3:03-cv-30231-MAP

Electrical Contractors, Inc. v. Peabody Construction Co., Inc. et al

Assigned to: Judge Michael A Ponsor
Referred to: Magistrate Judge Kenneth P. Neiman
Demand: $999000
Related Case: 3:05-cv-30105-MAP
Cause: 28:1332 Diversity-Breach of Contract

Date Filed: 09/25/2003
Jury Demand: Defendant
Nature of Suit: 190 Contract: Other
Jurisdiction: Diversity

**Plaintiff**

**Electrical Contractors, Inc.**    represented by    **Christopher W Huck**
Michelson, Kane, Royster & Barger, P.C.
93 Oak Street
Hartford, CT 06106
860-522-1243
Fax: 860-548-0194
Email: cwhuck@snet.net
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Steven B. Kaplan**
Michelson, Kane, Royster & Barger, P.C.
93 Oak Street
Hartford, CT 06106
860-522-1243
Fax: 860-548-0194
Email: sbkaplan@snet.net
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Peabody Construction Co., Inc.**    represented by    **Bradford R. Carver**
Hinshaw & Culbertson LLP
One International Place
3rd Floor
Boston, MA 02110
617-213-7002
Fax: 617-213-7001
Email: bcarver@hinshawlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Charles A. Plunkett**
Vewa, Riley, Deptula, LLP
250 Summer Street
Boston, MA 02118
617-951-2400
Email: cplunkett@vrdllp.com
*ATTORNEY TO BE NOTICED*

**Edward F. Vena**
Vena, Riley, Deptula, LLP
250 Summer Street
Boston, MA 02210
617-951-2400
Fax: 617-951-2420
Email: evena@vrdllp.com
*ATTORNEY TO BE NOTICED*

<u>**Defendant**</u>

**City of Springfield**                    represented by    **Edward M. Pikula**
O'Connor, Martinelli, Cullinan &
Pikula
1391 Main Street
Suite 1022
Springfield, MA 01103
413-781-5311
Fax: 413-746-2707
Email: epikula@omcp-law.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

<u>**Cross Claimant**</u>

**Peabody Construction Co., Inc.**          represented by    **Charles A. Plunkett**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Edward F. Vena**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

<u>**Cross Defendant**</u>

**City of Springfield**

<u>**Cross Claimant**</u>

**City of Springfield**

V.

**Cross Defendant**

**Peabody Construction Co., Inc.**

**ThirdParty Plaintiff**

**City of Springfield**                    represented by    **Edward M. Pikula**
                                                            (See above for address)
                                                            *ATTORNEY TO BE NOTICED*

V.

**ThirdParty Defendant**

**Bargmann, Hendrie + Archetype,**         represented by    **David J. Hatem**
**Inc.**                                                    Donovan & Hatem, LLP
                                                            Two Seaport Lane
                                                            Boston, MA 02210
                                                            617-406-4500
                                                            Email: dhatem@donovanhatem.com
                                                            *LEAD ATTORNEY*
                                                            *ATTORNEY TO BE NOTICED*

                                                            **Kenneth B. Walton**
                                                            Donovan & Hatem, LLP
                                                            Two Seaport Lane
                                                            Boston, MA 02210
                                                            617-406-4500
                                                            Fax: 617-406-4501
                                                            Email: kwalton@donovanhatem.com
                                                            *LEAD ATTORNEY*
                                                            *ATTORNEY TO BE NOTICED*

**ThirdParty Defendant**

**Scenic Technologies**                    represented by    **David J. Hatem**
                                                            (See above for address)
                                                            *ATTORNEY TO BE NOTICED*

                                                            **Kenneth B. Walton**
                                                            (See above for address)
                                                            *ATTORNEY TO BE NOTICED*

**ThirdParty Defendant**

**Gwathmey, Siegel Associates**            represented by    **David J. Hatem**
**Architects, LLC**                                         (See above for address)
                                                            *ATTORNEY TO BE NOTICED*

                                                            **Kenneth B. Walton**
                                                            (See above for address)

*ATTORNEY TO BE NOTICED*

**Cross Claimant**

**Peabody Construction Co., Inc.**


V.

**Cross Defendant**

**City of Springfield**

**ThirdParty Plaintiff**

**City of Springfield**


V.

**ThirdParty Defendant**

**Bovis Lend Lease, Inc.**                represented by   **Robert V. Lizza**
                                                          Holland & Knight, LLP
                                                          10 St. James Avenue
                                                          Boston, MA 02116
                                                          617-523-2700
                                                          Fax: 617-523-6850
                                                          Email: rlizza@hklaw.com
                                                          *LEAD ATTORNEY*
                                                          *ATTORNEY TO BE NOTICED*

                                                          **Matthew Charles Bouchard**
                                                          Holland & Knight LLP
                                                          10 St. James Avenue
                                                          Boston, MA 02116
                                                          617-305-2023
                                                          Fax: 617-523-6850
                                                          Email: mbouchard@hklaw.com
                                                          *ATTORNEY TO BE NOTICED*

**ThirdParty Defendant**

**Design Craftsmen, Inc.**               represented by   **Gregg P. Goumas**
*TERMINATED: 05/05/2005*                                  Shipman & Goodwin LLP
                                                          One Constitution Plaza
                                                          Hartford, CT 06103-1919
                                                          860-251-5000
                                                          Fax: 860-251-5214
                                                          Email: ggoumas@goodwin.com
                                                          *TERMINATED: 08/02/2005*
                                                          *LEAD ATTORNEY*
                                                          *ATTORNEY TO BE NOTICED*

                                                          **John T. Harris**
                                                          Shipman & Goodwin LLP

One Constitution Plaza
Hartford, CT 06103
860-251-5000
Fax: 860-251-5214
*TERMINATED: 08/02/2005*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**ThirdParty Defendant**

**Naismith Memorial Basketball Hall of Fame, Inc.**

represented by **Michael K Callan**
Doherty, Wallace, Pillsbury & Murphy, P.C.
One Monarch Place, 19th Floor
1414 Main Street
Springfield, MA 01144-1002
413-733-3111
Fax: 413-734-3910
Email: mcallan@dwpm.com
*ATTORNEY TO BE NOTICED*

**ThirdParty Defendant**

**O'Connell Development Group**

represented by **Michael K Callan**
(See above for address)
*ATTORNEY TO BE NOTICED*

**ThirdParty Defendant**

**Springfield Riverfront Development Corp.**

represented by **Michael K Callan**
(See above for address)
*ATTORNEY TO BE NOTICED*

**ThirdParty Defendant**

**Bargmann, Hendrie + Archetype, Inc.**

**ThirdParty Defendant**

**Scenic Technologies**

**ThirdParty Defendant**

**Gwathmey, Siegel Associates Architects, LLC**

**ThirdParty Defendant**

**Travelers Casualty and Surety Company of America, Inc.**

| Date Filed | # | Docket Text |
|------------|---|-------------|
| 08/23/2005 | 70 | NOTICE of Withdrawal of Appearance by Sabatino F. Leo *for the firm of Vena Riley Deptula LLP* (Leo, Sabatino) (Entered: 08/23/2005) |

| 08/19/2005 | 69 | DESIGNATION OF EXPERTS by Electrical Contractors, Inc. *Supplemental*. (Kaplan, Steven) (Entered: 08/19/2005) |
| 08/19/2005 | 68 | DESIGNATION OF EXPERTS by Gwathmey, Siegel Associates Architects, LLC , *Scenic Technologies, and Bargmann Hendrie + Archetype, Inc.*. (Attachments: # 1 Exhibit A, B & C)(Walton, Kenneth) (Entered: 08/19/2005) |
| 08/03/2005 | 67 | NOTICE of Appearance by Bradford R. Carver on behalf of Peabody Construction Co., Inc. (Carver, Bradford) (Entered: 08/03/2005) |
| 08/01/2005 | 66 | NOTICE of Appearance by Jonathan C. Burwood on behalf of Peabody Construction Co., Inc. (Burwood, Jonathan) (Entered: 08/01/2005) |
| 07/25/2005 |  | Judge Kenneth P. Neiman : Electronic ORDER entered denying without prejudice 63 Plaintiff's Motion to Consolidate. It would appear prudent for a motion to consolidate to be addressed only after (1) the discovery schedule in Civil Action No. 05-30105-MAP is established and completed and (2) the dispositive motion, which the three defendants in Civil Action No. 05-30105-MAP intend to file, is decided. (Neiman, Kenneth) (Entered: 07/25/2005) |
| 07/20/2005 | 65 | Opposition re 63 MOTION to Consolidate Cases *of Plaintiff, Electrical Contractors, Inc.* filed by Gwathmey, Siegel Associates Architects, LLC. (Walton, Kenneth) (Entered: 07/20/2005) |
| 07/08/2005 |  | Notice of correction to docket made by Court staff. Correction: Doc. #63 corrected because: Wrong document attached to event. Correct motion added. (Stuckenbruck, John) (Entered: 07/08/2005) |
| 07/08/2005 | 64 | Ptf's MEMORANDUM in Support of its 63 MOTION to Consolidate Cases filed by Electrical Contractors, Inc.. (Attachments: # 1 Exhibit A & B)(Lindsay, Maurice) (Entered: 07/08/2005) |
| 07/08/2005 | 63 | Ptf's MOTION to Consolidate by Electrical Contractors, Inc..(Lindsay, Maurice) Additional attachment(s) added on 7/8/2005 (Stuckenbruck, John).Wrong document picked when event docketed. Correct Motion added to event. Modified on 7/8/2005 (Stuckenbruck, John). (Entered: 07/08/2005) |
| 05/11/2005 | 62 | Magistrate Judge Kenneth P. Neiman. FURTHER REVISED SCHEDULING ORDER setting all non-expert depos. compl by 7/11/05; parties' expert discl by 8/19/05; rebuttal experts discl by 9/19/05; expert depos. compl by 11/18/05; case mgmt conf. rescheduled to 11/21/05 at 10:00 a.m. in Courtroom Three (the 9/8/05 conference is hereby cancelled), ENTERED, cc:cl. THERE SHALL BE NO FURTHER EXTENSIONS. (Healy, Bethaney) (Entered: 05/11/2005) |
| 05/11/2005 |  | Magistrate Judge Kenneth P. Neiman. ELECTRONIC ORDER granting 59 Motion for Extension of Time to Complete Discovery ENTERED, cc:cl. Upon reconsideration, the court hereby allows in part Motion for Extension of Time. See Further Revised Scheduling Order entered this day for further details. (Healy, Bethaney) (Entered: 05/11/2005) |

