UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 05-30105-KPN

_____
                                                 )
ELECTRICAL CONTRACTORS, INC.           )
    Plaintiff,                                  )
                                                 )
v.                                                    )
                                                 )
BARGMANN, HENDRIE & ARCHETYPE, INC.,  )
GWATHMEY, SIEGEL ASSOCIATES ARCHITECTS,  )
LLC, AND SCENIC TECHNOLOGIES a division  )
of PRODUCTION RESOURCE GROUP, LLC     )
                  Defendants.                 )
_____)

**MEMORANDUM OF THE DEFENDANTS, BARGMANN, HENDRIE & ARCHETYPE, INC., GWATHMEY SIEGEL ASSOCIATES ARCHITECTS, LLC AND SCENIC TECHNOLOGIES, IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

The defendants, Bargmann, Hendrie & Archetype, Inc., Gwathmey Siegel Associates Architects, LLC and Scenic Technologies (collectively, the "Architect") respectfully submit this Memorandum of Law in support of their Motion for Summary Judgment against the plaintiff, Electrical Contractors, Inc. ("ECI"). ECI has asserted time-barred claims against the Architect for restraint of trade (M.G.L. ch. 93, §13) and unfair trade practices (M.G.L ch. 93A) arising from services the Architect performed pursuant to an agreement executed nearly eight years ago in September 1997. The undisputed facts in this case demonstrate that ECI had notice of these claims as early as July 2000, yet ECI did not initiate this action until April 27, 2005, well beyond the four-year statute of limitations that expired, <u>at the latest</u>, in November of 2004. Having failed to timely assert this action despite sufficient knowledge of its claims against the Architect, there are no genuine issues of material fact in dispute, and the Architect is entitled to summary judgment as a matter of law.

I.   **STATEMENT OF UNDISPUTED FACTS**[1]

ECI's complaint arises from a project commissioned by the City of Springfield (the "City") and the Springfield Riverfront Development Corp. to construct the Naismith Memorial Basketball Hall of Fame (the "Facility") in Springfield, Massachusetts (the "Project"). Statement of Undisputed Facts ("SF") at ¶¶ 1, 9. The City retained the Architect to provide engineering and design services for the Project pursuant to an agreement dated September 1, 1997. SF at ¶ 2. After completing its services in early 2000, the Architect provided the City with final drawings and specifications used to enable public bidding for work on the Project. SF at ¶ 2. The City then contracted with Peabody Construction Company, Inc. ("Peabody") on July 25, 2000 to construct the Facility. SF at ¶ 3. ECI served as Peabody's electrical contractor pursuant to an agreement dated July 21, 2000. SF at ¶ 4. According to ECI, its work on the Project began on July 21, 2000. SF at ¶ 4.

**A.   The First Lawsuit**

On September 25, 2003, ECI filed a lawsuit against the City and Peabody in this Court (Civil Action No. 03-30231) to recover alleged losses arising from the Project (the "First Lawsuit"). SF at ¶ 5. In the First Lawsuit, ECI claimed that the specification for LED-based lighting fixtures prepared by the Architect and provided by the City was an illegal "proprietary" specification that violated Mass. Gen. Laws ch. 30, § 39M(b).[2] SF at ¶ 6. In support of its illegal specification theory, ECI, in the First Lawsuit alleged, among other things, actionable conduct attributable to the Architect:

---

[1] The Architect offers these facts for purposes of summary judgment only. The Architect reserves the right to contest all facts at trial.

[2] Mass. Gen. Laws ch. 30, § 39M(b) governs public works construction contracts and generally requires such contracts' specifications to permit the use of alternate "equal" materials and to identify those alternates.

