UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
| | |
|---|---|
| **ELECTRICAL CONTRACTORS, INC.** ) | CIVIL ACTION |
|    Plaintiff ) | NO. 05-30105-KPN |
| ) | |
| v. ) | |
| ) | |
| **BARGMANN, HENDRIE + ARCHETYPE, INC.,** ) | |
| **GWATHMEY SIEGEL & ASSOCIATES ARCHITECTS,** ) | |
| **LLC., AND SCENIC TECHNOLOGIES, a division of** ) | |
| **PRODUCTION RESOURCE GROUP, LLC** ) | |
|    Defendants ) | OCTOBER 6, 2005 |
_____

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

The plaintiff, Electrical Contractors, Inc. ("ECI") hereby submits this Memorandum of Law in Opposition to the Motion for Summary Judgment (9/15/05) filed by the defendants, Bargmann, Hendrie & Archetype, Inc., Gwathmey Siegel Associates Architects, LLC and Scenic Technologies (collectively, the "Architect"). The Architect has asserted that both counts of ECI's action are time-barred because neither count was brought within four years after the causes of action accrued. This assertion is without merit, as this lawsuit was brought within the four-year period following ECI's discovery that it had been harmed by the Architect's violations of the Massachusetts Consumer Protection and Antitrust Acts. In addition, the Architect's continuing violations of both Acts created numerous periods from which a cause of action could accrue. As such, the Architect's motion for summary judgment should be denied.

## I. COUNTER STATEMENT OF FACTS

In September 1997, the Architect entered into a contract with the City of Springfield to provide design and construction administration services for a municipal construction project located in Springfield, Massachusetts known as the "Naismith Memorial Basketball Hall of Fame" (hereinafter "the Project"). Complaint at ¶ 8. The City also contracted with Peabody Construction Co., Inc. (hereinafter "Peabody"), to act as the general contractor on the Project. Complaint at ¶ 9. ECI entered into a subcontract with Peabody whereby ECI, as the field electrical subcontractor, agreed to perform the electrical work for the Project pursuant to certain specifications drafted by the Architect. Complaint at ¶ 10.

The specifications at issue in the instant case were developed by the Architect for the various lighting fixtures for the electrical work on the Project. Complaint at ¶ 13. As drafted, and more important, as implemented by the Architect, these specifications were illegal "proprietary" specifications that violated Massachusetts consumer protection and antitrust laws. *See, e.g.,* Complaint at ¶¶ 26-29; Statement of Disputed Fact ("SF") at ¶ 1. At various dates between June and October of 2001, ECI specifically requested that it be allowed to utilize alternative manufacturers of numerous lighting fixtures-- most of whom were already listed by the Architect as acceptable in the project specifications-- to accomplish the design intent specified by the Architect. Complaint at ¶¶ 19, 25-26; SF at ¶ 2. The Affidavit of William Flynn (Ex. Q) and the following excerpts from Project correspondence confirm this fact:

   (a) ***By correspondence dated June 13, 2001,*** Peabody told ECI that "the Architect has formally rejected the Ardee fixture that you have submitted as a [substitute lighting] fixture]…[p]lease submit the specified fixture as soon as possible…." SF at ¶ 2; Exhibit A (emphasis added).

   (b) ***By correspondence dated June 21, 2001,*** ECI was notified by WESCO, a lighting supplier, that "the fixture type referenced above was returned [from the Architect]

marked 'revised and resubmit…' an entirely different fixture will now have to be submitted…." SF at ¶ 2; Exhibit B (emphasis added).

(c) ***By correspondence dated July 2, 2001,*** ECI was notified by WESCO that various lighting fixtures "are rejected because the submitted substitute fixture is not UL listed and will not be for the foreseeable future. Therefore the specified fixtures will have to be provided." SF at ¶ 2; Exhibit C (emphasis added).

(d) ***By correspondence dated July 9, 2001,*** ECI was notified by WESCO that a resubmittal of a certain lighting fixture would certainly be approved, as the fixture was "one of the named manufacturers and is an equal product to the specified units…." SF at ¶ 2; Exhibit D (emphasis added).