| | | |
|---|---|---|
| 05/11/2005 | | Reopen Document 59 First MOTION for Extension of Time to 90 days to Complete Discovery (Healy, Bethaney) (Entered: 05/11/2005) |
| 05/09/2005 | 61 | CERTIFICATE OF CONSULTATION re 59 First MOTION for Extension of Time to 90 days to Complete Discovery by Michael K Callan on behalf of Naismith Memorial Basketball Hall of Fame, Inc., Naismith Memorial Basketball Hall of Fame, Inc. by on behalf of Naismith Memorial Basketball Hall of Fame, Inc., Naismith Memorial Basketball Hall of Fame, Inc.. Related document: 59 First MOTION for Extension of Time to 90 days to Complete Discovery filed by Springfield Riverfront Development Corp.,, Naismith Memorial Basketball Hall of Fame, Inc.,, O'Connell Development Group,.(Callan, Michael) (Entered: 05/09/2005) |
| 05/05/2005 | 60 | Third-party Pltf. City of Springfield's NOTICE of Voluntary Dismissal as to the Third-party Deft. Design Craftsmen, Inc., only by City of Springfield filed without prejudice. (Finn, Mary) (Entered: 05/05/2005) |
| 05/02/2005 | | Judge Kenneth P. Neiman : Electronic ORDER entered denying 59 Motion for Extension of Time to Complete Discovery, the denial being without prejudice to Defendants renewing the motion and providing certification to the court pursuant to Local Rule 7.1(a)(2). (Neiman, Kenneth) (Entered: 05/02/2005) |
| 04/29/2005 | 59 | First MOTION for Extension of Time to 90 days to Complete Discovery by Naismith Memorial Basketball Hall of Fame, Inc., O'Connell Development Group, Springfield Riverfront Development Corp..(Callan, Michael) (Entered: 04/29/2005) |
| 04/29/2005 | 58 | NOTICE of Appearance by Michael K Callan on behalf of Naismith Memorial Basketball Hall of Fame, Inc., O'Connell Development Group, Springfield Riverfront Development Corp. (Callan, Michael) (Entered: 04/29/2005) |
| 04/20/2005 | 57 | Response by Bovis Lend Lease, Inc. *to Cross-Claims of Defendants Gwathmey Siegel Associates Architects, LLC, Scenic Technologies, and Bargmann Hendrie + Archetype, Inc.*. (Attachments: # 1 Certificate of Service)(Bouchard, Matthew) (Entered: 04/20/2005) |
| 04/20/2005 | 56 | ANSWER to Third Party Complaint *of The City of Springfield* by Bovis Lend Lease, Inc.. (Attachments: # 1 Certificate of Service)(Bouchard, Matthew) (Entered: 04/20/2005) |
| 04/19/2005 | 55 | NOTICE of Appearance by John T. Harris on behalf of Design Craftsmen, Inc. (Lindsay, Maurice) (Entered: 04/19/2005) |
| 04/13/2005 | | Judge Kenneth P. Neiman : Electronic ORDER entered denying 50 Plaintiff's Motion for Leave to File Cross-Claim, essentially for the reasons set forth in Defendants' Opposition 54. Plaintiff's motion is not only late, but is not permitted by Rule 13(g) insofar as Plaintiff is not a co-party to GSA, Scenic or BHA. (Neiman, Kenneth) (Entered: 04/13/2005) |
| | | |

| 04/12/2005 | 54 | Opposition re 50 MOTION for Leave to File *Cross-claim* filed by Bargmann, Hendrie + Archetype, Inc., Scenic Technologies, Gwathmey, Siegel Associates Architects, LLC. (Walton, Kenneth) (Entered: 04/12/2005) |
|---|---|---|
| 04/01/2005 | 53 | STATUS REPORT RE: Mediation by Bargmann, Hendrie + Archetype, Inc., Scenic Technologies, Gwathmey, Siegel Associates Architects, LLC, Bargmann, Hendrie + Archetype, Inc., Scenic Technologies, Gwathmey, Siegel Associates Architects, LLC. (Lindsay, Maurice) (Entered: 04/01/2005) |
| 04/01/2005 | 52 | NOTICE of Appearance by Matthew Charles Bouchard on behalf of Bovis Lend Lease, Inc. (Bouchard, Matthew) (Entered: 04/01/2005) |
| 04/01/2005 | 51 | NOTICE of Appearance by Robert V. Lizza on behalf of Bovis Lend Lease, Inc. (Lizza, Robert) (Entered: 04/01/2005) |
| 03/31/2005 | 50 | MOTION to File Cross-Claim by Electrical Contractors, Inc. (Attachments: # 1 Proposed Cross-Claim)(Lindsay, Maurice) (Entered: 03/31/2005) |
| 03/24/2005 | 49 | NOTICE of Appearance by John T. Harris on behalf of Design Craftsmen, Inc. (Lindsay, Maurice) (Entered: 03/24/2005) |
| 03/22/2005 | | Judge Michael A Ponsor : Electronic ORDER entered granting 48 Motion for John T. Harris to Appear Pro Hac Vice. Added John T. Harris for Design Craftsmen, Inc. A notice of Appearance for Atty. Harris is due within 10 days. cc/cl (Lindsay, Maurice) (Entered: 03/22/2005) |
| 03/22/2005 | 48 | Assented to MOTION to Admit John T. Harris Pro Hac Vice, Filing fee paid $50.00, receipt number 305890. by Design Craftsmen, Inc.(Lindsay, Maurice) (Entered: 03/22/2005) |
| 03/22/2005 | 47 | NOTICE of Appearance by Gregg P. Goumas on behalf of Design Craftsmen, Inc. (Lindsay, Maurice) (Entered: 03/22/2005) |
| 03/22/2005 | 46 | WAIVER OF SERVICE Returned Executed Design Craftsmen, Inc. waiver sent on 3/1/2005, answer due 5/2/2005. (Lindsay, Maurice) (Entered: 03/22/2005) |
| 03/14/2005 | 45 | Dft's ANSWER to Amended Third Party Complaint of the City of Springfield Counterclaims and cross-claims by Bargmann, Hendrie + Archetype, Inc., Gwathmey, Siegel Associates Architects, LLC, Bargmann, Hendrie + Archetype, Inc., Scenic Technologies.(Lindsay, Maurice) (Entered: 03/14/2005) |
| 02/24/2005 | | Notice of correction to docket made by Court staff. Correction: 44 Amended Third-Party Complaint corrected because: added word "Amended" to text (Healy, Bethaney) (Entered: 02/24/2005) |
| 02/24/2005 | | Summons Issued as to Bovis Lend Lease, Inc., Design Craftsmen, Inc., Naismith Memorial Basketball Hall of Fame, Inc., O'Connell Development Group, Springfield Riverfront Development Corp., Scenic Technologies, Bargmann, Hendrie + Archetype, Inc., Gwathmey, Siegel |

| | | |
|---|---|---|
| | | Associates Architects, LLC, Travelers Casualty and Surety Company of America, Inc.. (Healy, Bethaney) (Entered: 02/24/2005) |
| 02/23/2005 | 44 | AMENDED THIRD PARTY COMPLAINT against Bovis Lend Lease, Inc., Design Craftsmen, Inc., Naismith Memorial Basketball Hall of Fame, Inc., O'Connell Development Group, Springfield Riverfront Development Corp., Bargmann, Hendrie + Archetype, Inc., Scenic Technologies, Gwathmey, Siegel Associates Architects, LLC, Travelers Casualty and Surety Company of America, Inc. , filed by City of Springfield. (Attachments: # 1 Part 2 of Amended Third-Party Complaint)(Healy, Bethaney) Modified on 2/24/2005 (Healy, Bethaney). (Entered: 02/24/2005) |
| 02/23/2005 | | Magistrate Judge Kenneth P. Neiman. ELECTRONIC ORDER granting 42 Motion to Amend Third Party Complaint of the City of Springfield, ENTERED, cc:cl. ALLOWED without opposition. (Healy, Bethaney) (Entered: 02/23/2005) |
| 02/14/2005 | 43 | Letter/request (non-motion) from Yvette Concepcion. (Lindsay, Maurice) (Entered: 02/14/2005) |
| 02/04/2005 | 42 | Third-party Pltf. City of Springfield's MOTION to Amend their 24 Third Party Complaint to add parties and claims by City of Springfield filed. (Finn, Mary) (Entered: 02/04/2005) |
| 02/02/2005 | | Judge Kenneth P. Neiman : Electronic ORDER entered granting 41 City of Springfield's assented-to Motion for Extension of Time to February 14, 2005, to file a motion to add parties. So ordered. (Neiman, Kenneth) (Entered: 02/02/2005) |
| 02/01/2005 | 41 | Deft. and Third-party Pltf's MOTION to ext. time to 2/14/2005 to file a motion to add third parties by City of Springfield filed.(Finn, Mary) (Entered: 02/01/2005) |
| 01/04/2005 | | ElectronicClerk's Notes for proceedings held before Magistrate Judge Kenneth P. Neiman. Counsel appear for Case Management Conference held on 1/4/2005. Scheduling Order to issue. (Court Reporter FTR.) (Healy, Bethaney) (Entered: 01/07/2005) |
| 01/04/2005 | 40 | Magistrate Judge Kenneth P. Neiman. SCHEDULING ORDER: setting motoins to amend pleadings due by 2/4/05; parties to notify ct in writing re: settlement by 3/31/05; non-expert depos. compl. by 4/29/05; expert discl by 6/3/05; rebuttal experts by 7/8/05; expert depos. compl. 9/2/05; case mgmt conf. set for 9/89/05 at 2:00 in Ctrm Three, ENTERED, cc:cl. (Healy, Bethaney) (Entered: 01/07/2005) |
| 01/04/2005 | | Judge Kenneth P. Neiman : ElectronicORDER entered granting 39 Defendant City of Springfield's Motion for Extension of Time to Complete Discovery. See Revised Scheduling Order to be issued this day. (Neiman, Kenneth) (Entered: 01/04/2005) |
| 12/30/2004 | 39 | Deft. City of Springfield's motion to modify (ext.) discovery schedule re: non-expert depos. from 12/30/2004 to 4/30/2005 filed.(Finn, Mary) |

Case 3:05-cv-30105-MAP    Document 15-3    Filed 09/15/2005    Page 11 of 14

| | | (Entered: 12/30/2004) |
|---|---|---|
| 10/15/2004 | 38 | Letter/request (non-motion) from Steven B. Kaplan. notice re; mediation. (Lindsay, Maurice) (Entered: 10/18/2004) |
| 07/16/2004 | 37 | Document disclosure by Travelers Casualty and Surety Company of America, Inc..(Vena, Edward) (Entered: 07/16/2004) |
| 07/16/2004 | 36 | Document disclosure by Peabody Construction Co., Inc..(Vena, Edward) (Entered: 07/16/2004) |
| 07/02/2004 | 35 | Amended CROSSCLAIM against City of Springfield , filed by Peabody Construction Co., Inc..(Stuckenbruck, John) (Entered: 07/02/2004) |
| 07/02/2004 | | Judge Michael A Ponsor : Electronic ORDER entered granting 34 Motion to Amend Crossclaim (Stuckenbruck, John) (Entered: 07/02/2004) |
| 07/02/2004 | 34 | Assented to MOTION to Amend 8 Crossclaim against City of Spfld. by Peabody Construction Co., Inc..(Stuckenbruck, John) (Entered: 07/02/2004) |
| 06/18/2004 | 33 | Magistrate Judge Kenneth P. Neiman. REVISED SCHEDULING ORDER setting Deft Peabody Construction Co.'s amendment to cross-claims by 7/2/04; auto discl. by 7/16/04; all remaining written disc. served by 7/16/04;parties shall notify court in writing whether they mutually agree to engage in mediation by 10/15/04; non-expert depos. by 12/30/04; case mgmt conf set for 1/4/05 at 2:00 p.m. (the 11/18/04 conference is cancelled); parties expert discl by 1/31/05; rebuttal experts discl by 2/28/05; expert depos. compl. by 3/31/05, ENTERED, cc:cl. (Healy, Bethaney) (Entered: 06/18/2004) |
| 06/17/2004 | | Judge Kenneth P. Neiman : ELECTRONIC ORDER entered granting 30 Defendant City of Springfield's Motion for Extension of Time for Written Discovery. See Revised Scheduling Order to be issued forthwith. (Neiman, Kenneth) (Entered: 06/17/2004) |
| 06/17/2004 | | Electronic Clerk's Notes for proceedings held before Magistrate Judge Kenneth P. Neiman. Case Management Conference held on 6/17/2004. Counsel for Third-Party Defendants do not appear. Colloquy re: status of matter. November 18, 2004 case management conference is cancelled. Revised Scheduling Order to issue. (Court Reporter Digital Recording.) (Healy, Bethaney) (Entered: 06/17/2004) |
| 06/02/2004 | | Judge Kenneth P. Neiman : ELECTRONIC ORDER entered granting 31 Defendant City of Springfield's Motion to Schedule a Case Management Conference. The conference shall take place in Courtroom III on June 17, 2004, at 1:30 p.m. (Neiman, Kenneth) (Entered: 06/02/2004) |
| 06/01/2004 | 32 | Judge Michael A Ponsor : ORDER entered REFERRING MOTION 30 MOTION for Extension of Time to 7/1/04 to for written discovery filed by City of Springfield, 31 MOTION case management conference filed by City of Springfield to Magistrate Judge Kenneth P. Neiman(French, Elizabeth) (Entered: 06/01/2004) |