2

> *[c]ommencing in November 2000*, and thereafter, ECI complained to Peabody, and the City, on several occasions that the listed manufacturer for the LED lighting, Color Kinetics, was creating problems in procurement and imposing demands at variance with the contract specifications. SF at ¶ 6 (emphasis added).
>
> ECI was instructed by Peabody, *through its project architect*, in no uncertain terms that no substitution for the Color Kinetics products would be entertained, and that any such attempt would be summarily rejected. SF at ¶ 6 (emphasis added).
>
> ECI was likewise told by Peabody and the City, *through its project architect*, that substitutions would not be allowed on numerous electrical items, and in fact many of ECI's attempts to substitute "equal" products were wrongfully rejected by Peabody and the City. SF at ¶ 6 (emphasis added).

On March 26, 2004, the City brought a third-party Complaint against the Architect in the First Lawsuit for contribution and indemnification. SF at ¶ 7. Over a year later, on or about March 31, 2005, ECI moved to file a cross-claim against the Architect. SF at ¶ 8.

**B.     The Second Lawsuit**

After ECI's motion to file a cross-claim in the First Lawsuit was denied, ECI filed this action (the "Second Lawsuit") on April 27, 2005, again claiming that the LED-based lighting fixtures prepared by the Architect were an illegal "proprietary" specification. SF at ¶ 8. Like ECI's Complaint in the First Lawsuit, ECI's Complaint in the Second Lawsuit details the timing and extent of ECI's knowledge concerning the Architect's alleged misconduct:

> *Throughout performing its work on the Project*, ECI complained to the Architect, Peabody, and the City that the listed manufacturer for the LED lighting, Color Kinetics, was creating problems in procurement and performance, was delaying completion of the work, and was imposing demands at variance with the contract specifications. SF at ¶ 9 (emphasis added).
>
> ECI likewise was instructed *throughout the course of the Project by the Architect*, and by the Architect's consultants, that substitutions would not be allowed on numerous electrical items, and in fact many of ECI's attempts to provide products listed as acceptable in the contract specifications, or other "equal" products, *were wrongfully rejected by the Architect, and its consultants, throughout the course of the Project*. SF at ¶ 9 (emphasis added).

3

Beyond the knowledge explicit in its pleadings, the following ECI admissions by ECI confirm that ECI knew of the factual basis for its alleged claims against the Architect soon after executing its contract with Peabody on July 21, 2000:

1. ECI's, Vice President, William Flynn, admitted that, *"[c]ommencing in November 2000*, and thereafter, ECI complained to Peabody, and the City, on several occasions that the listed manufacturer for the LED lighting, Color Kinetics, was creating problems in procurement and imposing demands at variance with the contract specifications."  SF at ¶ 10 (emphasis added).

2. *In correspondence dated November 3, 2000*, ECI advised Peabody that it was expecting substitutions for certain lighting products and that it was reviewing products to ensure that they met the "technical specifications and design intent."  ECI also requested a meeting with Peabody and the Architect, among others, "due to the technical and highly integrated lighting/control package and many questions arising out of the bid specifications for these items."  SF at ¶ 10 (emphasis added).

3. *In correspondence dated December 4, 2000*, ECI advised Peabody that the "[Color Kinetics] package...[was] a major percentage of the total lighting package and the inability for "Color Kinetics" to agree to the project specifications and terms [was] preventing ECI from finalizing the balance of the lighting package with their supplier."  SF at ¶ 10 (emphasis added).

According to ECI's Project supplier, Chapman Thompson, ECI was notified of the allegedly illegal specification *even before ECI bid on the Project* in the Spring of 2000.  SF at ¶ 11.  On December 18, 2000, ECI was also notified by another supplier, WESCO, that WESCO would not be able to honor their November 17, 2000 quote concerning the lighting package.  SF at ¶ 12.  Finally, the deposition testimony of ECI's Vice President, William Flynn, confirms that during the bid process ECI was aware of the increased costs associated with the Architect's specification for LED-based lighting fixtures.  Mr. Flynn testified as follows:

1. "I'm responsible for reviewing the bid documents…" which referred to "[d]rawings, specs, and any instructions and/or any documents documents provided by, in this case, the City of Springfield."  SF at ¶ 13.