(e) ***By correspondence dated October 11, 2001,*** Peabody asked the Architect to "provide clarification on [the lighting] fixtures as soon as possible so that they can be released into fabrication so as not to impact the production on the Project." SF at ¶ 2; Exhibit E (emphasis added).

(f) ***By e-mail correspondence dated December 12, 2001,*** the Architect's lighting consultant, Mather Jorgensen, advised the Architect to reject ECI's submittal of the Cooper Lighting product for the MX fixtures--a pre-approved, listed manufacturer in the Project specifications-- due to alleged performance differences with a "preferred" listed manufacturer. This was a patent violation of Massachusetts law. SF at ¶ 2; Exhibit P.

The Architect did not reject many of ECI's requests to procure the lighting fixtures from a variety of vendors--who should have been accepted-- until well after April 27, 2001. SF at ¶ 3. The Affidavit of William Flynn (Ex. Q) and the following excerpts from correspondence confirm this fact:

(a) ***By correspondence dated June 13, 2001,*** Peabody told ECI that "the Architect has formally rejected the Ardee fixture that you have submitted as a MAR fixture…[p]lease submit the specified fixture as soon as possible…." SF at ¶ 3; Exhibit A (emphasis added).

(b) ***By correspondence dated June 21, 2001,*** ECI was notified by WESCO that "the fixture type referenced above was returned [from the Architect] marked 'revised and resubmit….' an entirely different fixture will now have to be submitted…." SF at ¶ 3; Exhibit B (emphasis added).

(c) ***By correspondence dated June 21, 2001,*** ECI contacted Peabody to express concern about the time it was taking the Architect to review a lighting submittal: "[The fixture] was submitted to Peabody on November 9, 2000. This should be enough

time for the design team to do a thorough review." SF at ¶ 3; Exhibit F (emphasis added).

(d) **By correspondence dated July 2, 2001,** ECI was notified by WESCO that various lighting fixtures had been "rejected because the submitted substitute fixture is not UL listed and will not be for the foreseeable future. Therefore the specified fixtures will have to be provided." SF at ¶ 3; Exhibit C (emphasis added).

(e) **By correspondence dated July 5, 2001**, ECI notified Peabody that "Mather Jorgenson [a lighting consultant] appears to be influencing the manufacturer of these substitute fixtures into not getting this approval. If this is in fact the case, we believe it constitutes illegal interference with our contractual relations on this project." SF at ¶ 3; Exhibit G (emphasis added).

(f) Peabody responded to ECI's accusations via correspondence dated **July 6, 2001**, which stated that "the accusations of interference that ECI is making…are very serious and it does not appear that ECI currently possesses any documentation to validate these claims." Peabody went on to request that ECI "forward the outstanding [light fixture] submittals **by July 13, 2001….**" SF at ¶ 3; Exhibit H (emphasis added).

(g) **By correspondence dated July 9, 2001,** the Architect was advised by a lighting consultant that "as per your request, we have reviewed the proposed MAR substitution and feel that the Ardee light fixture is unacceptable as a substitution of the specified fixture types…." SF at ¶ 3; Exhibit D (emphasis added).

(h) **By correspondence dated July 13, 2001,** Peabody told ECI that "[we] are presently one year into this project and ECI does not yet have a complete and approved lighting package." SF at ¶ 3; Exhibit I (emphasis added).

(i) **By correspondence dated September 14, 2001**, Peabody shared the status of ECI's light fixtures with the Architect, and specifically drew the Architect's attention to the "the submitted fixtures that are awaiting a response from the Design Team." SF at ¶ 3; Exhibit J (emphasis added).

(j) **By correspondence dated September 28, 2001**, ECI and Peabody requested a meeting with the Architect "to review the number of light fixtures that were submitted as specified yet returned rejected…." SF at ¶ 3; Exhibit K (emphasis added).

(k) **By correspondence dated October 11, 2001**, Peabody asked the Architect to "provide clarification on [the lighting] fixtures as soon as possible so that they can be released into fabrication so as not to impact the production on the Project." SF at ¶ 3; Exhibit E (emphasis added).