| 05/28/2004 | 31 | MOTION for case management conference by City of Springfield. (Lindsay, Maurice) (Entered: 05/28/2004) |
|---|---|---|
| 05/28/2004 | 30 | MOTION to Extend Time to 7/1/04 to complete written discovery by City of Springfield.(Lindsay, Maurice) (Entered: 05/28/2004) |
| 04/30/2004 | 29 | ANSWER to Crossclaim by Peabody Construction Co., Inc. (Lindsay, Maurice) (Entered: 04/30/2004) |
| 04/30/2004 | 28 | ANSWER to Third Party Complaint by Travelers Casualty and Surety Company of America, Inc. (Lindsay, Maurice) (Entered: 04/30/2004) |
| 04/30/2004 | 27 | ANSWER to Third Party Complaint by Gwathmey, Siegel Associates Architects, LLC.(Lindsay, Maurice) (Entered: 04/30/2004) |
| 04/30/2004 | 26 | ANSWER to Third Party Complaint by Scenic Technologies.(Lindsay, Maurice) (Entered: 04/30/2004) |
| 04/30/2004 | 25 | Dft. ANSWER to Third Party Complaint by Bargmann, Hendrie + Archetype, Inc..(Lindsay, Maurice) (Entered: 04/30/2004) |
| 03/26/2004 | 24 | THIRD PARTY COMPLAINT against Bargmann, Hendrie + Archetype, Inc., Scenic Technologies, Gwathmey, Siegel Associates Architects, LLC, Travelers Casualty and Surety Company of America, Inc. , filed by City of Springfield.(Stuckenbruck, John) (Entered: 03/29/2004) |
| 03/26/2004 | 23 | ANSWER to Complaint, CROSSCLAIM against Peabody Construction Co., Inc. by City of Springfield.(Stuckenbruck, John) Modified on 3/29/2004 (Stuckenbruck, John). ( docketed as filed on 3/29 not 3/26. Changed entry to 3/26.) (Entered: 03/29/2004) |
| 03/01/2004 | 22 | NOTICE of Hearing ISSUED, cc:cl. Status Conference set for 11/18/2004 at 10:00 AM in Courtroom 3 before Magistrate Judge Kenneth P. Neiman. (Healy, Bethaney) (Entered: 03/01/2004) |
| 02/27/2004 | 20 | Judge Michael A Ponsor : PRETRIAL SCHEDULING ORDER entered: The Answer of the Dft. City of Spfld. due 3/26/04, either Dft. will file any third-party complaint by 3/26/04, Answers to third-party complaints due 4/30/04, all interrogatories and request for production will be served by 6/1/04, all non-expert depositions due by 10/31/2004. (Lindsay, Maurice) (Entered: 03/01/2004) |
| 02/27/2004 |  | Judge Michael A Ponsor : Endorsed ORDER entered denying 9 Motion Deposit and or Writ of Mandamus, denying 9 Motion for Writ of Mandamus. (Lindsay, Maurice) (Entered: 02/27/2004) |
| 02/27/2004 |  | Judge Michael A Ponsor : Endorsed ORDER entered denying 10 Motion to Dismiss. (Lindsay, Maurice) (Entered: 02/27/2004) |
| 02/27/2004 |  | Judge Michael A Ponsor : Endorsed ORDER entered denying 17 Motion to Strike Affidavit of William Flynn (Lindsay, Maurice) (Entered: 02/27/2004) |
| 02/26/2004 | 21 | ELECTRONIC Clerk's Notes for proceedings held before Judge Michael A Ponsor : Motion Hearing held on 2/26/2004 re 10 MOTION to Dismiss |

| | | |
|---|---:|---|
| | | filed by City of Springfield, 17 MOTION to Strike filed by City of Springfield. Scheduling order to issue (Court Reporter Sara Mubarek.) (French, Elizabeth) (Entered: 03/01/2004) |
| 01/07/2004 | 19 | ELECTRONIC NOTICE of Hearing on Motion 17 MOTION to Strike, 9 MOTION for the Court to order the Deft. City of Springfield MOTION for Writ of Mandamus, 10 MOTION to Dismiss: Motion Hearing set for 2/26/2004 02:30 PM in Courtroom 2 before Honorable Michael A Ponsor. (French, Elizabeth) (Entered: 01/07/2004) |
| 01/05/2004 | 18 | Dft's OPPOSITION to Ptf's 9 MOTION for the Court to order the Deft. City of Springfield MOTION for Writ of Mandamus filed by City of Springfield. (Attachments: # 1 Exhibit to main document# 2 # 3 Exhibit to Main Document# 4 Exhibit to main document)(Lindsay, Maurice) (Entered: 01/05/2004) |
| 01/05/2004 | | Judge Michael A Ponsor : Endorsed ORDER entered granting 16 Motion for Extension of Time (Lindsay, Maurice) (Entered: 01/05/2004) |
| 12/23/2003 | 17 | MOTION to Strike Affidavit of William Flynn by City of Springfield. (Lindsay, Maurice) (Entered: 12/24/2003) |
| 12/23/2003 | 16 | MOTION to Extend Time to 12/23/03 to respond by City of Springfield. (Lindsay, Maurice) (Entered: 12/24/2003) |
| 12/22/2003 | 15 | Peabody Construction Co., Inc., OPPOSITION to Ptf's 9 MOTION for order of deposit and/or writ of Mandamus filed by Peabody Construction Co., Inc.. (Lindsay, Maurice) (Entered: 12/22/2003) |
| 12/15/2003 | 14 | MEMORANDUM OF LAW by Electrical Contractors, Inc. in support of 13 objection to the Deft. City of Springfield's motion to dismiss filed. (Finn, Mary) (Entered: 12/16/2003) |
| 12/15/2003 | 13 | P's Objection to the Deft. City of Springfield's 10 MOTION to Dismiss filed. (Finn, Mary) (Entered: 12/16/2003) |
| 12/15/2003 | | Judge Michael A Ponsor : Electronic ORDER entered granting Defts. [12] to ext. time to 12/22/03 to resp. to the Ptlf's motion for Order of deposit and/or writ of mandamus; cc/cl. (Finn, Mary) (Entered: 12/16/2003) |
| 12/15/2003 | 12 | Defts' City of Springfield and Peabody Construction's Assented to motion to ext. time to 12/12/2003 to resp. to the Pltf's motion for an order of deposit and/or writ of mandamus filed.(Finn, Mary) (Entered: 12/15/2003) |
| 12/05/2003 | 11 | Deft, City of Springfield's MEMORANDUM in Support of 10 MOTION to Dismiss filed. (Finn, Mary) (Entered: 12/08/2003) |
| 12/05/2003 | 10 | Deft. City of Springfield's motion to dismiss the Pltf's complaint for failure to state a claim filed.(Finn, Mary) (Entered: 12/08/2003) |
| 12/02/2003 | 9 | Pltf's motion for the Court to order the Deft. City of Springfield to deposit $1,332,374.80, plus interest since 12/08/2002, into an interest- |

| | | |
|---|---|---|
| | | bearing account and MOTION for the Court to issue a Writ of Mandamus filed. (Finn, Mary) (Entered: 12/02/2003) |
| 11/17/2003 | 8 | ANSWER to Complaint, and CROSSCLAIM against City of Springfield by Peabody Construction Co., Inc..(Lindsay, Maurice) (Entered: 11/17/2003) |
| 10/22/2003 | 7 | SUMMONS Returned Executed City of Springfield served on 9/29/2003. Answer due 11/14/2003. Peabody Construction Co., Inc. served on 10/14/2003. Answer due 11/3/2003. (Finn, Mary) (Entered: 10/22/2003) |
| 10/16/2003 | | Judge Michael A Ponsor : Endorsed ORDER entered granting 5 Motion to Extend Time to respond. (Lindsay, Maurice) (Entered: 10/17/2003) |
| 10/16/2003 | 6 | NOTICE of Appearance by Edward M. Pikula on behalf of City of Springfield (Lindsay, Maurice) (Entered: 10/16/2003) |
| 10/16/2003 | 5 | MOTION to Extend Time to 11/14/03 to respond to complaint by City of Springfield.(Lindsay, Maurice) (Entered: 10/16/2003) |
| 10/02/2003 | 4 | NOTICE of Appearance by Steven B. Kaplan on behalf of Electrical Contractors, Inc. filed. (Finn, Mary) (Entered: 10/02/2003) |
| 09/26/2003 | | Summons Issued as to City of Springfield, Peabody Construction Co., Inc.. (Lindsay, Maurice) (Entered: 09/26/2003) |
| 09/25/2003 | | Judge Michael A Ponsor : ENDORSEDORDER entered granting 3 Motion for Leave for Steven B. Kaplan to Appear Pro Hac Vice Added Steven B. Kaplan for Electrical Contractors, Inc.; cc/cl. (Finn, Mary) (Entered: 09/25/2003) |
| 09/25/2003 | 3 | P's motion for leave for Steven B. Kaplan to appear Pro Hace Vice filed. Filing fee of $50.00 paid. Receipt number 305360. (Finn, Mary) (Entered: 09/25/2003) |
| 09/25/2003 | 2 | NOTICE of Appearance by Christopher W Huck on behalf of Electrical Contractors, Inc. filed. (Finn, Mary) (Entered: 09/25/2003) |
| 09/25/2003 | 1 | COMPLAINT against City of Springfield, Peabody Construction Co., Inc. filed by Electrical Contractors, Inc. Filing Fee of $150.00 paid. Receipt #: 305360. CF, LR 4.1, notice of lawsuit and waiver of service of summons to Counsel.(Finn, Mary) (Entered: 09/25/2003) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 09/12/2005 12:57:34 | | |
| PACER Login: | dh0334 | Client Code: | |
| Description: | Docket Report | Search Criteria: | 3:03-cv-30231-MAP |
| Billable Pages: | 7 | Cost: | 0.56 |

ex. C.