4

2. "***During the bid process*** [in 2000], Chap Thompson came to Lou Bona and myself and Leo Christmas...indicating to us that he was running into a lot of resistance in his ability to obtain quotes from various manufacturers who were named in a second or third tier as being pre-approved lighting manufacturers. And he was also having difficulty in obtaining a quote from the Color Kinetic's representative in Connecticut or a price for the Color Kinetic's package." SF at ¶ 13 (emphasis added).

3. "[Chapman Thomson] was talking to the Color Kinetics reps and still being refused a breakout price just for the Kinetics package. So he indicated to us that if we wanted to insist and go forward with him with the order, he'd be more than happy to go on that venture; however, he could foresee us being six or seven months down the road with half of the package actually purchased and submitted and the other half still being in limbo and ECI being in a very difficult and bad situation in a project that needed to move along quickly and end up in a giant lawsuit with the project facing a huge delay." SF at ¶ 13.

4. "[W]e were amazed that anybody would have the audacity to do what they were apparently trying to do which was to jam the first line and the Color Kinetics package down our throat and that we had nowhere else to go….***at that point we were formulating the bid***…" SF at ¶ 13 (emphasis added).

5. "So now we go to WESCO and at the very best WESCO will only entertain taking Chap's approach if we give them $95,000 more. So faced with a giant lawsuit, a big delay, the job all screwed up, we decided to go with WESCO and the $95,000 more." SF at ¶ 13.

6. "Oh, we wrote letters to Peabody saying that ***we were objecting to the architect*** and the – well, lighting consultant or other representatives of the owner from communicating and obstructing our ability to buy our lighting fixture package. ***We did that. We put that in writing. Right from the beginning***." SF at ¶ 13 (emphasis added).

## II.     ARGUMENT

A.   Standard of Review

A party is entitled to summary judgment when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Barbour v. Dynamics Research Com.*, 63 F.3d 32, 36-37 (1st Cir. 1995) (quoting Fed. R. Civ. P. 56(c)). The moving party satisfies its initial burden by "pointing out...that there is an

5

absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986), *cert. denied*, 484 U.S. 1066 (1988). Once the Architect has made this showing, the burden then shifts to ECI, which must demonstrate "the existence of an element essential to [ECI's] case, and on which [ECI] will bear the burden of proof at trial." *Id*. at 322.

Substantive law identifies the material facts for purposes of summary judgment; disputes over facts which are not outcome determinative under governing law will not suffice to defeat the motion. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986). To survive summary judgment on the basis of disputed material facts, ECI must produce substantial evidence, going beyond the allegations of the complaint and supporting the claimed dispute, which would require a judge or jury to resolve the conflicting versions of the truth at trial. *Logan Equip. Corp. v. Simon Aerials Inc*., 736 F. Supp. 1188, 1195 (D. Mass. 1990). If ECI fails to make this requisite showing, summary judgment in favor of the Architect is appropriate. *Dias v. Vose*, 865 F.Supp. 53, 56 (D. Mass. 1994), *aff'd,* 50 F.3d 1 (1st Cir. 1995).

B.  <u>The Plaintiff's Claims Against the Architect are Barred by the Statute of Limitations and Must be Dismissed as a Matter of Law</u>

The Architect is entitled to judgment as a mater of law because ECI was aware of its claims against the Architect in 2000 and failed to initiate the Second Lawsuit until April 2005. SF at ¶¶ 6, 9-13. In cases such as this invoking diversity jurisdiction, Massachusetts law applies. *Zamboni v. Aladan Corp*. 304 F. Supp. 2d 218 (D. Mass. 2004), citing *Foisy v. Royal Maccabees Life Ins. Co*., 356 F.3d 141 (1st Cir. 2004); *Pitts v. Aerolite SPE Corp*., 673 F. Supp. 1123, 1127 (D. Mass. 1987). Both claims asserted by ECI are therefore governed by the four-year statutes of limitation provided under Massachusetts law. *See* Mass. Gen. Laws ch. 93, § 13; ch. 260, §5A.