(l) **On October 18, 2001**, ECI wrote to Peabody, stating that ECI had "not received an update from you regarding the status of lighting fixtures from our meeting of October 4, 2001." ECI went on to state that "there were 16 [lighting fixture] items we

  reviewed at [the October 4, 2001] meeting…[s]ix of the items were submitted for approval at the [October 4, 2001] meeting to [the Architect]," and "7 items were pending a response to a question from ECI to [the Architect]." SF at ¶ 3; Exhibit L (emphasis added).

(m) ECI continued to look for an answer regarding its submittals on ***October 30, 2001,*** when it wrote to Peabody, "[we] still have not received an update from you regarding the status of lighting fixtures from our meeting of October 4, 2001, other than your memo indicating that ***you are awaiting a response from the Architect***." SF at ¶ 3; Exhibit M (emphasis added).

After April 27, 2001, and until ECI was informed by the Architect's final decisions and actions that many of ECI's proposed lighting fixture submittals would not be permitted, ECI believed that its proposed fixture manufacturers should be accepted by the Architect for use on the Project. SF at ¶ 4. The Affidavit of William Flynn (Ex. Q) and the following excerpts from the deposition testimony of Mr. Flynn, ECI's Vice-President, confirm this fact:

(a) "…[E]verybody in my company, myself included, and Chap felt as though a rumor [that alternate lighting fixture companies would not be considered] prior to the bid is one thing but actually – actually someone trying to pull that off after the bid, we couldn't believe it would -- that would occur. ***We didn't believe it could occur. I still don't believe the people did it to this day.*** I can't believe that a fixture manufacturer won't provide us a shop drawing because through his own contacts and working with a specific lighting consultant doesn't want to anger them by participating in trying to get his fixture approved when he's being told point blank not to do so. ***So I didn't believe that would happen on a job like this. I mean, I can't believe that it happened***…." SF at ¶ 4, Exhibit N (emphasis added).

(b) ***"…I didn't believe in the end the rep for Color Kinetics could refuse to provide a quote if his product was named on this project and he represented that line."*** SF at ¶ 4, Exhibit O (emphasis added).

(c) "Prior to submitting the bid, what would I have brought to the owner's attention, that I heard a rumor that somebody might not approve a fixture that was not even bought yet? ***I don't think I could have. I didn't believe it would happen. I still don't believe it happened. But I wouldn't believe back then for the life of me that anyone would do what they did on this job.***" *Id.*

(d) I think everybody knew the law. I don't think there was any doubt that everybody knew the law. What was confronting us was ***we were amazed that anybody would have the audacity to do what we were apparently trying to do*** which was to jam the first line and the Color Kinetics package down our

>throat and that we had nowhere else to go. That's what amazed us. ***I've been in this business for 35 years. That's never happened to me anywhere***. *Id.*
>
>(e) At that point we were formulating the bid, we still couldn't believe that anyone would have the courage to try to pull that off. *Id.*

ECI was not harmed by the Architect's implementation of the illegal proprietary specifications and source of procurement until after April 27, 2001. Affidavit of William Flynn (Ex. Q); SF at ¶ 6. Prior to that time, had the Architect approved ECI's various lighting fixture submittals, and/or permitted substitution of the Color Kinetics exterior dome light system, the harm resulting to ECI from the architect's application of illegal, proprietary sources of supply would have been negligible, if anything. Affidavit of William Flynn (Ex. Q); SF at ¶ 5.

## II.  ARGUMENT

### A.  Standard of Review

Summary judgment is authorized "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242 (1986). Summary judgment is appropriate only in circumstances where "the evidence is such that a reasonable jury could [not] return a verdict for the nonmoving party." *Id.* at 248. The moving party bears the burden of proving that no genuine issue of material fact exists. *Celotex v. Catrett,* 477 U.S. 317, 323 (1986). In determining whether the moving party has satisfied the burden, the Court considers all inferences drawn from the underlying facts in the light most favorable to

the party opposing the motion, and resolves all reasonable doubts against the moving party. *Anderson,* 477 U.S. at 255.

> B. ECI's Claims Against The Architect Are Not Barred By Any Statute Of Limitations; The Plaintiff Did Not Have Knowledge That It Had Sustained An Injury More Than Four Years Prior To The Initiation Of The Instant Lawsuit.