## UNITED STATES DISTRICT COURT
### DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| ELECTRICAL CONTRACTORS, INC. | ) | CIVIL ACTION NO. |
| | ) | No. 03–30231MAP |
| | ) | |
| v. | ) | |
| | ) | |
| PEABODY CONSTRUCTION CO., INC. | ) | |
| & THE CITY OF SPRINGFIELD | ) | December 1, 2003 |

## AFFIDAVIT OF WILLIAM FLYNN, Jr.

STATE OF CONNECTICUT)
                     ) ss. December 1, 2003
COUNTY OF HARTFORD )

William J. Flynn, Jr., being duly sworn, hereby subscribes to the following:

1.     I am over the age of eighteen years and believe in the obligation of an oath.

2.     At all times relevant hereto, I have been the Vice-President of the plaintiff, Electrical Contractors, Inc. ("ECI"). In that capacity, I supervised and participated in the bidding and performance of ECI's work for the Naismith Memorial Basketball Hall of Fame Project, helped prepare the various claim correspondence referenced herein, and am thoroughly familiar with all of the issues raised by ECI in this lawsuit.

1

3.      I am familiar with the matters and circumstances involved in ECI's Complaint n

this lawsuit and the allegations of the Complaint are true to the best of my knowledge and belief.

4.      I am familiar with the Motion for Order of Deposit filed by ECI of even date

hereof, and believe that the following facts support the granting of that motion.

5.      By written contract dated July 25, 2000, following a competitive public bid per

Mass.G.L. c.30, §39M, Peabody Construction Co., Inc. ("PCC"), as general contractor, entered

into a contract with the City of Springfield ("the City'), as the owner/awarding authority, for

the construction of the Naismith Memorial Basketball Hall of Fame Project. The original

amount of the general contract was $32,907,395.00; with approved change orders to date, the

adjusted contract amount is approximately $34,617,140.00.

6.      By written contract dated July 21, 2000, ECI entered into a subcontract with

PCC whereby ECI, as the filed electrical subcontractor, agreed to perform the electrical work

for the Hall of Fame Project. The original subcontract amount was $4,138,810.00; with

approved change orders to date, the adjusted subcontract amount is $4,740,111.50. The

contract start date for ECI's work was on or about July 21, 2000, with 570 calendar days

allotted for a completion date of February 10, 2002.

7.      Due to acts, errors, and omissions of Peabody and the City and other events that

were beyond the control of ECI, plaintiff was unable to substantially complete its work until on

or about July 31, 2002, and could not complete all of its work until on or about October 25,

2002. In total, ECI's work took approximately 741 calendar days for completion, an overrun of

2

about 171 days.

8.    Despite repeated demand for payment, ECI is presently owed approximately $143,768.75 in approved contract balances and retainage, which defendant Peabody has wrongfully failed and refused to pay.

9.    Throughout the prosecution of ECI's work on the Project, PCC ordered ECI on numerous occasions to provide extra labor and materials for a variety of work beyond the scope of ECI's subcontract, which ECI provided in expectation of being paid and for which ECI submitted individualized change order requests.  PCC has benefited from this work by ECI, and either has failed to pay the full amount due to ECI, or has failed to pay ECI any amount at all for many of these numerous items of extra work.  These unpaid "change order" amounts presently total $207,469.48, and despite repeated demand by ECI, PCC has wrongfully failed and refused to pay such amounts to ECI.

10.    In addition to the foregoing, ECI has repeatedly requested direction from PCC since at least February 2003 (and earlier)  as to whether the City wants ECI to provide certain attic stock ("spare materials") that is specified in the contract.  In April 2003, ECI offered a credit in the amount of $71,804.00—the quoted value of these materials from our supplier—if PCC/the City no longer required this attic stock.  We also agreed to order these materials if the City would agree to immediately pay for them upon delivery.  ECI has received no direction on this item since February 2003.

11.    The Project specifications and plans were developed by the City and its agents,

3

and were furnished to ECI by the City for purposes of bidding and performing the electrical

work on the Project.   The Project specifications and plans were made part of the subcontract

between ECI and Peabody, and also were subject to the requirements and provisions of

Mass.G.L. c.30, §39M.

      12.     In §2.27, ¶A-D, at pp. 16000-92 & 93, the specifications require, in part, the

following:

> 1.  LED-based lighting fixtures to use Chromacore™ Technology, shall be of
> one manufacturer to insure compatibility. It shall be manufactured by Color
> Kinetics, Inc. or an approved equal.

The specifications for the LED-based lighting fixtures was in fact an illegal "proprietary"
specification that  violated the provisions of Mass.G.L. c.30, §39M(b), including but not limited
to the following:

> (a)  The specifications were not written so as to provide for full competition for
> each item of material to be furnished under the contract;
>
> (b)  The specifications failed to provide for either a minimum of three named
> brands of material or a description of material which can be met by a
> minimum of three manufacturers;
>
> (c)  The specifications failed to provide sufficient information by which the
> electrical subcontractor could submit and procure an "equal" product, as
> defined under the statute;
>
> (d)  The awarding authority failed to provide sound reasons in the public interest,
> stated in writing in its public records after reasonable investigation,  for failing
> to adhere to the statutory prescriptions.

      13.     Commencing in November 2000, and thereafter, ECI complained to Peabody, and

the City, on several occasions that the listed manufacturer for the LED lighting, Color Kinetics,

4

was creating problems in procurement and imposing demands at variance with the contract specifications. ECI specifically requested that it be allowed to pursue alternate manufacturers of these products that could accomplish the same design intent. ECI was instructed by Peabody and the City, through its project architect, in no uncertain terms that no substitution for the Color Kinetics products would be entertained, and that any such attempt by ECI would be summarily rejected. As a result, ECI was forced to purchase the LED lighting from Color Kinetics, through its distributor and sole manufacturer's representative, at a substantially increased price from what it would have cost ECI to either procure a comparable product from another manufacturer, or what it would have cost to purchase the same Color Kinetics system if there had been open competition on these items.

14.     As a further result of these illegal "proprietary" specifications, the manufacturer's representative for the Color Kinetics product was permitted to act as a sole source of procurement for the product, and also refused to break out separate pricing for the Color Kinetics product apart from the entire lighting fixture package, which included dozens of other products as well. Thus, ECI was forced to purchase all of the light fixtures specified for the Project through the factory representative for Color Kinetics, thereby causing ECI to unnecessarily expend hundreds of thousands additional dollars to purchase the fixtures on a sole source procurement basis.

15.     ECI likewise was told by PCC and the City, through its project architect, that substitutions would not be allowed on numerous other electrical items, and in fact many of ECI's attempts to substitute "equal" products were wrongfully rejected by PCC and the City. In many

other instances, when ECI attempted to submit and purchase items that had been explicitly listed in the specifications and plans, these items were wrongfully rejected by PCC and the City because they were not the "first" listed or "preferred" item. Moreover, in many instances PCC and the City forced ECI to provide additional features to the lighting fixtures that were not called for in the contract specifications or plans.   As a result, ECI incurred additional costs of procuring and providing the lighting fixtures for the Project in the amount of approximately $396,902.00.

16.    There also were numerous errors, deficiencies, and incomplete elements of the design for the Project that required ECI to expend substantially more labor hours than it reasonably anticipated in order to complete its work.  PCC and the City repeatedly failed to review and approve ECI's submittals for products and materials in a timely fashion, and also failed and refused to follow the statutory and contractually prescribed requirements for specifying and approving products and materials, as per Mass.Gen.L. c.30, §39M(b).  PCC and the City also added scores of change orders to ECI's contract work, and also required ECI to perform numerous items of work beyond the scope of its subcontract without issuing or approving change orders for same.

17.    In August 2001, vandals broke into the Project and damaged a significant amount of ECI's work in place, as well as stealing or destroying important project documents. On  numerous occasions, ECI requested that Peabody extend the time period for completing ECI's work as a result of the foregoing items.  Peabody wrongfully failed to issue any time extension whatsoever to ECI to complete either its original contract work, or the work added by

this plethora of problems and changes to ECI's original contract work.

18.    Due to the foregoing, ECI was forced to expend approximately 7900 additional labor hours to complete the work than it had originally anticipated, at an increased cost of approximately $394,873.13.

19.    ECI believes that PCC and the City knew, or should have known, that the Project plans and specifications were incomplete and deficient when they were put to bid, and that there would be numerous delays and interruptions to ECI's work as a result. Notwithstanding same, PCC and the City failed to extend the time for ECI to complete its work, failed to provide ECI with reasonable and sufficient access to the site so that it could perform its work in a timely fashion, forced ECI to perform its work out of sequence, repeatedly interrupted ECI in the reasonable prosecution of its work, and effectively interfered with the reasonable prosecution of ECI's work. PCC's and the City's actions were willful, arbitrary and capricious in this regard. As a result, ECI was forced to accelerate and compress the performance of both its original contract work and the work added by Peabody and the City, thereby causing it to incur the additional labor costs cited above, as well as extended, unabsorbed home office expenses of approximately $189,361.00.

20.    On December 9, 2002, ECI sent to PCC its Claim Summary, with detailed discussion regarding amounts due for extra work/unresolved change orders ($314,190.00), and extra labor and materials resulting from design deficiencies, fixture problems, and other problems encountered on the Project by ECI ($1,050,552.60.) (Copy attached hereto as "Ex.

7

1.") This Claim was sent to the City by ECI's counsel on December 10, 2002 (see "Ex. 2," attached hereto.)

    21.    Pursuant to Mass. G.L. c.30, §39F, ECI issued a Demand for Direct Payment to the City on December 19, 2002. (Copy attached hereto as "Ex. 3.") Pursuant to that Demand, which incorporated by reference the December 9, 2002 Claim (Ex. 1), and in compliance with the applicable provisions of the statute, ECI indicated the following:

    (a)    It had substantially completed its work on or about July 31, 2002, and had completed all of its work on or about October 25, 2002;

    (b)    At that time, it was owed $225,249.06 in retainage (contract balances); $314,189.68 for a multitude of unresolved change orders (extra labor and materials); and $1,050,332.60 for extra costs, consisting of $383,371.97 for added labor, $466,098.00 in added fixture costs, $11,501.16 for small tools, and $189,361.47 in additional home office overhead. The total amount claimed as being owed by ECI for work performed under the subcontract was $1,589,771.20.

    22.    By letter dated December 30, 2002 (copy attached hereto as "Ex. 4"), PCC replied to the ECI demand for direct payment. Contrary to the requirements of §39F, this reply was not a "sworn statement" and did not "contain a detailed breakdown of the balance due under the subcontract including any amount due for extra labor and materials furnished to the general contractor." PCC stated that a "balance due of $122,857.46 will be paid upon rejection of the direct payment claim or ECI's rescinding their direct payment claim." This was a patently illegal position, and ECI believes it was tantamount to attempted extortion.

    23.    By letter dated January 6, 2003 (copy attached hereto as "Ex. 5"), PCC attempted to cure some of these deficiencies by amending its reply. This letter was sworn before a notary

8

public, but contained no further detailed breakdown of amounts due—except that it included new math that now reduced the admitted amount due to ECI to $42,076.73. ECI does not believe that this letter from PCC should have been considered by the City because it was issued more than ten days after PCC's receipt (12/23/02) of ECI's demand, as per §39F(1)(d).

24.    By letter dated January 6, 2003 (copy attached hereto as "Ex. 6"),  ECI's counsel responded to the first PCC resply (Ex. 4), and detailed to the City the deficiencies therein.  ECI reviewed the statutory requirements and reiterated the components of its demand for direct payment and/or deposit into a joint interest bearing account.