6

When a defendant raises the statute of limitations, the burden rests on the plaintiff to demonstrate that his claim is not time barred. *Albrecht v. Clifford*, 436 Mass. 706, 715 (2002). As such, ECI must establish sufficient facts to take its case "outside the impact of the statute of limitations." *Shahzade v. Gregory*, 930 F. Supp. 673, 675 (D. Mass. 1996).

    1.    <u>ECI's Claim for Violation of the Massachusetts Antitrust Act is Time Barred</u>.

Massachusetts law requires that actions for violations of the Massachusetts Antitrust Act be brought "within four years after the cause of action accrues." Mass. Gen. Laws ch. 93, § 13. The four year statute of limitations "begins to run when the injured person has notice of the claim." *White v. Peabody Constr. Co.*, 386 Mass. 121, 129 (1982). The 'notice' required in not notice of every fact which must eventually be proved in support of the claim...[r]ather the 'notice' is simply knowledge that an injury has occurred. *Id.* at 386. "The important point is that the statute of limitations starts to run when an event or events have occurred that were reasonably likely to put the plaintiff on notice that someone may have caused [its] injury." *Bowen v. Eli Lilly & Co.*, 408 Mass. 204, 207 (1990).

The facts in this case easily surpass the notice threshold articulated in *White* because ECI had notice of every element of its claim by July 2000, and not simply knowledge that an injury had occurred. *See White v. Peabody*, 386 Mass. at 130. As discussed above, ECI was notified of the allegedly illegal specification by Chapman Thompson even before ECI and Peabody executed their agreement in July 2000. SF at ¶ 11. The deposition testimony of ECI's Vice President, William Flynn, confirms that ECI knew about the specification prior to July 2000 when it was formulating its bid:

> "We were amazed that anybody would have the audacity to do what they were apparently trying to do which was to jam the first line and the Color Kinetics package down our throat and that we had nowhere else to go...at that point we were formulating the bid..." SF at ¶ 13.

7

ECI also recognized the consequences of the allegedly illegal specification soon after beginning the work in July 2000, a fact explicitly verified by ECI's own pleadings. SF at ¶¶ 6, 9. Indeed, ECI's Complaint in the Second Lawsuit admits that "throughout performing its work on the Project, ECI complained to the Architect Peabody and the City" that the allegedly illegal specification "was creating problems in procurement and performance" and "was delaying completion of the work." SF at ¶ 9. ECI further admits that it was instructed, "throughout the course of the Project...that substitutions would not be allowed on numerous electrical items" and that "other 'equal' products were wrongfully rejected by the Architect, and its consultants, throughout the course of the Project." SF at ¶ 9. Once again, Mr. Flynn's emphatic deposition testimony reinforces the knowledge explicit in ECI's pleadings:

> "Oh, we wrote letters to Peabody saying that we were objecting to the Architect and the-well, lighting consultant or other representatives of the owner from communicating and obstructing our ability to buy our lighting fixture package. We did that. We put that in writing. Right from the beginning." SF at ¶ 10.

Once a plaintiff has knowledge or notice of his injury and its cause, the cause of action begins to accrue-even if the plaintiff does not apprehend the full extent or nature of its injury. *Phinney v. Morgan*, 39 Mass. App. Ct. 202, 208 (1995). Therefore, to escape the operation of the time bar, ECI must demonstrate that it had no notice of an injury until April 27, 2001 - - less than four years before it filed the Complaint in the Second Lawsuit on April 27, 2005. ECI cannot make this required showing because ECI knew about the allegedly illegal specification before July 2000, and was on notice of the alleged problems and delays arising from the specification "throughout the Project," which commenced in July 2000. SF at 6, 9-13. As such, ECI's claim against the Architect for violations of the Massachusetts Antitrust Statute is time barred, and must be dismissed as a matter of law.