The Architect properly cites the two Massachusetts statutes of limitations which are applicable in this case (Mass.G.L. c.93, §13 & c.260, §5A), but improperly concludes that the four-year limitation period set forth in both statutes bars ECI's claims.

Massachusetts General Law c.93, §13, which applies to actions for violations of the Massachusetts Antitrust Act, provides in relevant part:

> An action brought to enforce the provisions of this Act shall be barred unless commenced within four years **after the cause of action accrued**.

(Emphasis added). Similarly, M.G.L. c.260, §5A, which applies to actions for violations of the Massachusetts Consumer Protection Act, provides in relevant part:

> Actions arising on account of violations of any law intended for the protection of consumers…shall be commenced only within four years next **after the cause of action accrues**.

(Emphasis added).

Determining when a cause of action accrues has not been defined by statutes, but has long been the product of judicial interpretation in Massachusetts. *Riley v. Presnell*, 409 Mass. 239, 243 (1991); *Phinney v. Morgan*, 39 Mass.App.Ct. 202, 209 (1995). Accrual of a chapter 93A claim typically occurs **at the time injury results** from the asserted unfair or deceptive acts. *Cambridge Plating Co., Inc.*, 991 F.2d 21, 25 (1993) (quoting *International Mobiles Corp. v. Corroon & Black/Fairfield & Ellis, Inc.*, 29 Mass.App.Ct. 215, 220-21 (1990)) (emphasis

added). Massachusetts law is clear that a plaintiff must suffer some "appreciable harm" for the statute of limitations to be triggered. *Swasey v. Barron*, 46 Mass.App.Ct. 127, 129 (1999).

Furthermore, Massachusetts courts have recognized that it would be unfair to begin running a statute of limitations before a plaintiff is put on notice that he has a claim. *Bowen v. Eli Lilly & Co.*, 408 Mass. 204, 205 (1990). The judicially created tool for ensuring fairness is the "discovery rule," which tolls the statute of limitations until a plaintiff discovers, or reasonably should have discovered, that he has been injured as a result of the defendant's conduct. *Bowen*, 408 Mass. 204, 205-06; *Riley*, 409 Mass. 239, 244. Thus, in order for a cause of action to accrue, a plaintiff must have "(i) knowledge or sufficient notice that she was harmed and (ii) knowledge or sufficient notice of what the cause of harm was." *Riley*, 409 Mass. 239, 244.

In the instant case, the Architect maintains that ECI knew that the Architect would insist on the use of illegal proprietary specifications as early as July 2000.[1] Thus, according to the Architect, ECI's instant claim is barred by the four-year statute of limitations, as ECI's complaint was not brought until April 27, 2005. But this argument fails because ECI did not sustain any injury by virtue of the Architect's misdeeds until *after* April 27, 2001.

While ECI knew that the Architect had specified the Color Kinetics product in the specifications prior to April 27, 2001, ECI always believed that it could propose a suitable alternate to Color Kinetics that would be accepted. Numerous excerpts from the deposition testimony of ECI's Vice President, William Flynn, bear this out:

1. "…[E]verybody in my company, myself included, and Chap felt as though a rumor [that alternate lighting fixture companies would not be considered]

---

[1] The Architect also asserts at page 1 of its motion for summary judgment that ECI's claims against the Architect "arise from services the Architect performed pursuant to an agreement executed nearly eight years ago, in September 1997." This date is obviously completely irrelevant for purposes of determining when ECI's cause of action accrued.

prior to the bid is one thing but actually – actually someone trying to pull that off after the bid, we couldn't believe it would -- that would occur. *We didn't believe it could occur. I still don't believe the people did it to this day.* I can't believe that a fixture manufacturer won't provide us a shop drawing because through his own contacts and working with a specific lighting consultant doesn't want to anger them by participating in trying to get his fixture approved when he's being told point blank not to do so. *So I didn't believe that would happen on a job like this. I mean, I can't believe that it happened*…." SF at ¶ 4, Exhibit N (emphasis added).

2. *"…I didn't believe in the end the rep for Color Kinetics could refuse to provide a quote if his product was named on this project and he represented that line."* SF at ¶ 4, Exhibit O (emphasis added).