25.    The City responded by letter dated January 7, 2003 (w/attachments) (copy attached hereto as "Ex. 7").  The City characterized the December 30, 2002 reply from PCC, as amended on January 6, 2003, as disputing the entire amount in demand, and engaged in an extended discussion of this dispute.  Putting aside the merits of the City's arguments and assuming  that the PCC responses were proper under the statute, the City failed to recognize that it still was required under §39F(1)(f) to deposit into an interest-bearing joint account for ECI/PCC the amount deducted from the direct payment demand due to the disputed issues raised by PCC.  Further, under §39F(1)(g), all direct payments or amounts deposited should have been "made out of amounts payable to the general contractor at the time of receipt of a demand for direct payment from a subcontractor and out of amounts which later became payable to the general contractor." The City entirely ignored this responsibility, and has continued to do so to date.

26.    The City also claimed in its response that it had no obligation to either pay or

9

deposit such funds because these amounts did not constitute "the balance due" under the subcontract. The City contended that until it properly processed all paperwork for approved change orders, "the funds are not 'payable' to Peabody and cannot be released." Likewise, the City claimed that disputed items, whether for change orders or other damages, are not "due" under the contract and likewise are not subject to the statutory requirements of deposit into a joint account. The City's refrain was that "ECI's demand does not represent the *balance due under the subcontract* including any amount *due* for extra labor and materials furnished to the general contractor." This position violates the express terms of §39F(1)(f) & (g).

      27.    ECI's legal counsel responded on several particular points to the City by letter of January 10, 2003 (copy attached hereto as "Ex. 8"). Primarily, that letter indicated that all supposed issues of "incomplete work" by ECI, other than the attic stock issue, had already been resolved. There simply have been no other incomplete items of work by ECI since January 2003.

      28.    ECI has contended that neither of the PCC responses should have been considered at all by the City, and per §39F(1)(e), direct payments should have been made to ECI. Nonetheless, the City either should have made direct payments to ECI or made deposits into a joint account as amounts came due to PCC. Yet at no time since receipt of ECI's Demand for Direct Payment has the City made any payment directly to ECI or deposited any funds into an interest-bearing joint account in the names of ECI and Peabody. Rather, since ECI's Demand for Direct Payment of December 19, 2002, the City has paid PCC at least the sum of $1,026,565.00 under the general contract. (See Ex. 9, attached hereto. Canceled checks to PCC

10

from the City from 3/4/03 to 5/20/03 total this amount.  PCC Payment Certificates #27-29

indicate that $1,041,746 was paid to PCC .)  ECI believes that additional payments to PCC from

the City are forthcoming.

29.     In turn, PCC has paid ECI a total of $216,194.80 since the December 2002

Demand for Direct Payment was issued.

30.     By its acts and omissions, the City violated the provisions of Mass.G.L. c.30,

§39F, including but not limited to the following:

(a)     Within fifteen days after receipt of the Demand, it failed to make direct payments of any amount to ECI, whether for the balance due under the subcontract or for any amount due for extra labor and materials furnished by ECI to the general contractor;

(b)     Thereafter, and up to the present time, it has failed to make direct payments of any amount to ECI, whether for the balance due under the subcontract or for any amount due for extra labor and materials furnished by ECI to the general contractor;

(c)     It has wrongfully failed to deposit any amount at any time into an interest-bearing joint account in the names of ECI and Peabody in regard to amounts claimed by ECI for direct payment;

(d)     It wrongfully considered statements by Peabody, the general contractor, that did not comport with the requirements of the statute, as a basis for not making the requisite direct payments to ECI or establishing the requisite joint account;

(e)     It wrongfully asserted as a basis for the foregoing failures that the amounts claimed due by ECI were not subject to the statute because the City had not yet determined that they were "due";

(f)     It made payments directly to Peabody in derogation of its statutory obligation to either make such payments directly to ECI or deposit such amounts into

11

an interest- bearing joint account in the names of ECI and Peabody.

31.    To date ECI is still owed approximately $143,768.75 in approved contract balances; $207,469.48 for a multitude of unresolved change orders (extra labor and materials; and $981,136.60 for extra costs, consisting of $383,371.97 for added labor, $396,902.00 in added fixture costs (net of the attic stock credit), $11,501.16 for small tools, and $189,361.47 in additional home office overhead. This totals $1,332,374.80.

Further, Affiant sayeth not.

_William J. Flynn, Jr._

On December 1, 2003, before me appeared William J. Flynn, Jr., who subscribed and swore before me to the truth of the foregoing.

_Steven B. Kaplan_
Commissioner of the Superior Court

12

## CERTIFICATION

I hereby certify that a copy of the foregoing, with exhibits, was sent, postage prepaid, on the 1st

day of December, 2003, to all counsel and parties of record as follows:

> Edward M. Pikula, Esq.
> City of Springfield Law Department
> 36 Court Street
> Springfield, MA 01103
>
> Edward A. Vena
> Charles Plunkett, Esq.
> Vena, Riley, Deptula LLP
> 250 Summer Street
> Boston, MA 02210

Steven B. Kaplan

13

ex. D



*Electrical Contractors, Inc.*

STATE LIC. #102800, #103327
3510 MAIN ST.   HARTFORD, CONNECTICUT 06120
(860) 549-2822   FAX (860) 549-7948
E.O.E. M/F
e-mail: Info@ECIncorporated.com

November 3, 2000

**Peabody Construction Company**
536 Granite Street
Braintree, Massachusetts  02184-9107

Attn: Thomas Denney, Project Manager

Re: Naismith Memorial Basketball Hall of Fame
      Springfield, Massachusetts

Dear Tom:

In order to comply with the guidelines and requirements of specification "Product Requirements" section 0600-2.2-A, Timing, we are requesting that the "substitutions" or "comparable product requirement period be extended 30 days beyond the 60 days requirement.

We are expecting the following sections to need at least "substitutions" or "comparable products".
Section 16000-2.22 Lighting Control System
Section 16000-2.23 Low Voltage Dimming Meeting Room - 2nd Floor Part A
Section 16000-2.24 Dimming Cabinet / Preset Lighting Control System
Section 16000-2.25 Heat Tracing System
Section 16000-2.26 Lighting Fixtures - Fixture Schedule No. 1, Drawing E-001
Section 16000-2.27 Lighting Fixtures - Fixture Schedule No. 2, Drawing E-002 And Fixture
      Schedule No. 3, Drawing E-003
Section 16000-2.32 Fire Alarm System - Voice Evacuation Capabilities
Section 16000-2.42 Integrated Track Ceiling Grid System

This request is being generated as a direct result of ongoing discussions between Electrical Contractors, Inc., local vendors and specified manufactures.

Electrical Contractors, Inc., continues to review products proposed by vendors and specified manufactures and compile and answer questions generated by these reviews in order to ensure a complete submittal, meeting the technical specifications and design intent.

Electrical Contractors, Inc., is also requesting that an informal meeting be scheduled between Peabody, design professionals, lighting vendors and Electrical Contractors, Inc., to review and discuss issues before formally documenting same. We feel this approach is necessary due to the

ECI 06427

technical and highly integrated lighting / control package and many questions arising out of the bid specifications for these items. We are taking all possible steps to expedite bringing the lighting / control package to a conclusion incorporating the design intent and our mutual interest in achieving a highly successful project.

Please advise me of your direction on this matter and a possible meeting date.

Sincerely,

Douglas C. Maxellon
Sr. Project Manager

cc: B. Flynn, ECI VP.
    W. Bailey, ECI Superintendent
    file

ECI 06428

Ex. E



## Electrical Contractors, Inc.

STATE LIC. #102800, #103327
3510 MAIN ST.   HARTFORD, CONNECTICUT 06120
(860) 549-2822   FAX (860) 549-7948
E.O.E.  M/F
e-mail: Info@ECIncorporated.com

December 4, 2000

**Peabody Construction Company**
1000 West Columbus Ave.
Springfield, Massachusetts  01101

Attn: Thomas Denney, Project Manager

Re: Naismith Memorial Basketball Hall of Fame
       Springfield, Massachusetts

Dear Tom:

Attached is a quotation from WESCO, on the "Color Kinetics" portion of the lighting package from our supplier.

In reading you will see that "Color Kinetics" has not waived the deposit requirements for their lighting package, and to go one better they are requesting full payment prior to any shipping of equipment.

The "Exterieur Vert" manufacture listed in the quote is part of the "Color Kinetics" package and equipment and is needed to make their system work.

I think "Color Kinetics" has embarrassed the design team and owner and exploited and delayed the lighting package on this project far enough. We would like permission to pursue alternative lighting design and packages to accomplish the same intent the design team was trying to obtain with the "Color Kinetics" system.

This package as you are aware is a major percentage of the total lighting package and the inability for "Color Kinetics" to agree to the project specifications and terms is preventing ECI from finalizing the balance of the lighting package with our supplier.

ECI 06441

The "Color Kinetics" system also needs to be interconnected throughout the building with other lighting systems and will need to have conduits installed in the slabs, which at this time we cannot design.

Please review this important issue as soon as possible and provide ECI with direction.

Sincerely,

Douglas C. Maxellon
Sr. Project Manager

cc: J. Goiangos, ECI Purchasing Manager.
    W. Bailey, ECI Superintendent
    file

encl: WESCO Quot 12/04/2000

ECI 06442

WESCO HARTFORD    Fax:8602899329    Dec 4 2000  8:30    P. 01

Quick Service Quotation

This quotation constitutes an offer to sell which offer expressly limits acceptance to the terms of this offer accompanying this quotation. This offer shall be firm for a period of fifteen (15) business days from the date of this offer. Subject to Buyer's credit worthiness, the return of this form with a Purchase Order number or any other reasonable manner of acceptance will be sufficient to form an agreement on the terms and conditions accompanying this quotation.

62 VILLAGE STREET
E. HARTFORD, CT 06108
860-289-0291 BELL
860-289-9329 FAX

# WESCO

| To: | ELECTRICAL CONTRACTORS | Date: | 12/4/00 |
| | 3510 MAIN ST | Project Name: | BBFF |
| | HARTFORD.CT 06120 | Our Reference Number: | |
| Attention: | JOHN GOINAGOS | Salesperson: | JON SULLIVAN |

| Item | Quantity | Description | Price | U/M | Total | Shipping Info |
|------|----------|-------------|-------|-----|-------|---------------|
| | 1 | LOT OF LIGHTING INCLUDING: | | | | |
| | | 1-LOT OF COLOR KINETICS PER PLANS AND | | | | |
| | | SPECS INCLUDING ALL REQUIRED ITEMS FOR | | | | |
| | | TYPES MA.MAC.MAC1.MAC2,MAP AND MAP1 | | | | |
| | | 1-LOT OF EXTERIEUR VERT PER PLANS AND | | | | |
| | | SPECS INCLUDING ALL REQUIRED ITEMS FOR | | | | |
| | | TYPES MAP AND MAP1 | | | | |
| | | **LOT PRICE** | $595,000.00 | Lot | $595,000.00 | |
| | | 1)PER COLOR KINETICS THEIR PAYMENT TERMS | | | | |
| | | AS AS FOLLOW AND WILL BE FOLLOWED UP ON | | | | |
| | | THEIR LETTERHEAD | | | | |
| | | $100,000.00 DEPOSIT REQUIRED PRIOR TO FORMAL | | | | |
| | | RELEASE FOR MANUFACTURE AND SHIPMENT. | | | | |
| | | BALANCE OF $255,000.00 REQUIRED PRIOR TO | | | | |
| | | SHIPMENT OF ORDER | | | | |
| | | 2)PER EXTERIEUR VERT THEIR PAYMENT TERMS | | | | |
| | | AS AS FOLLOW AND WILL BE FOLLOWED UP ON | | | | |
| | | THEIR LETTERHEAD | | | | |
| | | $120,000.00 DEPOSIT REQUIRED PRIOR TO FORMAL | | | | |
| | | RELEASE FOR MANUFACTURE AND SHIPMENT. | | | | |
| | | BALANCE OF $120,000.00 REQUIRED PRIOR TO | | | | |
| | | SHIPMENT OF ORDER | | | | |
| | | ALL $595,000.00 OF THIS QUOTE WILL BE REQUIRED | | | | |
| | | AT THE MANUFACTURERS PRIOR TO MANUFACTURE | | | | |
| | | AND SHIPMENT OF ANY ITEMS ON THIS QUOTE | | | | |
| | | FORMAL TERMS AND CONDITIONS WILL FOLLOW | | | | |
| | | ON EACH OF THE MANUFACTURERS LETTERHEAD | | | | |
| | | 1)QUOTE VALID FOR 30 DAYS | | | | |
| | | 2)CANCELLATION FEES WILL APPLY FOR ANY | | | | |
| | | CUSTOM MATERIAL CANCELLED AFTER FORMAL | | | | |
| | | RELEASE. | | | | |