2.     ECI's Claim for Violation of the Consumer Protection Statute is Time Barred.

Actions for violations of the Massachusetts Consumer Protection Act must also be commenced "within four years next after the cause of action accrues." Mass. Gen. Laws ch. 260, § 5A. However, actions which implicate ch. 260, §5a, such as consumer protection violations, "accrue when the plaintiff knows or reasonably should have known of harm attributable to a defendant's conduct." *Paterson-Leitch Co., Inc. v. Massachusetts Mun. Wholesale Elec. Co.*, 840 F.2d 985, 994 (1998); *see also Levin v. Berley*, 728 F.2d 551, 556 (1st Cir. 1984). The undisputed facts in this case, again largely based on ECI's own pleadings and admissions, easily satisfy this requirement.

As discussed above, ECI knew about the allegedly illegal specification during the bidding process and also knew about the consequences of the specification soon after the Project began in July 2000. SF at ¶¶ 6, 9-13. ECI's pleadings also demonstrate that ECI knew that the alleged harm associated with the specification was attributable to the Architect. For instance, in ECI's Complaint in the First Lawsuit, ECI explicitly alleges that:

> "ECI was instructed by Peabody, **through its project Architect**, in no uncertain terms that no substitution for the Color Kinetics products would be entertained, and that any such attempt would be summarily rejected." SF at ¶ 6 (emphasis added).

> "ECI was likewise told by Peabody and the City, **through its project Architect**, that substitutions would not be allowed on numerous electrical items, and in fact many of ECI's attempts to substitute "equal" products were wrongfully rejected by Peabody and the City." SF at ¶ 6 (emphasis added).

ECI's Complaint in the Second Lawsuit similarly evidences knowledge of alleged harm attributable to the Architect:

> "**Throughout performing its work on the Project**, ECI complained to the Architect, Peabody, and the City that the listed manufacturer for the LED lighting,

9

Color Kinetics, was creating problems in procurement and performance, was delaying completion of the work, and was imposing demands at variance with the contract specifications." SF at ¶ 9 (emphasis added).

"ECI likewise was instructed *throughout the course of the Project by the Architect*, and by the Architect's consultants, that substitutions would not be allowed on numerous electrical items, and in fact many of ECI's attempts to provide products listed as acceptable in the contract specifications, or other "equal" products, *were wrongfully rejected by the Architect, and its consultants, throughout the course of the Project*." SF at ¶ 9 (emphasis added).

ECI is bound by the allegations in its pleadings and the sworn admissions of its Vice President, which plainly demonstrate that ECI knew of the harm flowing from the specification "right from the beginning" of the Project (in the summer of 2000), and that those problems were attributable to the Architect. ECI therefore cannot avoid the operation of Mass. Gen. Laws ch. 260, § 5A, and its claim against the Architect for unfair trade practices is time barred, and must be dismissed as a matter of law.

### III.    REQUEST FOR RELIEF

For the foregoing reasons, the Architect respectfully requests that this Honorable Court GRANT its motion for summary judgment on both claims brought against them by ECI in this action under Fed. R. Civ. P. 56 in favor of the defendants, Bargmann, Hendrie & Archetype, Inc., Gwathmey Siegel Associates Architects, LLC and Scenic Technologies,.

                Respectfully submitted,
                Bargman, Hendrie & Archetype, Inc.,
                Gwathmey Siegel Associates Architects, LLC
                and Scenic Technologies
                By its attorneys,

                /s/ Kenneth B. Walton
                David J. Hatem, BBO #225700
                Kenneth B. Walton, BBO #562174
                Donovan Hatem LLP
                Two Seaport Lane
                Boston, MA 02110
Dated:  September 15, 2005      (617) 406-4524

## **CERTIFICATE OF SERVICE**

  I, Kenneth B. Walton, hereby certify that on this 15th day of September 2005, I served a copy of the foregoing pleading by mailing postage pre-paid to:

Christopher W. Huck, Esq.
Steven B. Kaplan, Esq.
Michelson, Kane, Royster & Barger, P.C.
93 Oak Street
Hartford, CT 06106
Attorneys for Electrical Contractors, Inc.


               /s/ Kenneth B. Walton

00936326/22017.2