3. "Prior to submitting the bid, what would I have brought to the owner's attention, that I heard a rumor that somebody might not approve a fixture that was not even bought yet? *I don't think I could have. I didn't believe it would happen. I still don't believe it happened. But I wouldn't believe back then for the life of me that anyone would do what they did on this job."* Id.

4. I think everybody knew the law. I don't think there was any doubt that everybody knew the law. What was confronting us was *we were amazed that anybody would have the audacity to do what we were apparently trying to do* which was to jam the first line and the Color Kinetics package down our throat and that we had nowhere else to go. That's what amazed us. *I've been in this business for 35 years. That's never happened to me anywhere*. Id.

5. At that point we were formulating the bid, we still couldn't believe that anyone would have the courage to try to pull that off. Id.

Furthermore, correspondence between ECI, Peabody, WESCO [a lighting supplier] and the Architect in the months following April 2001 reveals that the approval of lighting fixture suppliers remained an unresolved issue:

1. *By correspondence dated June 13, 2001,* Peabody told ECI that "the Architect has formally rejected the Ardee fixture that you have submitted as a MAR fixture…[p]lease submit the specified fixture as soon as possible…." SF at ¶ 3; Exhibit A (emphasis added).

2. *By correspondence dated June 21, 2001,* ECI was notified by WESCO that "the fixture type referenced above was returned [from the Architect] marked 'revised and resubmit….' an entirely different fixture will now have to be submitted…." SF at ¶ 3; Exhibit B (emphasis added).

3.  ***By correspondence dated June 21, 2001,*** ECI contacted Peabody to express concern about the time it was taking the Architect to review a lighting submittal: "[The fixture] was submitted to Peabody on November 9, 2000. This should be enough time for the design team to do a thorough review." SF at ¶ 3; Exhibit F (emphasis added).

4.  ***By correspondence dated July 2, 2001,*** ECI was notified by WESCO that various lighting fixtures had been "rejected because the submitted substitute fixture is not UL listed and will not be for the foreseeable future. Therefore the specified fixtures will have to be provided." SF at ¶ 3; Exhibit C (emphasis added).

5.  ***By correspondence dated July 5, 2001***, ECI notified Peabody that "Mather Jorgenson [a lighting consultant] appears to be influencing the manufacturer of these substitute fixtures into not getting this approval. If this is in fact the case, we believe it constitutes illegal interference with our contractual relations on this project." SF at ¶ 3; Exhibit G (emphasis added).

6.  Peabody responded to ECI's accusations via correspondence dated ***July 6, 2001***, which stated that "the accusations of interference that ECI is making…are very serious and it does not appear that ECI currently possesses any documentation to validate these claims." Peabody went on to request that ECI "forward the outstanding [light fixture] submittals ***by July 13, 2001….***" SF at ¶ 3; Exhibit H (emphasis added).

7.  ***By correspondence dated July 9, 2001,*** the Architect was advised by a lighting consultant that "as per your request, we have reviewed the proposed MAR substitution and feel that the Ardee light fixture is unacceptable as a substitution of the specified fixture types…." SF at ¶ 3; Exhibit D (emphasis added).

8.  ***By correspondence dated July 13, 2001,*** Peabody told ECI that "[we] are presently one year into this project and ECI does not yet have a complete and approved lighting package." SF at ¶ 3; Exhibit I (emphasis added).

9.  ***By correspondence dated September 14, 2001***, Peabody shared the status of ECI's light fixtures with the Architect, and specifically drew the Architect's attention to the "the submitted fixtures that are awaiting a response from the Design Team." SF at ¶ 3; Exhibit J (emphasis added).

10. ***By correspondence dated September 28, 2001***, ECI and Peabody requested a meeting with the Architect "to review the number of light fixtures that were submitted as specified yet returned rejected…." SF at ¶ 3; Exhibit K (emphasis added).

11. ***By correspondence dated October 11, 2001***, Peabody asked the Architect to "provide clarification on [the lighting] fixtures as soon as possible so that they can be released into fabrication so as not to impact the production on the Project." SF at ¶ 3; Exhibit E (emphasis added).