F. O. B. Point of Shipment. The prices stated in this offer shall, unless renewed, automatically expire fiftee n (15) days from the date of this offer. **Subject to approval and standard manufacturers terms and conditions.**

WESCO 

Per: _____

ECI 06443




# E*lectrical Contractors, In*c.

3510 Main Street
Hartford, Connecticut 06120
Voice: (860) 549-2822, Fax: 860-549-7948
e-mail: Doug@ECIncorporated.com

## Fax Transmission

Date: *12-04-2000*                Fax No: _____

To: *Tom Denney*

From: Douglas C. Maxellon, Senior Project Manager

Reference: *BBHF*

Subject: _____

*See attached letter.*

Number Of Pages Including This Cover Sheet: *4*
If you do not receive all pages, please contact: Electrical Contractors, Inc.
860-549-2822, Douglas C. Maxellon

**CONFIDENTIALITY NOTICE:** THIS FACSIMILE, TOGETHER WITH ANY AND ALL DOCUMENTS ACCOMPANYING IT CONTAINS INFORMATION WHICH IS CONFIDENTIAL AND PRIVILEGED. THE INFORMATION IS INTENDED TO BE USED ONLY BY THE INDIVIDUAL OR ENTITY NAMED ON THE COVER SHEET. IF YOU ARE NOT THE INTENDED RECIPIENT, BE AWARE THAT ANY DISCLOSURE, REPRODUCTION, DISTRIBUTION OR USE OF THE CONTENTS OF THIS FACSIMILE INFORMATION IS PROHIBITED. IF YOU HAVE RECEIVED THIS FACSIMILE IN ERROR, PLEASE NOTIFY US COLLECT, BY TELEPHONE IMMEDIATELY, SO THAT WE CAN ARRANGE FOR THE RETRIEVAL OF THE DOCUMENT(S) AT NO COST TO YOU.

ECI 06444

ex. F

COPY

April 14, 2003

Steven B. Kaplan, Esq.
Michelson, Kane, Royster & Barger, PC
93 Oak Street
Hartford, CT  06106

**Re:**    *Electrical Contractors, Inc./ Basketball Hall of Fame*

## STATEMENT OF CHAPMAN THOMSON

Dear Mr. Kaplan:

Per your request, what follows is my statement of facts regarding my involvement in bidding the lighting package for Electrical Contractors, Inc. for the Basketball Hall of Fame Project.  It is my understanding that ECI is meeting with representatives of the City of Springfield on April 23, 2003 to discuss these, and other, matters.   I would have attended this meeting at ECI's request to personally discuss these matters, except that I will be out of the country on a long-planned vacation at that time. All of the facts in the following statement are true to the best of my knowledge and belief, and I would be happy to testify, under oath, to these statements if the need arises.

I am the Sales Manager at The Beacon Light & Supply Co. in Hartford, CT.  I have been in the electrical supply business for thirty-nine years. I have been employed in my present position at Beacon Light for six years.  I was sales manager at two other prominent Hartford supply houses for the previous fifteen years.  For about twenty-five years, I have been preparing estimates for various materials, equipment and fixture  packages for major (and smaller) electrical contractors in Connecticut and Massachusetts.  On those projects where my firm has been the successful bidder/vendor, I have managed the contract and purchase/supply of the materials and equipment.

Some of the more substantial projects with which I have been involved recently as the electrical materials supplier are:     Mullins Center at UMASS, Amherst;  Gampel Pavilion at UCONN, Storrs;  Legislative Office Building, Hartford;  State Capitol, Hartford; Sea Aquarium, Mystic, CT; UCONN Health Center, Farmington, CT.

I have worked with ECI on significant projects in the past and am familiar with their bidding practices.  The approach I took to bidding the lighting package to ECI for the Basketball

ECI 04347

Hall of Fame project was similar to the approach I always take on major projects for ECI, as well as for other major contractors.

For the Hall of Fame Project, I reviewed the plans and specifications and proceeded to take off the lighting fixture package so that I could provide a bid price to ECI. I knew that if ECI decided to rely on my bid price, and if they were then awarded the project by the owner, then I would be obligated to enter into a contract with ECI to provide the lighting packages at my bid price (if not lower, through the "buy-out" process). I finalized my take-off on April 26 (see attached) and called my price in to ECI's vice-president, Leo Christmas, who manages their estimating department. I told Mr. Christmas that my "buy" price for the lighting packages was $1,248,570.00, and suggested that he use $1,300,000.00 as a bid price for those items. I suggested this slightly increased figure (about 5%) as a cushion factor, which was something that we customarily do when bidding larger projects. It is my understanding that ECI followed my advice and did in fact use this $1.3 million dollar figure as part of its bid for the project.

My take-off sheets for compiling this estimate, and reaching the price of $1,248.750.00 included all of the specified items—without substitution. In many instances, two or more alternative suppliers were listed in the specifications; I used one of these specified suppliers in each case. There is little question in my mind that if ECI had been allowed to use the suppliers that I used in my estimate—again, specified suppliers—the lighting packages could have been bought out at a final price of $1.3 million dollars, if not less.

In preparing my estimate, I followed my usual practice of speaking with and getting pricing from the various manufacturer's representatives for the products that had been specified. I was very troubled to learn in this process that the lighting designer apparently had indicated that only the first specified items would be accepted—despite the fact that in numerous cases, two or more manufacturers were specified. Quite simply, the common understanding among the suppliers and manufacturer's representatives was that the lighting designer was treating this project as a proprietary specification, and was going to reject submissions of numerous products that were expressly named in the specifications. Not only would no substitutions be considered, but many of the specified products would be rejected.

Prior to the bid, I reported this information to ECI, and at their request, nonetheless put my bid together—again based on items that were specified in the project documents. I agreed with ECI at the time that especially on a public project, bidders were entitled to submit their bids based on the items specified in the bid documents.

I did encounter some problems in procuring prices for some of the specified items, particularly the fixtures for the outside of the building (Color Kinetics). There was very little detail for these items provided in the plans and specifications. It appeared that the design for many of the lighting items had not been completed when the project was let to bid. Moreover, both the

2

manufacturer's rep and the manufacturer for Color Kinetics refused to break out the pricing for the various components of the outside lighting system. Pricing for the Color Kinetics system was being carried only via a lump sum price for all of the project fixtures by one of the distributors. This was highly unusual, and indicated to me that this was not the normal, or proper, competitive bidding situation.

For the exterior lighting system, I took off the individual components myself based on the information that was available in the bid documents. I arrived at a reasonable price based on the individual components of this system, and used that price in my overall estimate.

I must observe that in my 39 years in this business, this as the worst engineered set of bid documents for a major project that I have ever seen. The electrical plans were plainly deficient as to the necessary detail for the fixture packages. It is my understanding that many design elements for the lighting fixtures that should have been included in the bid documents were not provided to ECI until after the job was awarded.

After ECI was awarded the project, they concluded that they were going to have tremendous problems with the lighting designer in getting approvals on items I had used in my estimate—despite the fact that these items were specified in the bid documents. It is my understanding that ECI made the business decision to submit and purchase the fixture packages that the designer had indicated it would approve, and accordingly used a different vendor (not my firm) to supply those materials. In essence, ECI incurred the additional expense of purchasing materials at a higher price because it recognized early in the submittal process that the designer would not permit it to purchase less expensive items that nonetheless had been specified.

If you require further information or detail on these issues, please call me.

Very truly yours,

Chapman Thomson

3

ECI 04349




**WESCO**
the extra
effort people

82 Village Street
East Hartford, CT 06108
(860) 289-0291
FAX (860) 289-9329

December 18, 2000

Electrical Contractors Inc.
3510 Main St.
Hartford, Ct. 06120

RE: Basketball Hall of Fame Lighting Package

Attention: John Goiangos

Dear John,

Based on the struggle that we have had in getting agreement on purchase orders for the lighting on this project, it is with great regret that I must inform you that we will not be able to honor the $1,395,000.00 quote that we given to you on 11/17/00.

There are a variety of reasons behind this decision. One reason is that we cannot get from Lighting Affiliates the proper pricing to back up our quotation. Another important reason is that we cannot justify the time we would spend trying to get a package approved that all indications are will not get approved. It also appears to us that the support we would receive from your company in trying to get this substitute package approved would not be sufficient to achieve this task.

As you know we have already voided the previous quote by agreeing to use the specified ETC dimming in lieu of the Colortran that was going to be submitted as a substitute.

In it's place we offer a revised price for the specified package for $1,621,000.00 based on the enclosed quotation. With that quote are deducts for various cost savings that will be your responsibility to get approved and if approved will be deducted off of the purchase order amount.

It is our opinion that the revised quotation represents what the package is actually worth and would be the price after all substitution attempts would be made to the owner.

I apologize that this has to be done and I hope that you understand the reasoning behind our decision. Please feel free to call us if you have any questions.

Sincerely,

Jon Sullivan
Construction Sales

c.c. Ken Violette Wesco Branch Manager

*Ltg. Affiliates*
*721-1171*

*Came back 2'nd Time*
*Coating, Equal,*
*Samples.-*
*1st time it came back. Dang foot*
*Care of*

ECI 06430



Quick Service Quotation

This quotation constitutes an offer to sell which offer expressly limits acceptance to the terms of this offer accompanying this quotation. This offer shall be firm for a period of fifteen (15) business days from the date of this offer. Subject to Buyer's credit worthiness, the return of this form with a Purchase Order number or any other reasonable manner of acceptance will be sufficient to form an agreement on the terms and conditions accompanying this quotation.