12. ***On October 18, 2001***, ECI wrote to Peabody, stating that ECI had "not received an update from you regarding the status of lighting fixtures from our meeting of October 4, 2001." ECI went on to state that "there were 16 [lighting fixture] items we reviewed at [the October 4, 2001] meeting…[s]ix of the items were submitted for approval at the [October 4, 2001] meeting to [the Architect]," and "7 items were pending a response to a question from ECI to [the Architect]." SF at ¶ 3; Exhibit L (emphasis added).

13. ECI continued to look for an answer regarding its submittals on ***October 30, 2001,*** when it wrote to Peabody, "[we] still have not received an update from you regarding the status of lighting fixtures from our meeting of October 4, 2001, other than your memo indicating that *you are awaiting a response from the Architect*." SF at ¶ 3; Exhibit M (emphasis added).

14. ***By e-mail correspondence dated December 12, 2001,*** the Architect's lighting consultant, Mather Jorgensen, advised the Architect to reject ECI's submittal of the Cooper Lighting product for the MX fixtures--a pre-approved, listed manufacturer in the Project specifications-- due to alleged performance differences with a "preferred" listed manufacturer. This was a patent violation of Massachusetts law. SF at ¶ 2; Exhibit P.

*See also* Affidavit of William Flynn (Ex. Q).

As a matter of plain fact, the Architect's approval of ECI's lighting fixture submittals (that subsequently were rejected improperly) was an unresolved issue through the end of 2001, with ECI still awaiting the Architect's response regarding numerous fixture submittals. Throughout that time, ECI reasonably continued to believe that it could avoid suffering losses on the Project if the Architect complied with Massachusetts law by permitting the use of previously specified lighting fixture suppliers, as well as several substitute submittals.

The Architect's assertion that "the four-year statute of limitations expired, at the latest, in November of 2004," is simply untrue. ECI continued to reasonably believe that it would avoid significant damages die to the Architect's illegal acts until well after April 27, 2001. It was only when the Architect conclusively refused to accept many of ECI's fixture submittals that ECI's damages, and its causes of action against the Architect for restraint of trade and unfair trade practices, began to accrue. Through the end of 2001, the Architect's compliance with

Massachusetts law was still unresolved; positive determinations by the Architect on numerous ECI submittals would have averted significant damages for ECI.

The fact that ECI simply feared that that the Architect might not comply with Massachusetts law prior to April 2001 does not bar the instant lawsuit. The analogous case of *Behn v. Legion Insurance Co.*, 173 F.Supp.2d 105 (D.Mass. 2001), is instructive in this regard. In *Behn*, the defendant moved for summary judgment on the grounds that that the plaintiffs' Chapter 93A claims were barred by the four-year statute of limitations. Much like the Architect in the instance case, the defendant in *Behn* noted that "the plaintiffs refer throughout their pleadings to liability becoming clear" on a date which preceded the plaintiffs' complaint by more than four years. The court, citing the discovery rule, found that summary judgment was <u>not</u> appropriate, stating:

> Although liability may have seemed reasonably clear to the plaintiffs on [a date more than four years prior to the initiation of a lawsuit], the Chapter 93A claim…arises from [the defendant's] behavior from the time it learned of this allegedly clear liability and its failure to take subsequent action. [The plaintiffs] assert that they were not aware that the insurance company had no intention of paying their claim until after [the defendant] failed to respond to their settlement demand…and [the defendant] has offered no evidence to contradict this assertion.

*Behn*, 173 F.Supp.2d 105, 112-13.

Similarly, while the Architect's ongoing illegal actions may have been an developing problem for ECI prior to April 27, 2001, the four-year statutory period did not begin to run until ECI's proposed lighting suppliers were conclusively rejected by the Architect at some time in the end of 2001. Until then, ECI believed it could avoid harm, and made positive attempts to do so, which ultimately failed in the face of the Architect's implementation of an illegal, proprietary procurement system. Simply because ECI was attempting to avert and/or diminish the effects of the Architect's wrongdoing does not mean that ECI had suffered damages thereby.