62 VILLAGE STREET
E. HARTFORD, CT 06108
860-289-0291 BELL
860-289-9329 FAX

# WESCO

| To: | ELECTRICAL CONTRACTORS INC | Date: | 12/18/00 |
| | 3510 MAIN ST | Project Name: | BASKETBALL HALL OF |
| Attention: | HARTFORD, CT 06120 | Our Reference Number: | FAME |
| | JOHN G | Salesperson: | JON SULLIVAN |

| Item | Quantity | Description | Price | U/M | Total | Shipping Time |
|------|----------|-------------|-------|-----|-------|---------------|
| | 1 | LOT OF LIGHTING INCLUDING: | | | | |
| | | 212·FS1 16·FS2 2·FS3 2·FS4 1·FR1 1·FR2 7' 1·FR2 10' | | | | |
| | | 5·FR2 11' 2·FR2 12' 1·FR2 14' 2·FR2 20' 20·FR3 3' | | | | |
| | | 33·FR3 4' 70·FR4 18·FR5 7·FR6 28·FP 16' 1·LT1 8' | | | | |
| | | 1·LT1 12' 8·LT1 HEAD 114·R1 2·R2 30·R3 2·R4 4·R5 | | | | |
| | | 35·R6 8·R7 4·R8 7·S1 1·S2 10·S3 59·W1 9·W2 4·W3 | | | | |
| | | 2·W4 1·X1 19·X2 30·X4 57·X5 6·X6 16·EB 1·EB1 | | | | |
| | | 16·MA 4' 16·MA 8' 16·MA 12' 16·MA 16' 64·MA POWER | | | | |
| | | SUPPLY 326·ME 2·MG 58' 2·MG 65' 1·MG·2 7' 1·MG·2 9' | | | | |
| | | 1·MG·2 17' 1·MG·2 21' 286' MG 65' 1·MG·2 7' 1·MG·2 9' | | | | |
| | | 31·MI·1 HEADS 4·MI·1 FEEDS 38·MJ HEADS 76·MJ·2 | | | | |
| | | 40·MK 68·ML·1 ML TRFR 68·ML·1 1·MI·1 TRFR | | | | |
| | | 68·ML·2 1·ML·2 TRFR 33·MO 22·MR 21·MS 48·MU·9' | | | | |
| | | 24·MU·16' 72·MU FEEDS 4·MU·1 5' 4·MU·1 6' | | | | |
| | | 14·MU·1 20' 45·MU·2 1' 6·MU·2 5' 1·MU·2 6' 1·MU·2 7' | | | | |
| | | 2·MU·2 8' 18·MU·2 9' 1·MU·2 11' 184·MU·2 12' | | | | |
| | | 3·MU·2 13' 10·MU·2 14' 4·MU·2 16' 273·MU·2 FEEDS | | | | |
| | | 2·MU·3 15' 2·MU·3 FEEDS 2·MX 36·MX·1 | | | | |
| | | 8·MX·2 35·MAC 8·MAC·1 7·MAC 2 6·MAE 34' 6·MAE | | | | |
| | | POWER SUPPLY 12·MAM 83·MAO | | | | |
| | | 813·MAP 95·MAP POWER SUPPLY 71·MAP·1 25·MAQ | | | | |
| | | 2·MAR 75' 1·MAR·1 90' 1·MAR·1 155' 1·MAR·1 200' | | | | |
| | | 13·MAR·1 TRFR 1·MAS 17' 1·MAS·18' 1·MAS 19' | | | | |
| | | 1·MAS 47' 1·MAS 56' 102·MAT 22·MAT·1 14·MAU | | | | |
| | | 112·MAU·1 12·MAV 362·MAZ 1·MBA 25' 14·MBG | | | | |
| | | 240·MBH 1080·MBJ 1·LV DIMMING SYSTEM FOR | | | | |
| | | 2ND FL MEETING ROOM 1·GARAGE DIMMING SYS | | | | |
| | | 1·LOT OF ETC PER ENCLOSED BILL OF MATERIAL | | | | |
| | | **LOT PRICE WITH LAMPS** | $1,621,000.00 | Lot | $1,621,000.00 | |
| | | | | | | |
| | | **NOTES AND EXCEPTIONS** | | | | |
| | | 1)PRICE BASED ON WESCO STANDARD TERMS | | | | |
| | | AND CONDITIONS | | | | |
| | | 2)SPARE FIXTURES, LAMPS, BALLASTS ETC. | | | | |
| | | ARE NOT INCLUDED. | | | | |
| | | 3)SOLITE GLASS IS NOT INCLUDED FOR TYPES MAZ | | | | |
| | | OR MBA | | | | |
| | | 4)PEDESTRIAN LIGHT BOX BY OTHERS/SUPPLYING | | | | |
| | | MBH AND MBJ FIXTURES AND LAMPS ONLY | | | | |
| | | **CONTINUED** | | | | |

F. O. B. Point of Shipment. The prices stated in this offer shall, unless renewed, automatically expire fifteen (15) days from the date of this offer. **Subject to approval and standard manufacturers terms and conditions.**

Per _____

WESCO 

ECI 06431

Quick Service Quotation



This quotation constitutes an offer to sell which offer expressly limits acceptance to the terms of this offer accompanying this quotation. This offer shall be firm for a period of fifteen (15) business days from the date of this offer. Subject to Buyer's credit worthiness, the return of this form with a Purchase Order number or any other reasonable manner of acceptance will be sufficient to form an agreement on the terms and conditions accompanying this quotation.

62 VILLAGE STREET
E. HARTFORD, CT 06108
860-289-0291 BELL
860-289-9329 FAX

# WESCO

| To: | ELECTRICAL CONTRACTORS INC | Date: | 12/16/00 |
| | 3510 MAIN ST | Project Name: | BASKETBALL HALL OF |
| | HARTFORD, CT 06120 | Our Reference Number: | FAME |
| Attention: | JOHN G. | Salesperson: | JON SULLIVAN |

| Item | Quantity | Description | Price | U/M | Total | Shipping Date |
|------|----------|-------------|-------|-----|-------|---------------|
| | | **NOTES AND EXCEPTIONS CONTINUED** | | | | |
| | | 5)COLRKINETICS AND EXTERIEUR VERT PAYMENT | | | | |
| | | TERMS ARE NET 30 DAYS AND THE 30 DAYS STARTS | | | | |
| | | AT SHIPMENT TO ANY SITE IN US(IE MICHAEL'S ELEC SUPPLY) | | | | |
| | | 6)NO SAMPLES OR MOCKUPS ARE INCLUDED | | | | |
| | | 7)ALL LOW VOLTAGE TERMINATIONS FOR DIMMING | | | | |
| | | AND LIGHTING CONTROL SYSTEMS ARE BY OTHERS | | | | |
| | | 8)NO CORNERS OR ANGLES ARE AVAILABLE FOR | | | | |
| | | TYPES FR3 AND MG-3 | | | | |
| | | 9)ILST SIGN TRANSFORMERS ARE INCLUDED | | | | |
| | | AS EDWARDS 88-50 BASED ON VERBAL INFO GIVEN | | | | |
| | | 10)PRICING IS BASED ON THIS B.O.M. AND THE | | | | |
| | | QUANTITIES AND TYPES LISTED HEREIN. ALL | | | | |
| | | OTHERS ARE ASSUMED TO BE BY OTHERS AND ARE | | | | |
| | | NOT INCLUDED | | | | |
| | | 11)NO NEMA 3R ENCLOSURES FOR TRANSFORMERS | | | | |
| | | INCLUDED | | | | |
| | | 12)SPECIFIED ETC DIMMING IS INCLUDED IN THIS PRICE | | | | |
| | | 13) THE FOLLOWING POTENTIAL COST SAVINGS ARE | | | | |
| | | OFFERED AND ARE THE RESPONSIBILTY OF ECI TO GET | | | | |
| | | APPROVED: | | | | |
| | | a)TYPE MAR AND MAR1 DEDUCT $25,000.00 TO SUPPLY ARDEE | | | | |
| | | IN LIEU OF THE SPECIFIED B'LIGHT | | | | |
| | | b)TYPE MAT,MAT1,MAU AND MAU1 DEDUCT $9,000.00 TO | | | | |
| | | SUPPLY WINSCAPE IN LIEU OF THE SPECIFIED BK LIGHTING | | | | |
| | | c)TYPE MAC,MAC1 AND MAC2 DEDUCT $20,000.00 TO | | | | |
| | | SUPPLY DIVERSIFIED IN LIEU OF THE SPECIFIED HESS LTG | | | | |
| | | d)TYPE ME,MAM,MS,MX,MX1 AND MX2 DEDUCT $12,000.00 | | | | |
| | | TO SUPPLY PORTFOLIO IN LIEU OF THE SPECIFIED | | | | |
| | | EDISON PRICE LIGHTING | | | | |

F. O. B. Point of Shipment. The prices stated in this offer shall, unless renewed, automatically expire fifteen (15) days from the date of this offer. **Subject to approval and standard manufacturers terms and conditions.**

WESCO

By: _____

ECI 06432

ex. H

1

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

C.A. No. 03-30231-MAP

ELECTRICAL CONTRACTORS, INC.,                    )
               Plaintiff                             )
VS.                                              )
                                                 )
PEABODY CONSTRUCTION CO., INC.                   )
             Defendant and                          )
AND THE CITY OF SPRINGFIELD,                     )
             Defendant and                          )
             Third-Party Plaintiff                   )
VS.                                              )
                                                 )
TRAVELERS CASUALTY AND SURETY                    )
COMPANY OF AMERICA, GWATHMEY,                    )
SIEGEL ASSOCIATES ARCHITECTS, LLC,               )
SCENIC TECHNOLOGIES, AND BARGMANN,               )
HENDRIE + ARCHETYPE, INC.,                       )
             Third-Party Defendants                  )

DEPOSITION OF WILLIAM FLYNN, taken

before Debra Vance, Notary Public Stenographer,

pursuant to the provisions of Rule 30 of the

Massachusetts Rules of Civil Procedure, at the

offices of ACCURATE COURT REPORTING, 1500 Main

Street, Springfield, Massachusetts on February 2,

2005, commencing at 10:00 a.m.

  APPEARANCES:   (See Page 2)

Debra A. Vance
Notary Public Stenographer

27

1    estimators beginning to bid the job.

2        Q.    Now, you submitted an affidavit in

3    this case dated --

4        MR. KAPLAN:  Are you done with your

5        answer, because you were cut off?

6        THE WITNESS:  I participated in the

7        bid, but it depends on your definition of

8        the bid.

9        Q.  (By Mr. Pikula) Let's use your

10    definition.  You did an affidavit in this case

11    dated December 1, 2003.  I can show you that

12    affidavit.  It says in paragraph 2, "I supervised

13    and participated in the bidding," among other

14    things.

15        A.    That's a true statement.

16        Q.    Tell me what your participation was.

17        A.    Overall, I'm responsible for

18    reviewing the bid documents to make sure the

19    estimators do the takeoff on the project in a way

20    that is conducive with the bid documents.  I'm

21    involved with the acquiring of quotes, because

22    the purchasing department obtains those quotes,

23    ensures that the quotes meet with the spec, meet

24    the bid documents.  I'm involved on bid day and

28

1    pulling the bid together, finalizing the bid, if

2    you would, up to the point that it is finalized

3    and ready to go out the door.  Then Lou Bona and

4    Leo Christmas make the final decisions on the

5    things such as how much profit and overhead to

6    put on the job, what kind of discounts to take on

7    various pricing that we may have in the bid.

8            MR. CORKUM:  Can I interject just a

9        question for clarification?  When you use

10       the word "bid documents," I guess I'm not

11       sure whether you're talking about the ECI

12       documents or putting the bid together or

13       the contract documents.

14           THE WITNESS:  I'm talking about the

15       documents published by the party we'd be

16       putting the bid to.

17           MR. CORKUM:  When you say bid

18       documents, you're talking about the

19       drawings and specs?

20           THE WITNESS:  Drawings, specs, and

21       any instructions and/or any documents

22       whatsoever provided by, in this case, the

23       City of Springfield.

24           MR. CORKUM:  And when ECI puts

50

1       A.    I believe Wesco is one of the

2   companies, and I believe there were at least one

3   other or maybe two others.