Where compliance with a statute of limitations is at issue, "factual disputes concerning when a plaintiff knew or should have know of his causes of action are to be resolved by [a trier of fact]." *Riley*, 409 Mass. 239, 240. In the instant case, summary judgment is inappropriate, given the factual disputes concerning the date on which ECI knew it had been harmed. *See also Cambridge Planting Co., supra* (trial court's grant of summary judgment on basis of plaintiff's alleged violation of four-year limitation period set aside, where factual issues remained as to when plaintiff discovered that it had been injured); *Ross v. Garabedian*, 433 Mass. 360 (2001) (summary judgment denied, where material questions of fact existed as to when plaintiff had knowledge that he had been harmed).

In light of the foregoing, the Architect's motion for summary judgment should be denied.

C. <u>ECI's Claims Against The Architect Are Not Barred By Any Statute Of Limitations, Since The Architect's Violations Of The Massachusetts Consumer Protection Act and The Massachusetts Antitrust Act Were Continuing In Nature, Thereby Creating New Causes Of Action Upon Each Violation.</u>

Even if this Court somehow found that ECI knew that it had sustained an injury by virtue of the Architect's violations prior to April 27, 2001, ECI is still not time-barred from bringing these claims because Massachusetts has adopted the "continuing violation" doctrine in such cases.

As discussed previously, pursuant to the discovery rule, any violation by the Architect of either the Consumer Protection Act or the Massachusetts Antitrust Act which ECI did not reasonably discover until after April 27, 2001 is timely per this lawsuit. Even if, *assuming arguendo*, ECI knew that it had been harmed prior to that date, it may still maintain the instant action because the Architect continued to violate both statutes well beyond April 27, 2001.

Massachusetts courts have addressed the issue of a defendant's "continuing violations" of a statute as they relate to the accrual date of a limitation period:

> The problem of whether to look only at the initial breach of duty or at the continued [violation] has split the courts. Is each successive [violation] a breach or tort, or does the wrong become frozen for the statute of limitations purposes, on the date of the initial breach or wrong?

(Internal citations omitted). *Prescott*, 769 F.Supp. 404, 408 (D.Mass 1990). In *Prescott*, the court applied the continuing violation rule to determine when a claim accrued under the Massachusetts Consumer Protection Act. The court differentiated between "continuing acts and single acts with continuing consequences," and found that the each of the defendant's repeated violations of the Consumer Protection Act created a new cause of action. *Id.* Thus, the plaintiff's claim was not time-barred.

Similarly, in the instant case, the Architect violated both the Consumer Protection Act and the Antitrust Act within the four-year period preceding April 27, 2005, the date on which ECI brought this action. As stated in the previous section of this Memorandum, ECI was still waiting for approval of its lighting fixture submissions from the Architect at the end of 2001. The Architect subsequently rejected ECI's submissions, thereby violating Massachusetts law and injuring ECI. Inasmuch as a separate cause of action accrues for each of the instances in which the Architect insisted on the use of proprietary specifications, ECI's claims are not time-barred for any violation that it did not reasonably discover until after April 27, 2001.

Therefore, the Architect's motion for summary judgment should be denied, as a genuine issues of material fact exist as to when ECI's cause of action accrued.

**CONCLUSION**

Based on all of the foregoing, ECI respectfully requests that the Court deny the defendant's motion for summary judgment.

                THE PLAINTIFF
                ELECTRICAL CONTRACTORS, INC.

By:  *Steven B. Kaplan*
      Steven B. Kaplan
      Federal Bar # CT 06366
      Michelson, Kane, Royster & Barger, P.C.
      93 Oak Street
      Hartford, CT 06106
      Tel:   (860) 522-1243
      Fax:  (860) 548-0194
      Email:skaplan@mkrb.com

**CERTIFICATE OF SERVICE**

      This is to certify that on October 6, 2005 a copy the foregoing was filed electronically with this Court and served by mail upon any counsel or party unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system, or by mail to anyone unable to accept electronic fling.  A copy of the foregoing also was sent, postage prepaid, on the 6th day of October, 2005, to all counsel and parties of record as follows:

Kenneth B. Walton, Esq.
David J. Hatem, Esq.
Donovan Hatem LLP
Two Seaport Lane
Boston, MA 02110

*STEVEN B. KAPLAN*
Steven B. Kaplan