4       Q.    Now, when it comes to using

5   particular vendors, are there circumstances where

6   you may use a quote from a particular vendor in

7   formulating your bid but then when you actually

8   have the work done use a different supplier?

9       A.    That could occur.

10      Q.    Did that happen here?

11      A.    Yes.

12      Q.    Who was the vendor that you relied on

13   in formulation of the bid?

14      A.    Chap Thompson's quote.

15      Q.    And who was the vendor that you

16   actually used as the supplier?

17      A.    Wesco.

18      Q.    Why did you have two different -- why

19   was there a difference between on what you relied

20   on the bid versus who you used as a supplier?

21      A.    During the bid process, Chap Thompson

22   came to Lou Bona and myself and Leo Christmas.

23   Actually it came to them and I got called in,

24   indicating to us that he was running into a lot

1    of resistance in his ability to obtain quotes

2    from various manufacturers who were named in a

3    second or third tier as being pre-approved

4    lighting manufacturers.  And he was also having

5    difficulty in obtaining a quote from the Color

6    Kinetic's representative in Connecticut or a

7    price for the Color Kinetic's package.

8         Q.    And what was the nature of the

9    difficulties that he related?

10        A.    Some of the vendors were telling Chap

11   that they weren't interested in providing a quote

12   because they knew they wouldn't be approved.

13        Q.    Who were some of the vendors saying

14   that?

15        A.    I don't know.  You'd have to speak to

16   Chap.

17        Q.    What was the basis for the statement,

18   if you know, of why they felt they would not be

19   approved?

20        A.    Chap at least told me that they were

21   saying they had -- a lot of these manufacturers

22   have direct relationships with various lighting

23   consultants, especially fixtures companies that

24   are in or around New York City.  If the lighting

57

1          A.    Once we won the project, we obviously

2     told Chap to go ahead and begin the buy process

3     and get what we needed, submittals and all that

4     sort of thing.  He then went out and attempted to

5     do that.  He came back, and I don't remember if

6     it was a couple of days later or a couple of

7     weeks later, I can't recall now, came back and

8     informed Lou Bona that he was running into a

9     brick wall and that things that had been said to

10    him during the bid process about second and

11    named, second or third named vendors not wanting

12    to participate in this project were coming true.

13          Even though he had the job now, he

14    was saying I want to place an order with you for

15    100, 200, 300 of whatever of your fixture type

16    XYZ and I'd like shop drawings.  They were

17    basically telling them no, they didn't want to go

18    through the exercise because they knew they

19    weren't going to get approved.

20          Second of all, he was talking to the

21    Color Kinetics reps and still being refused a

22    breakout price just for the Kinetics package.  So

23    he indicated to us that if we wanted to insist

24    and go forward with him with the order, he'd be

1   more than happy to go on that venture; however,

2   he could foresee us being six or seven months

3   down the road with half of the package actually

4   purchased and submitted and the other half still

5   being in limbo and ECI being in a very difficult

6   and bad situation in a project that needed to

7   move along quickly and end up in a giant lawsuit

8   with the project facing a huge delay.

9        Q.    So now connect the dots to me to

10  Wesco.  So how did that get you to Wesco?

11       A.    So we went to -- one of the other

12  things, let me just add, one of the other things

13  was that Chap Thompson had informed us Beacon

14  Supply, his company, didn't have access, could

15  not buy all of the first line fixtures.  That's

16  one of the reasons why each supply house carries

17  different fixture types and manufacturers.  His

18  company did have direct access to the second and

19  third named fixtures and some of the first, but

20  not all.  So that was in the mix.

21            So now in order to -- faced with the

22  dilemma that we're faced with, we decided to go

23  with one of the other vendors that we knew who

24  had access to the first line, first named fixture

62

1    submittals, submitting the submittals only to

2    have them rejected and lose the order.

3        Q.    Now, these other vendors, were these

4    listed vendors?

5        A.    Yes.

6        Q.    So these were not --

7        A.    Manufacturers.

8        Q.    And these manufacturers, these were

9    not something that you would propose as an equal.

10   Would it be fair to say that these would have

11   been listed as equals under the contract?

12       A.    They were in every case one of the

13   listed, approved listed manufacturers.

14       Q.    And at the time that you were having

15   these discussions with Chapman Thompson, were you

16   aware of the requirements of Massachusetts law

17   with regard to the listing of more than one

18   specified vendor?

19       A.    Yes.

20       Q.    And did you discuss with him your

21   knowledge of the law as to these vendors?

22       A.    I think everybody knew the law.  I

23   don't think there was any doubt that everybody

24   knew the law.  What was confronting us was we

63

1    were amazed that anybody would have the audacity

2    to do what we were apparently trying to do which

3    was to jam the first line and the Color Kinetics

4    package down our throat and that we had nowhere

5    else to go.  That's what amazed us.  I've been in

6    this business 35 years.  That's never happened to

7    me anywhere.

8         Q.    And this was happening as you were

9    formulating your bid that you were submitting?

10        A.    We were getting a gleam of it.  At

11   that point we were formulating the bid, we still

12   couldn't believe that anyone would have the

13   courage to try to pull that off.

14        Q.    Did you bring your concerns with

15   regard to what you just described to the

16   attention of the owner or anyone on the owner's

17   behalf?

18        A.    No.  And the reason we did not --

19             MR. KAPLAN:  Time frame?

20        Q.    (By Mr. Pikula) Prior to submitting

21   the bid.

22        A.    Prior to submitting the bid, what

23   would I have brought to the owner's attention,

24   that I heard a rumor that somebody might not

1  and energy on an order where we don't believe it

2  has any life whatsoever of getting approved.

3      Q.    Well, it says that the reference to

4  the $1,395,000 quote of November 17, 2000, it's

5  fair to say that that was $95,000 more than the

6  estimate that Chapman had given you?

7      A.    Absolutely.

8      Q.    And it sounds to me like that was

9  some concern and the topic of some discussion

10 with Wesco?

11     A.    Well, yeah.  ECI's concern and

12 dilemma was we were faced -- we were between a

13 rock and a hard spot.  We had one vendor telling

14 us that we could continue to go with him.  And we

15 had a lot of faith in him who we had a long-term

16 relationship with who was saying go ahead, I'll

17 go with you guys as long as you want.  But I'm

18 envisioning you being six to eight months into a

19 job without an approved fixture package and a

20 huge legal battle.  And my company really isn't

21 looking forward to getting into that battle with

22 the owner and you guys.

23         So now we go to Wesco and at the very

24 best Wesco will only entertain taking Chap's

1    approach if we give them $95,000 more.  So faced

2    with a giant lawsuit, a big delay, the job all

3    screwed up, we decided to go with Wesco and the

4    $95,000 more.

5        Q.    On December 18 of 2000 in this

6    letter, they indicated they could not honor the

7    November 17, 2000 quote.  It's fair to say they

8    said the specified package, quote, "was now

9    $1,621,000."  Is that correct?

10        A.    That's correct.

11        Q.    Now, there's some notations on

12    Exhibit 7.  I just want to ask you first, do

13    recognize whose handwriting that is?

14        A.    No.

15        Q.    I don't want to do this wrong, but it

16    looks like it says "came back second time coding,

17    comma, lens, comma, samples, hyphen, first time

18    it came back Doug took care of."  Do you have any

19    idea what that --

20        A.    No.

21        Q.    Would Doug be Doug Maxellon?

22        A.    More than likely.

23        Q.    What was Doug Maxellon's role with

24    regard to the purchasing of these fixtures?

1

1              UNITED STATES DISTRICT COURT
                 DISTRICT OF MASSACHUSETTS
2


3


4


5    ELECTRICAL CONTRACTORS, INC.
                      Plaintiff
6    vs.

7    PEABODY CONSTRUCTION CO., INC.
                      Defendant and Third
8                     Party Plaintiff
     vs.
9

10   TRAVELERS CASUALTY AND SURETY
     COMPANY OF AMERICA, ET ALS,
                      Third-Party Defendants
11


12


13            CONTINUED DEPOSITION OF:  WILLIAM FLYNN,

14   taken before ROXANNE C. COSTIGAN, Notary Public

15   Stenographer, pursuant to Rule 30 of the

16   Massachusetts Rules of Civil Procedure, at the

17   offices of ACCURATE COURT REPORTING, 1500 Main

18   Street, Springfield, Massachusetts on March 2, 2005.

19


20   APPEARANCES:   (See Page 2)

21


22


23


24              Roxanne C. Costigan
                Registered Merit Reporter

1    Q.    Did you ask him specifically whether it

2    included spares?

3    A.    We never got that far with Chap.  I mean,

4    we were, as I've testified in the past, he was

5    concerned about the fact that he had heard rumors

6    that nothing but the first line fixtures would be

7    approved and that he was concerned about that because

8    he didn't have access to the first line in every case

9    or in many cases.  However, he had access to the

10    second and third and in some case fourth and fifth,

11    however many fixtures were pre approved.  So, as soon

12    as we -- as soon as we got the job and he began to

13    try to buy it out, he immediately learned from a

14    great deal of the vendors that they weren't going to

15    bother even beginning to provide him with submittals.

16           MR. KAPLAN:  Just answer the

17           question.  Don't go off on tangents.  I don't

18           think the question was about all this other

19           stuff.  The question was did it include spares,

20           right?

21           MR. CORKUM:  I appreciated the

22           education.

23           MR. KAPLAN:  Yeah, but he didn't

24           just answer the question that's been posed.

1    together.  We were running review numbers and stuff.

2    He spent I think a couple of months.  I'm not quite

3    sure about this now on the time.  But I know he spent

4    a substantial amount of time attempting to buy all of

5    the fixtures for this job and couldn't get quotes

6    from a large number of the second and third named

7    fixture companies, couldn't buy the fixture from

8    them.  And that's when he brought that to our

9    attention, that he wasn't getting anywhere from the

10   second and third fixture companies, enough of them to

11   put his package together.  He couldn't get a breakout

12   price from the rep on the Color Kinetics package for

13   just that package.  And that's when he came to us and

14   said, I can't buy the Color Kinetics package, and all

15   the fixtures second and third name fixture companies,

16   I can't buy them.

17        Q.    Sounds to me like that's Chap's problem,

18   not your problem.

19        A.    No.  No.  It wasn't Chap's problem.  We

20   could have stubbornly went forward with Chap.  He was

21   willing to go, but it was with the understanding that

22   we could get -- we could still get shop drawings.  We

23   can get shop drawings off the internet for any

24   fixture you want and we could have submitted them and

1    relay that conversation again.

2         Q.    It seems to me that if you were being

3    impacted and impeded, you would have I guess --

4         A.    Oh, we wrote letters to Peabody saying

5    that we were objecting to the architect and the --

6    well, to the lighting consultant or other

7    representatives of the owner from communicating and

8    obstructing our ability to buy our lighting fixture

9    package.  We did write that.  We put that in writing.

10        Q.    When did you start writing these?

11        A.    Right from the beginning.

12        Q.    Is that a week into the project?

13        A.    I'm not quite -- no.  I don't think it

14   was that fast because --

15        Q.    A month?

16        A.    I'm not sure, but early on, before

17   submittals had been put in.

18        Q.    Do you know when you started making

19   submittals on the project?

20        A.    I believe in November.

21        Q.    Before you had Wesco signed up?

22        A.    We had a verbal with Wesco.  Wesco was

23   cooperating with us and Wesco had the order and knew

24   it, but we were trying to attempt to come to a bottom