## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____

| | |
|---|---|
| **ELECTRICAL CONTRACTORS, INC.** ) | **CIVIL ACTION** |
| **Plaintiff** ) | **NO. 05-30105-KPN** |
| ) | |
| **v.** ) | |
| ) | |
| **BARGMANN, HENDRIE + ARCHETYPE, INC.,** ) | |
| **GWATHMEY SIEGEL & ASSOCIATES ARCHITECTS,** ) | |
| **LLC., AND SCENIC TECHNOLOGIES, a division of** ) | |
| **PRODUCTION RESOURCE GROUP, LLC** ) | |
| **Defendants** ) | **OCTOBER 6, 2005** |

_____

### STATEMENT OF MATERIAL FACTS AS TO WHICH
### THERE IS A GENUINE ISSUE TO BE TRIED

The plaintiff, Electrical Contractors, Inc. ("ECI") hereby submits, pursuant to Local Rule 56.1, this Statement of Material Facts in support of ECI's Opposition to Defendants' Motion for Summary Judgment.

1.    The Architect developed specifications for the LED-based lighting fixtures for the electrical work on the Project which were illegal "proprietary" specifications that violated Massachusetts consumer protection and antitrust law.  Complaint at ¶¶ 26-29.

2.    At various dates between June and October of 2001, ECI specifically requested that it be allowed to utilize alternative manufacturers of numerous lighting fixtures-- most of whom were already listed by the Architect as acceptable in the project specifications-- to accomplish the design intent specified by the Architect.  The Affidavit of William Flynn (Ex. Q) and  the following excerpts from correspondence confirm this fact:

(a) ***By correspondence dated June 13, 2001,*** Peabody told ECI that "the Architect has formally rejected the Ardee fixture that you have submitted as a [substitute lighting] fixture]…[p]lease submit the specified fixture as soon as possible…."  Exhibit A.

(b) ***By correspondence dated June 21, 2001,*** ECI was notified by WESCO, a lighting supplier, that "the fixture type referenced above was returned [from the Architect] marked 'revised and resubmit…' an entirely different fixture will now have to be submitted…." Exhibit B.

(c) ***By correspondence dated July 2, 2001,*** ECI was notified by WESCO that various lighting fixtures "are rejected because the submitted substitute fixture is not UL listed and will not be for the foreseeable future. Therefore the specified fixtures will have to be provided." Exhibit C.

(d) ***By correspondence dated July 9, 2001,*** ECI was notified by WESCO that a resubmittal of a certain lighting fixture would certainly be approved, as the fixture was "one of the named manufacturers and is an equal product to the specified units…." Exhibit D.

(e) ***By correspondence dated October 11, 2001***, Peabody asked the Architect to "provide clarification on [the lighting] fixtures as soon as possible so that they can be released into fabrication so as not to impact the production on the Project." Exhibit E.

(f) ***By e-mail correspondence dated December 12, 2001,*** the Architect's lighting consultant, Mather Jorgensen, advised the Architect to reject ECI's submittal of the Cooper Lighting product for the MX fixtures--a pre-approved, listed manufacturer in the Project specifications-- due to alleged performance differences with a "preferred" listed manufacturer. This was a patent violation of Massachusetts law. Exhibit P.

3.      The Architect did not reject many of ECI's requests to pursue alternate manufacturers of the lighting fixture products until well after April 27, 2001. The Affidavit of William Flynn (Ex. Q) and following excerpts from correspondence confirm this fact:

(a) ***By correspondence dated June 13, 2001,*** Peabody told ECI that "the Architect has formally rejected the Ardee fixture that you have submitted as a MAR fixture…[p]lease submit the specified fixture as soon as possible…." Exhibit A.

(b) ***By correspondence dated June 21, 2001,*** ECI was notified by WESCO that "the fixture type referenced above was returned [from the Architect] marked 'revised and resubmit….' an entirely different fixture will now have to be submitted…" Exhibit B.

(c) ***By correspondence dated June 21, 2001,*** ECI contacted Peabody to express concern about the time it was taking the Architect to review a lighting submittal: "[The fixture] was submitted to Peabody on November 9, 2000. This should be enough time for the design team to do a thorough review." Exhibit F.

(d) ***By correspondence dated July 2, 2001,*** ECI was notified by WESCO that various lighting fixtures had been "rejected because the submitted substitute fixture is not UL listed and will not be for the foreseeable future. Therefore the specified fixtures will have to be provided." Exhibit C.

(e) ***By correspondence dated July 5, 2001,*** ECI notified Peabody that "Mather Jorgenson [a lighting consultant] appears to be influencing the manufacturer of these substitute fixtures into not getting this approval. If this is in fact the case, we believe it constitutes illegal interference with our contractual relations on this project." Exhibit G.

(f) Peabody responded to ECI's accusations via correspondence dated ***July 6, 2001,*** which stated that "the accusations of interference that ECI is making…are very serious and it does not appear that ECI currently possesses any documentation to validate these claims." Peabody went on to request that ECI "forward the outstanding [light fixture] submittals ***by July 13, 2001….***" Exhibit H.

(g) ***By correspondence dated July 9, 2001,*** the Architect was advised by a lighting consultant that "as per your request, we have reviewed the proposed MAR substitution and feel that the Ardee light fixture is unacceptable as a substitution of the specified fixture types…." Exhibit D.

(h) ***By correspondence dated July 13, 2001,*** Peabody told ECI that "[we] are presently one year into this project and ECI does not yet have a complete and approved lighting package." Exhibit I.

(i) ***By correspondence dated September 14, 2001,*** Peabody shared the status of ECI's light fixtures with the Architect, and specifically drew the Architect's attention to the "the submitted fixtures that are awaiting a response from the Design Team." Exhibit J.

(j) ***By correspondence dated September 28, 2001,*** ECI and Peabody requested a meeting with the Architect "to review the number of light fixtures that were submitted as specified yet returned rejected…." Exhibit K.

(k) ***By correspondence dated October 11, 2001,*** Peabody asked the Architect to "provide clarification on [the lighting] fixtures as soon as possible so that they can be released into fabrication so as not to impact the production on the Project." Exhibit E.

(l) ***On October 18, 2001,*** ECI wrote to Peabody, stating that ECI had "not received an update from you regarding the status of lighting fixtures from our meeting of October 4, 2001." ECI went on to state that "there were 16 [lighting fixture] items we reviewed at [the October 4, 2001] meeting…[s]ix of the items were submitted for approval at the [October 4, 2001] meeting to [the Architect]," and "7 items were pending a response to a question from ECI to [the Architect]." Exhibit L.

(m) ECI continued to look for an answer regarding its submittals on **October 30, 2001,** when it wrote to Peabody, "[we] still have not received an update from you regarding the status of lighting fixtures from our meeting of October 4, 2001, other than your memo indicating that you are awaiting a response from the Architect."  Exhibit M.

4.      After April 27, 2001, and until ECI was informed by the Architect's final decisions and actions that many of ECI's proposed lighting fixture submittals would not be permitted, ECI believed that its proposed fixture manufacturers should be accepted by the Architect for use on the Project. The Affidavit of William Flynn (Ex. Q) and the following excerpts from the deposition testimony of Mr. Flynn, ECI's Vice-President, confirm this fact:

(a) "…[E]verybody in my company, myself included, and Chap felt as though a rumor [that alternate lighting fixture companies would not be considered] prior to the bid is one thing but actually – actually someone trying to pull that off after the bid, we couldn't believe it would  -- that would occur.  ***We didn't believe it could occur.  I still don't believe the people did it to this day.***  I can't believe that a fixture manufacturer won't provide us a shop drawing because through his own contacts and working with a specific lighting consultant doesn't want to anger them by participating in trying to get his fixture approved when he's being told point blank not to do so.  ***So I didn't believe that would happen on a job like this.  I mean, I can't believe that it happened***…."  March 2, 2005 Deposition of William Flynn ("Second Flynn Depo"), at Pgs. 42-43 (emphasis added), Exhibit N.

(b) ***"…I didn't believe in the end the rep for Color Kinetics could refuse to provide a quote if his product was named on this project and he represented that line."***  Feb. 2, 2005 Deposition of William Flynn ("First Flynn Depo"), at Pg. 54 (emphasis added), Exhibit O.

(c) "Prior to submitting the bid, what would I have brought to the owner's attention, that I heard a rumor that somebody might not approve a fixture that was not even bought yet?  ***I don't think I could have.  I didn't believe it would happen.  I still don't believe it happened.  But I wouldn't believe back then for the life of me that anyone would do what they did on this job."***  *Id.* at Pgs. 63-64 (emphasis added), Exhibit O.

(d) I think everybody knew the law.  I don't think there was any doubt that everybody knew the law.  What was confronting us was ***we were amazed that anybody would have the audacity to do what we were apparently trying to do*** which was to jam the first line and the Color Kinetics package down our throat and that we had nowhere else to go.  That's what amazed us. ***I've been***

*in this business for 35 years.  That's never happened to me anywhere*.  *Id*. at Pgs. 62-63 (emphasis added), Exhibit O.

(e) At that point we were formulating the bid, we still couldn't believe that anyone would have the courage to try to pull that off.  *Id*. at Pgs. 62-63 (emphasis added), Exhibit O.

5.    Throughout the last six months of 2001, had the Architect approved ECI's various lighting fixture submittals, and/or permitted substitution of the Color Kinetics exterior dome light system--or facilitated a non-proprietary system of procurement for these products-- the harm resulting to ECI from the architect's application of illegal, proprietary sources of supply would have been negligible, if anything.  *See* Flynn Affidavit.

6.    ECI was not harmed by the Architect's insistence on the use of proprietary specifications until after April 27, 2001. *See* Flynn Affidavit.


                              THE PLAINTIFF
                              ELECTRICAL CONTRACTORS, INC.


                    By:    *STEVEN B. KAPLAN*
                              Steven B. Kaplan
                              Federal Bar # CT 06366
                              Michelson, Kane, Royster & Barger, P.C.
                              93 Oak Street
                              Hartford, CT 06106
                              Tel:    (860) 522-1243
                              Fax:    (860) 548-0194
                              Email: skaplan@mkrb.com

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that on October 6th, 2005 a copy the foregoing was filed electronically with this Court and served by mail upon any counsel or party unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system, or by mail to anyone unable to accept electronic fling.   A copy of the foregoing also was sent, postage prepaid, on the 6th day of October, 2005, to all counsel and parties of record as follows:

    Kenneth B. Walton, Esq.
    David H. Corkum, Esq.
    Donovan Hatem, LLP
    Two Seaport Lane
    Boston, MA  02110

*STEVEN B. KAPLAN*
Steven B. Kaplan

# EXHIBIT A

# PEABODY CONSTRUCTION

June 13, 2001

*Via Fax: 860-549-7948*

Mr. Doug Maxellon
Electrical Contractors, Inc.
3510 Main Street
Hartford, CT  06120

**RE:   Naismith Basketball Hall of Fame**

Dear Doug,

536 Granite Street
Braintree, Massachusetts
02184-9107

Please be advised that the Architect has formally rejected the Ardee fixture that you have submitted as a MAR fixture. The Ardee fixture does not meet the design criteria that it is intended for. The specified fixture is designed to be encased in a walkway and it appears that the substituted fixture needs additional accessories to accomplish the design intention.

Telephone
781. 848. 2680
Fax
781. 849. 3194
peabodyconstruction.com

Please submit the specified fixture as soon as possible so that it does not impact the project schedule.

Thank you for your attention to this matter.

Sincerely,

*Tom Denney*

Thomas J. Denney
Project Manager

Cc:   S. Dionne
        File

Building a Legacy of Excellence Since 1891

# EXHIBIT B



WESCO
the extra
effort people

62 Village Street
East Hartford, CT 06108
(860) 289-0291
FAX (860) 289-9329

June 21.2001

Electrical Contractors Inc.
3510 Main St.
Hartford, CT. 06120

RECEIVED

.JIII. 1 0 2001

Re: Basketball Hall of Fame Type MAM

Attention: Doug Maxellon

MATHER JORGENSEN
LIGHTING DESIGN, INC.

Dear Doug,

The fixture type referenced above was returned marked "revised and resubmit". The
submittal given was for the actual catalog number shown on the lighting schedule on
drawing E-003. That catalog number for the Portfolio fixture is HD6-6601. There is also
a catalog number shown for the same type for an Edison Price fixture. That catalog
number is shown on the schedule as DL38/6-EOL. The EOL suffix stands for a semi-
specular clear reflector. The returned submittal makes reference to a requiremert for an
etched aluminum reflector. While this is shown on the schedule in 2 places it is not
shown on either catalog number referenced for that type.

The returned submittal also says that the specified fixture calls for "low brightness 45
degree cutoff". I am not sure exactly which fixture is the specified as there are catalog
numbers shown for both Edison Price and Portfolio for this type. I do know that the
Portfolio has a 60-degree cutoff and the Edison price catalog shows a 40-degree cutoff
for this fixture. This certainly needs to be clarified.

The returned submittal also talks about a requirement for a "low brightness black cross
baffle assembly". This is not shown anywhere neither in the Edison Price or the Portfolio
cut nor in the Fixture schedule. These fixtures are open specular downlights. Please
confirm that this is a requirement and an entirely different fixture will have to be
submitted and change order pricing will be provided.

There is also a description for a requirement for a "clip on lens" for this fixture type.
There is no specification of any kind as to what kind of lens is required. Based on the
Edison Price catalog it does not appear that a lens is even available for the DL38/6-EOL
style fixture. A lens could be supplied for the specified Portfolio.



WESCO
the extra
effort people



62 Village Street
East Hartford, CT 06108
(860) 289-0291
FAX (860) 289-9329

Page 2

I have included with this letter a resubmittal on the specified Portfolio fixture with a specular clear reflector to match the Edison Price along with a clip on lens as shown in the fixture description.

I hope that I have been clear about what I am trying to say. If you have any questions about this issue please feel free to give me a call.

Sincerely,

Jon Sullivan
Construction Sales

c.c. Greg Loda Lighting Affiliates

RECEIVED

JUL 1 0 2001

MATHER JORGENSEN
LIGHTING DESIGN, INC.

# EXHIBIT C



WESCO
the extra
effort people

DISTRIBUTION

62 Village Street
East Hartford, CT 06108
(860) 289-0291
FAX (860) 289-9029

July 2, 2001

Electrical Contractors Inc.
3510 Main St.
Hartford. CT 06120

Re: Basketball Hall of Fame Purchase Order 31789 Status

Attention: Doug Maxellon

Dear Doug,

A letter was sent to you on June 8th updating you as to that status of the dollars on this purchase order. This letter serves as a further update.

1) Types MAT, MAT1, MAU, MAU1 are rejected because the submitted substitute fixture is not UL listed and will not be for the foreseeable future. Therefore the specified fixtures will have to be provided. The deduct for these fixture types is voided.

Based on this the purchase order amount remains at $785,000.00 with a potential $50,000.00 of additional deduct if the types MAR, MAR1 and MAR2 are approved.

If you have any questions regarding this letter please feel free to give me a call.

Sincerely,

Jon Sullivan
Construction Sales

.c. Ken Violette Wesco Branch Manager

# EXHIBIT D

01/00/1995   04:27    2129253983              ANITA JORGENSEN                    PAGE   01



Maithor Jorgensen
Lighting Design, Inc.

**MEMO**

To:      Thomas A. Scarlata (via fax)

From:  Anita Jorgensen

cc:      Ted Mather, MJLD / Nancy Clayton, GSAA / Raphael Guadalupe, HPS -Entolo

Re:      Fixture type Substitution: "MAR", "MAR-1", "MAR-2"

Date: 7/9/01

As per your request, we have reviewed the proposed MAR substitution and feel that the Ardee light fixture is unacceptable as a substitution for the specified fixture types "MAR", "MAR-1", and "MAR-2" (Louvre Neptune IP54, by B' Light) for the following reasons:

- We are confident of the specified fixture's longevity, but we have no information regarding the substitution fixture's track record. We know that an installation of the specified B' Light fixture has been in operation at the Louvre museum in Paris for eight years with no reported lamp burnouts or problems.

- Based on an in-house side-by-side comparison of the fixture samples, we have found the specified fixture to have superior optics to the proposed substitution.

- The specified fixture is available with a colored glass lens of any color as a standard option; the proposed substitution is not. The colors offered by the Ardee fixture are based on the limited colors of the lamps. The colored lamps provided by Ardee are considerably lower in wattage (3 watts Instead of 5 watts as specified) and are available only in incandescent, which has only half the lamp life as the specified lamp (10,000 hours as opposed to 20,000 with the specified fixture).

- As mentioned in your transmittal, the proposed substitution has a considerably larger profile than the specified fixture— nearly twice the size in width—which may affect the size of the architectural pocket that accommodates it.

268 Grove Street Teaneck, NJ  07866      T (201) 928-1658      F (201) 928-1659      E    tmather@mjld.net
55 Prince Street New York, NY 10012     T (212) 343-0454      F (212) 925-3303      E   ajorgensen@mjld.net

BHA 07416

EXHIBIT E

# PEABODY CONSTRUCTION

October 11, 2001

*Via Fax: 617-350-0215*

Mr. Thomas Scarlata, Associate Principle
Bargmann Hendrie & Achetype, Inc.
316 Summer Street, 2nd Floor
Boston, MA 02210-1710

RE:   *Naismith Basketball Hall of Fame*

Dear Tom,

Attached please find three letters from Wesco to Electrical Contractors Inc. regarding three fixtures; MBH, MS, and MAS. Please review the attached letters and provide clarification or direction on how you would like Electrical Contractors Inc. to proceed with each of these issues.

Please note that no resubmittal can be provided for type MS until direction is received on the baffle. For type MAS please clarify the type of lamp that will be acceptable, presently the T8 lamps specified are not available in all sizes required to make up the rows. The MBH fixture submitted was the specified fixture, yet the notation on the submittal required that it be no larger than 2 1/4" x 2 1/4". The fixture dimensions are actually 2 1/2" x 2 1/8". Is the submitted fixture acceptable?

Please provide clarification on these three fixtures as soon as possible so that they can be released into fabrication so as not to impact the production on the Project.

Thank you for your attention to this matter.

Sincerely,

Tom Denney

Thomas J. Denney
Project Manager

Cc:   B. Clark
      S. Delisi
      S. Dionne
      File

536 Granite Street
Braintree, Massachusetts
02184-9107

Telephone
731. 848. 2680

Fax
731. 849. 3194

peabodyconstruction.com

*MBH= E' Flourecent Tube*

*MS  Tube*

*MAS  ......*

OC- 08333

**EXHIBIT F**

Tom Denney

_File_

**From:** Doug Maxellon [doug@ecincorporated.com]

**Sent:** Thursday, June 21, 2001 10:20 AM

**To:** Denney, Tom

**Cc:** Bailey, Wendell; Dionne Steve; Sullivan, Jon

**Subject:** BBHF

Tom:
My lighting supplier called and is looking for the status of the type "FP" fixture.

It was submitted to Peabody on November 09, 2000. This should be enough of time for the design team to do a thorough review.

Please get back to me as soon as possible.

                    Thank You!!!

# EXHIBIT G

## Electrical Contractors, Inc.

STATE LIC. #102800, #103327
3510 MAIN ST.  HARTFORD, CONNECTICUT 06120
(860) 549-2822   FAX (860) 549-7948
E.O.E.  M/F
e-mail: info@ECincorporated.com



July 5, 2001

**Peabody Construction Company**
1000 West Columbus Ave.
Springfield, Massachusetts 01101

Attn: Thomas Denney, Project Manager

Re: Naismith Memorial Basketball Hall of Fame
    Springfield, Massachusetts

Dear Tom:

I enclose a very troubling letter I recently received from our fixture supplier. It appears that the type MAT, MAT1, MAU and MAU1 fixtures will not have the U.L. approval that we had been expecting by the end of June.

Our supplier indicates that Mather Jorgenson appears to be influencing the manufacturer of these substitute fixtures into not getting this approval. If that is in fact the case, we believe it constitutes illegal interference with our contractual relations on this project.

We request that you, and the owner remind Mather Jorgenson that this is a public project and that this type of interference is not only improper, but also will cause delays to the project and may have serious monetary and legal ramifications. Note that this project has requirements that prohibit collusion.

Electrical Contractors, Inc., will not sit back passively and let any type of improper self-dealing by third parties take place at our expense. ECI will use all means legally available to us to protect our interest and complete the project on schedule.

Please advise the owner and its representatives of these concerns. We request that this type of behavior cease immediately.

Sincerely,

Douglas C. Maxellon
Sr. Project Manager


encl.

cc: S. Dionne, Peabody Const. Co.
    William J Flynn, ECI VP
    W. Bailey, ECI Superintendent
    Steven B. Kaplan, Esq., Michelson, Kane, Royster & Barger, P.C.
    file

# EXHIBIT H

# PEABODY CONSTRUCTION

*Via Fax 860-549-7948*

Mr. Douglas Maxellon
Electrical Contractors, Inc.
3510 Main Street
Hartford, CT 06120

July 6, 2001

Re: Naismith Memorial Basketball Hall of Fame

Dear Douglas,

I am in receipt of your recent correspondence regarding the outstanding fixtures (MAT, MAT1, MAU, MAU1) that do not currently possess a U.L. approval. Please be reminded that we are currently 11 months into this project and Peabody Construction Co., Inc. views outstanding submittals at this juncture to be a significant delay to the project.

The accusations of interference that ECI is making against Mather Jorgenson are very serious and it does not appear that ECI currently possesses any documentation to validate these claims. I strongly suggest that ECI gather evidence of impropriety prior to making accusations that could be perceived as slanderous. Without any evidence or documentation of impropriety Peabody Construction Co., Inc. cannot bring these claims forward to the design team.

ECI is contractually obligated to provide a light fixture that can meet the design requirements for this project, to date ECI has failed to provide adequate submittals for the aforementioned fixtures. Please forward the outstanding submittals for approval by July 13, 2001 so as not to further delay the progress of this project.

Sincerely,

Thomas J. Denney
Project Manager

CC: Steve Dionne
File

538 Granite Street
Braintree, Massachusetts
02184-3107

Telephone
781. ??? 2580
Fax
781. 848. 5784
peabodyconstruction.com

Building a Legacy of Excellence Since 1981

EXHIBIT I

# PEABODY CONSTRUCTION

July 13, 2001

*Via Fax: 860-549-7948*

Mr. Doug Maxellon
Electrical Contractors, Inc.
3510 Main Street
Hartford, CT  06120

### RE:    Naismith Basketball Hall of Fame

Dear Doug,

I am in receipt of your July 12 letter and I appreciate Electrical Contractors' (ECI) efforts to keep Peabody Construction Company appraised of all information relative to this project.

Please be advised that Peabody Construction Company is not assuming an adversarial approach with ECI. Peabody Construction Company is trying to emphasize to ECI the severity of the issues as it relates to this project. We are presently one year into this project and ECI does not yet have a complete and approved lighting package. This is a significant concern and could jeopardize the successful completion of this project.

Peabody Construction Company will continue to take a team approach with all subcontractors on this project, and as issues arise, it is our responsibility to point them out so that they can be resolved expeditiously.

Peabody Construction Company will not accept daily reports from individual trade superintendents as an official method of project communication. They are generally not representative of all of the issues and present a very myopic view of the project. I suggest that if there is information contained within the daily reports that ECI feels needs to be addressed by the General Contractor, the Project Manager should summarize the issues in a letter and Peabody Construction will take action on the issues. Please note that Peabody Construction is not refusing to take relevant information, but the manner that it is being presented is superfluous and it is not productive for Peabody Construction to expend manpower trying to decipher what information is relevant to the Project.

As we discussed, Peabody Construction is concerned with the role Mather Jorgenson has taken with this Project, but without documentation to substantiate ECI's claims of interference there is nothing that Peabody Construction can do to protect ECI. Informally, I have discussed the Mather Jorgenson issue with Tom Scarlatta of BH&A but he cannot take any action on these claims.

Peabody's goal is for the successful completion of this Project, and we will continue to work with all parties towards that end. To meet our goal we need a concerted effort from all

536 Granite Street
Braintree, Massachusetts
02184-9107

Telephone
781. 848. 2680
Fax
781. 849. 3194
peabodyconstruction.com

Building a Legacy of Excellence Since 1891

CONSTRUCTION

trades to promptly resolve problems and we encourage all parties to take a pro-active approach to issues as they arise.

Peabody Construction is concerned that ECI has not been pro-active in addressing outstanding submittals Peabody Construction has continually shown our support for ECI throughout this Project, coordinating meeting with your vendors and the design team in an attempt to resolve lighting issues, in no instance has Peabody Construction walked away from an ECI issue and left ECI to fend for itself.

If you need assistance addressing any issues please do not hesitate to call upon me.

Sincerely,

Thomas J. Denney
Project Manager

Cc:    S. Dionne
       File

EXHIBIT J

# PEABODY CONSTRUCTION

FILE COPY

September 14, 2001

*Via Fax: 617-350-0215*

Mr. Thomas Scarlata, Associate Principle
Bargmann Hendrie & Achetype, Inc.
316 Summer Street, 2nd Floor
Boston, MA 02210-1710

*RE:    Naismith Basketball Hall of Fame*

Dear Tom,

Attached please find the status of Electrical Contractors Inc.'s light fixtures. Please note the
submitted fixtures that are awaiting a response from the Design Team. If there is anything
that you can do to accelerate the review process for these fixtures it would be greatly
appreciated.

Thank you for your attention to this matter.

Sincerely,

Thomas J. Denney
Project Manager

Cc:      Steve Dionne
         File

855 Granite Street
Braintree, Massachusetts
02184-9107

Telephone
781. 348. 2830
Fax
781. 849. 3134
peabodyconstruction.com

Building a Legacy of Excellence Since 1891

BHA 06555

EXHIBIT K

# PEABODY CONSTRUCTION

📁 **FILE**

September 28, 2001

*Via Fax: 617-350-0215*

Mr. Thomas Scarlata, Associate Principle
Bargmann Hendrie & Achetype, Inc.
316 Summer Street, 2nd Floor
Boston, MA 02210-1710

*RE:   Naismith Basketball Hall of Fame*

Dear Tom,

Please be advised Electrical Contractors Inc. and Peabody Construction Company request a lighting meeting to review status of light fixtures. All parties are currently available on Thursday October 4 at 1:00 p.m. Please let me know if this is an acceptable time for you.

The primary topic of the meeting is to review the number of light fixtures that were submitted as specified yet returned rejected by Mather Jorgenson. This is seriously affecting the production of all trades on the job and needs to be resolved as soon as possible.

Please notify this office is the aforementioned time and date is acceptable.

Sincerely,

*Tom Denney*

Thomas J. Denney
Project Manager

Cc:     D. Maxxellen
        S. Dienne
        File

536 Granite Street
Braintree, Massachusetts
02184-3107

Telephone
781. 843. 2900
Fax
781. 843. 3734
peabodyconstruction.com

Building a Legacy of Excellence Since 1891

BHA 06559

EXHIBIT L

## Electrical Contractors, Inc.

STATE LIC. #102500, #103327
3510 MAIN ST.   HARTFORD, CONNECTICUT 06120
(860) 549-2822   FAX (860) 549-7948
E.O.E. M/F
e-mail: Info@ECincorporated.com

Mr. Thomas Denney                                          10/18/01
Peabody Construction Co. Inc.
1000 West Columbus Ave.
Springfield Massachusetts 01101

Re: Lighting Fixtures Submittal Status

Dear Tom;

I have not received an update from you regarding the status of lighting fixtures from our meeting on 10\4\01. As you are aware and as we further pointed out at the meeting, we requested a prompt response to these issues to avoid any further delays in receiving the lighting fixtures. I have attached an updated status for your use.

There were 16 items that we reviewed at our meeting.
1 item was approved at the meeting by bh+a.
6 of the items were submitted for approval at the meeting to bh+a.
7 items were pending a response to a question from ECI to bh+a.
1 item was a sample that was mailed out today by ECI.
1 item is still pending receipt of a sample by ECI.

I would appreciate it if you could find out why these items have not been responded to and if there is anything I could do to speed up the process.

Thank you,

Clifford Clauson
Sr. Project Manager

CC- C9477

**EXHIBIT M**

## *Electrical Contractors, Inc.*

STATE LIC. #102800, #103327
3510 MAIN ST.    HARTFORD, CONNECTICUT 06120
(860) 549-2822    FAX (860) 549-7948
E.O.E. M/F
e-mail: Info@ECIncorporated.com

Mr. Thomas Denney                                                    10/30/01
Peabody Construction Co. Inc.
1000 West Columbus Ave.
Springfield Massachusetts 01101

Re: Lighting Fixtures Submittal Status

Dear Tom;

I still, have not received an update from you regarding the status of lighting fixtures from
our meeting on 10\4\01, other than your memo indicating that you are awaiting a
response from the Architect. It's been almost 4 weeks since the meeting and as you are
aware we are in critical need of this information and approvals so we can proceed with
our work. WESCO sent the sample lamp display case for the type ML fixture to Anita
Jorgensen with the understanding that this sample case was on loan for 2 weeks and to
date we have not received the case back.
  As I indicated to you today, I did receive a disc for the type ML fixture layout; however
the disc will not open.

The project specification includes a listing of processing time required by the Architect
for submittal reviews. These requirements are not being adhered to.
I should not be wasting my time or yours trying to obtain updates on information that is
not only required but expected in a timely manner. Please be advised that ECI is being
delayed by this lack of response and we request an immediate response to these
outstanding issues.

Thank you;

Clifford Clauson
Sr. Project Manager

**EXHIBIT N**

```
1                    SIGNATURE/ERRATA SHEET

2          I have read the foregoing, and it is a true

3    transcript of the testimony given by me at the taking

4    of the subject deposition with the following

5    corrections/changes, if any:

6

7    _____        _____

8              Date             WILLIAM FLYNN

9

10   PAGE    LINE    CHANGE                      REASON

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19   _____

20   _____

21   _____

22   Case Name:  ECI v. Peabody, et als

23   Date Taken:  3/2/05

24   rcc
```

**Accurate Court Reporting * 1500 Main Street**
**Springfield, MA   01115**
**413-747-1806**

**Page 1**

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

ELECTRICAL CONTRACTORS, INC.
            Plaintiff
vs.

PEABODY CONSTRUCTION CO., INC.
            Defendant and Third
            Party Plaintiff
vs.

TRAVELERS CASUALTY AND SURETY
COMPANY OF AMERICA, ET ALS.
            Third-Party Defendants

        CONTINUED DEPOSITION OF: WILLIAM FLYNN,

taken before ROXANNE C. COSTIGAN, Notary Public

Stenographer, pursuant to Rule 30 of the

Massachusetts Rules of Civil Procedure, at the

offices of ACCURATE COURT REPORTING, 1500 Main

Street, Springfield, Massachusetts on March 2, 2005.

APPEARANCES:  (See Page 2)

                    Roxanne C. Costigan
                    Registered Merit Reporter

**Page 3**

I N D E X

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| William Flynn | 4 | | | |

EXHIBITS                                PAGE:

Exhibit 20...................................... 31
Exhibit 21...................................... 36
Exhibit 22...................................... 37
Exhibit 23...................................... 56
Exhibit 24...................................... 59
Exhibit 25...................................... 61
Exhibit 26...................................... 62
Exhibit 27...................................... 63
Exhibit 28...................................... 64
Exhibit 29...................................... 68
Exhibit 30...................................... 70
Exhibit 31...................................... 70
Exhibit 32...................................... 81
Exhibit 33...................................... 83
Exhibit 34...................................... 96
Exhibit 35...................................... 97
Exhibit 36...................................... 108

**Page 2**

APPEARANCES:

FOR THE PLAINTIFF:

MICHELSON, KANE, ROYSTER & BARGER, P.C.
93 Oak Street
Hartford, CT  06108
860-522-1243
    BY: STEVEN B. KAPLAN, ESQ.

FOR THE DEFENDANT:

SPRINGFIELD LAW DEPARTMENT
Court Street
Springfield, MA  01103
413-787-6085
    BY: EDWARD M. PIKULA, ESQ.
        JOHN T. LIEBEL, ESQ.

FOR THE DEFENDANT:

DONOVAN HATEM LLP
Two Seaport Lane
Boston, MA  02210
617-406-4500
    BY: DAVID H. CORKUM, ESQ.

**Page 4**

1         STIPULATIONS
2         It is agreed by and between the parties
3    that all objections, except objections as to the form
4    of the questions, and all motions to strike
5    unresponsive answers are reserved and may be raised
6    at the time of trial for the first time.
7         It is further agreed by and between the
8    parties that the sealing of the original deposition
9    transcript and notification to all parties of the
10   receipt of the original deposition transcript is
11   hereby waived.
12
13        WILLIAM FLYNN, Deponent, having been
14   satisfactorily identified by the production of his
15   driver's license and having been first duly sworn by
16   the Notary Public, deposes and says as follows:
17
18        CROSS EXAMINATION BY MR. CORKUM:
19   Q.    Mr. Flynn, my name is Dave Corkum.  I
20   represent the three architectural firms that make up
21   the design team in this matter.  I guess just to
22   clear up a joke, you advised us at the beginning of
23   this deposition or before we got started that you
24   were on some medication.  Is that medication, you

41

1  told point blank that they wouldn't sell them to them
2  either. So, Wesco came back and offered us deducts
3  if we could get the second and third fixture
4  companies approved on only those fixtures where the
5  company was willing to get involved in the process
6  here and give us shop drawings and submit on their
7  fixture. And if you go back and look at that
8  document, you'll find out that it's a very
9  insignificant number of the original fixture package
10 companies that were willing to participate in the bid
11 -- in the purchase process for this job. They were
12 -- they were telling -- they had told Chap and now
13 they were telling Wesco that they were -- they had it
14 point blank from some source within the lighting
15 consultant's office that they would never get
16 approved, and they were not going to spend their
17 money getting involved and producing documentation to
18 get approved on a job that they knew they would never
19 get approved on. It costs people money to get
20 involved trying to sell you something when in fact
21 they know they'll never get approved and they'll
22 never be able to sell their product. So, they
23 refused.
24     Q.    You're saying Chap knew this going into

42

1  the project?
2     A.    Chap had heard rumors going into the
3  project that that was the case.
4     Q.    Do you think these other vendors had
5  heard those rumors?
6     A.    Oh, other vendors carried different
7  lines. Other vendors can make elections. Wesco, I
8  believe when they quoted us, quoted us the first line
9  fixture vendor, fixture specified fixture.
10    Q.    I mean, if Chap heard this rumor, if I'm
11 going to write a purchase or I'm going to commit to
12 provide you fixtures and I've got a rumor that I
13 believe out in the industry that says, hey, you
14 better pick these products, these first name
15 products, wouldn't it be kind of foolish of me to go
16 out and estimate or provide you a quote based on
17 other products that the rumor says you'll never get
18 approved?
19    A.    Not when it's against the law to do that,
20 and everybody in my company, myself included, and
21 Chap felt as though a rumor prior to the bid is one
22 thing but actually -- actually someone trying to pull
23 that off after the bid, we couldn't believe it would
24 -- that would occur. We didn't believe it would

43

1  occur. I still don't believe the people did it to
2  this day. I can't believe that a fixture
3  manufacturer won't provide us a shop drawing because
4  through his own contacts and working with a specific
5  lighting consultant doesn't want to anger them by
6  participating in trying to get his fixture approved
7  when he's being told point blank not to. So, I
8  didn't believe that would happen on a job like this.
9  I mean, I can't believe that it happened and I
10 believe that -- I believe the laws should be a heck
11 of a lot stronger when it comes to this kind of stuff
12 and people shouldn't be allowed to pull off this kind
13 of crap on a public project, but it succeeded here
14 and it cost ECI a lot of money.
15              MR. KAPLAN: Dave, just let me know
16        before you this leave this point, when you're
17        about to leave this topic, because I just want
18        to go off the record and ask you something.
19              MR. CORKUM: Sure.
20    Q.    (By Mr. Corkum) Turning back to Exhibit
21 22, 595,000 for the Color Kinetics package with 813
22 lamps, I mean, that's -- if I ignore, and granted
23 it's not an accurate way to do it, but if I ignore
24 all the other, the 16 MA four-footers, the 16 MA

44

1  eight-footers, the twelve-footers, the
2  sixteen-footers and everything, it looks like we're
3  looking at about $300,000 for half of this lighting
4  package for half the 407 MAP lights. It looks to me
5  like the difference between what you bid, what you
6  included in your bid, what Chap Thompson quoted and
7  what's represented in your claim is the value of
8  these missed lights. I mean, it looks like you got
9  about 300,000, if I add that 300,000 to Chap's 1.3
10 quote and add the spares to that, we're up to 1.67.
11 We're almost at what you bought the package out for.
12             MR. KAPLAN: Where are you getting
13        -- I don't know where you're getting your
14        numbers from.
15             MR. CORKUM: I'm assuming --
16    Q.    (By Mr. Corkum) Okay. Let's work
17 through it. Did you understand what I said?
18    A.    I understand that you're going through a
19 mathematical subjective --
20    Q.    Speculation?
21    A.    -- speculation of what you think things
22 are worth. I would respond by saying that I don't
23 think this package was worth anywhere near $595,000
24 on any day, anywhere, any time, but that because of

**EXHIBIT O**

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

C.A. No. 03-30231-MAP

ELECTRICAL CONTRACTORS, INC.,          )
                    Plaintiff           )
VS.                                     )
                                        )
PEABODY CONSTRUCTION CO., INC.          )
                    Defendant and       )
AND THE CITY OF SPRINGFIELD,            )
                    Defendant and       )
                    Third-Party Plaintiff )
VS.                                     )
                                        )
TRAVELERS CASUALTY AND SURETY           )
COMPANY OF AMERICA, GWATHMEY,           )
SIEGEL ASSOCIATES ARCHITECTS, LLC,      )
SCENIC TECHNOLOGIES, AND BARGMANN,      )
HENDRIE + ARCHETYPE, INC.,              )
                    Third-Party Defendants )

DEPOSITION OF WILLIAM FLYNN, taken

before Debra Vance, Notary Public Stenographer,

pursuant to the provisions of Rule 30 of the

Massachusetts Rules of Civil Procedure, at the

offices of ACCURATE COURT REPORTING, 1500 Main

Street, Springfield, Massachusetts on February 2,

2005, commencing at 10:00 a.m.

APPEARANCES:  (See Page 2)

Debra A. Vance
Notary Public Stenographer

FOR THE PLAINTIFF:

MICHELSON, KANE, ROYSTER & BARGER, P.C.
93 Oak Street
Hartford, Connecticut  06108
860-522-1243
          BY:  STEVEN B. KAPLAN, ESQ.

FOR THE CITY OF SPRINGFIELD:

O'CONNOR, MARTINELLI & COHN & PIKULA
1391 Main Street
Springfield, Massachusetts  01103
413-781-5311
          BY:  EDWARD M. PIKULA, ESQ.

FOR THE CITY OF SPRINGFIELD:

LIEBEL, DESOUSA, MULHOLLAND
1391 Main Street, Suite 822
Springfield, Massachusetts  01103
413-781-1004
          BY:  JOHN T. LIEBEL, ESQ.

FOR GWATHMEY, SIEGEL ASSOCIATES ARCHITECTS:

DONOVAN HATEM LLP
Two Seaport Lane
Boston, Massachusetts  02210
617-406-4500
          BY:  DAVID H. CORKUM, ESQ.

FOR PEABODY CONTRUCTION AND TRAVELERS:

VENA, RILEY, DEPTULA, LLP
250 Summer Street, 2nd Floor
Boston, Massachusetts  02210
617-951-2400
          BY:  CHARLES A. PLUNKETT, ESQ.

53

1    various fixture companies, and, two, the rep for

2    Color Kinetics was refusing to give him a quote

3    just for the Color Kinetics package.  In so much

4    of that rep from what I know of the situation

5    also represented a great many of the first named

6    fixtures.

7              So it appeared as though he was

8    trying to protect his own interest and only allow

9    for one quote, which would be for all the light

10   fixtures.  And that breakout for the Color

11   Kinetics package from the rest of the package

12   would allow people to split up the order and buy

13   from the various pre-approved companies.

14              We discussed this at that point in

15   time with Chap.  Chap continued to say that he

16   believed that in spite of that he could still

17   come up with a buy number for the whole fixture

18   package.  I specifically, my input at that point,

19   was to say that that couldn't happen, that he

20   should go forward and get his quotes and put a

21   package together that he felt was competitive and

22   met the bid documents because of the fact of the

23   Massachusetts statutes that required all public

24   entities to approve three vendors for every type

1    of product that you were going to be providing on

2    the project and that I didn't believe in the end

3    the rep for Color Kinetics could refuse to

4    provide a quote if his product was named on this

5    project and he represented that line.

6            Chap, based on all of us really

7    saying we still had faith that he could get the

8    number and put the number together, he felt at

9    the time he could not.  If, in fact, these people

10   did have to provide quotes he could get them.  On

11   bid day Chap came back with a number and he said

12   that he felt he would provide a fixture package

13   that comported with the project specifications

14   for the number he gave us.

15           He, I think, at the time instructed

16   us to carry a little bit more than what he

17   thought that buy number would be.  It's my

18   recollection that we did carry a little bit more

19   than what he told us.  Then to complete your

20   question --

21           Q.    Let's hold off there.  I'm going to

22   withdraw that question and we'll come back to it

23   for a minute.  I just want to break very quickly

24   and show you another document.

62

1      submittals, submitting the submittals only to

2      have them rejected and lose the order.

3              Q.    Now, these other vendors, were these

4      listed vendors?

5              A.    Yes.

6              Q.    So these were not --

7              A.    Manufacturers.

8              Q.    And these manufacturers, these were

9      not something that you would propose as an equal.

10     Would it be fair to say that these would have

11     been listed as equals under the contract?

12             A.    They were in every case one of the

13     listed, approved listed manufacturers.

14             Q.    And at the time that you were having

15     these discussions with Chapman Thompson, were you

16     aware of the requirements of Massachusetts law

17     with regard to the listing of more than one

18     specified vendor?

19             A.    Yes.

20             Q.    And did you discuss with him your

21     knowledge of the law as to these vendors?

22             A.    I think everybody knew the law.   I

23     don't think there was any doubt that everybody

24     knew the law.   What was confronting us was we

1    were amazed that anybody would have the audacity

2    to do what we were apparently trying to do which

3    was to jam the first line and the Color Kinetics

4    package down our throat and that we had nowhere

5    else to go.  That's what amazed us.  I've been in

6    this business 35 years.  That's never happened to

7    me anywhere.

8            Q.    And this was happening as you were

9    formulating your bid that you were submitting?

10           A.    We were getting a gleam of it.  At

11   that point we were formulating the bid, we still

12   couldn't believe that anyone would have the

13   courage to try to pull that off.

14           Q.    Did you bring your concerns with

15   regard to what you just described to the

16   attention of the owner or anyone on the owner's

17   behalf?

18           A.    No.  And the reason we did not --

19                 MR. KAPLAN:  Time frame?

20           Q.    (By Mr. Pikula) Prior to submitting

21   the bid.

22           A.    Prior to submitting the bid, what

23   would I have brought to the owner's attention,

24   that I heard a rumor that somebody might not

1    approve a fixture that was not even bought yet?

2    I don't think I could have. I didn't believe it

3    would happen. I still don't believe it happened.

4    But I wouldn't believe back then for the life of

5    me that anyone would do what they did on this

6    job.

7            Q.    When you're saying that you can't

8    believe anyone would do what they did on this

9    job, what is it specifically that you can't

10   believe that they did and who specifically are

11   you saying did it?

12           A.    Well in that I don't have the

13   privilege of seeing exactly the pecking order and

14   how every submittal goes and who really does and

15   says what. All I'll say is that when the

16   submittals left our office on specific fixtures,

17   they were named second or third as pre-approved

18   and came back disapproved for no reason other

19   than the individuals reviewing it didn't like the

20   fixture that they named as a pre-approved

21   fixtures.

22           And it made it apparent to us that

23   what was being rumored around prior to the bid

24   was gospel, and unless the first named fixture

1      manufacturer and the specific make and model, it

2      wasn't going to get approved on this job.

3          Q.    What you're saying is this rejection

4      of submittals that you said occurred with regard

5      to the lighting fixtures is something that you

6      had had, I think you described, a gleam of prior

7      to submitting your bid?

8          A.    We were being told it would happen.

9      We didn't believe it.

10         Q.    And Mr. Thomas was telling you that?

11         A.    Mr. Thomas was telling us it was

12     going to happen and we didn't believe it.

13         Q.    And in the course of any of your

14     employment, had you ever seen anything like that

15     happen before?

16         A.    Never.

17         Q.    Now, at some point, you put in an

18     order with Wesco?

19         A.    Yes.

20         Q.    And do you recall when you put the

21     order in for Wesco?

22         A.    No, I don't.

23         Q.    What was the date of your

24     subcontract, when did you enter into that,

# EXHIBIT P

## Bill Flynn

**From:** Anitajorg@aol.com
**Sent:** Wednesday, December 12, 2001 1:43 PM
**To:** n.clayton@gwathmey-siegel.com; tscarlata@bhplus.com; B.Yanku@gwathmey-siegel.com; tmather@mjld.net; rguadalupe@prg.com; PatriciaSDAlight@aol.com; scarey@elssoho.com
**Cc:** Anitajorg@aol.com
**Subject:** BHF - MQ / MX, MX-1, MX-2 Lighting Fixtures

Dear All:



EXHIBIT 9

Scarlata
8A ... 12/12/04

### Type MQ (Theater Sconce):

Per Nancy Clayton's request, the finish is to be satin chrome.
Lamp: 100 A/1SBIF (1/2 silver, Inside Frost, Philips)

### Type MX, MX-1 Cooper Lighting Substitute sample review:

MJLD rejects the working sample for the following reasons
Re: Basketball Hall of Frame Fixture Types MX, MX1, MX2 Comparison betweenCooper Lighting Portfolio Series(CLP) and Edison Price (EPL) Lighting Triples–V 32/7COL General: The EPL TRP32/7COL has an aperture of exactly 7.0" andhas adepth of 10,313" and the optical system is fixed to optimize theperformance ofthe 32 watt triple tube lamp. The fixture comes with an etched clearaluminum finish anodized Alzakreflector that is virtually free from iridescenceand provides a shieldingangle of 40 degrees. The ballast has afive yearwarranty and serviced by Edison Price Lighting as well as themanufacturer ofthe ballast, which is Sylvania. The ballast has THD of less then 10%, Power Factor above 99%, input watts of 37 and an operating Minimum temperatureof –5 degrees (F). The CLP C7032-2E-7001-H-HB26 has an aperture of7,375"and a depth of 11.0" when used with a 32 watt lamp (the fixture has theability to have the yoke adjusted for a 26 watt lamp-this opens up thepossibility that the position of the socket is not set for the proper lampbecause contractors normally do not pay attention to this. The fixture samplesent had the wrong position and the reflector was not properly positioned forthe 32 watt lamp. The reflector has a haze on it, which seems to be equal tothe etch that EPL provides. The shielding angle of the correctpositioning of the yoke for the correct lamp is stated to be 45degrees. The ballast is manufacturedby ESI and warranted only by the ballastmanufacture for 5 years. The ballast has THD less the 20%, powerfactorgreater than 95%, input watts of 37 and an operating Min tempter of 50degreesF. Photometric Comparison: (Based on a clear specular reflector for bothproducts)

|  | EdisonPrice | CLPEfficiency |  |
|---|---|---|---|
|  | 62.4% | 51.3%Spacing Ratio | 1.1 |
|  | 1.0Brightness: | 45degrees | 12525 |
|  | 7233 | 55 degrees | 65 |
|  | 316 | 65degrees | 89 |
|  | 075degrees | 0 | 085degree's |
|  | 0 | 0Shielding Angle: 40 |  |
|  | 45Electrical Comparison: (277V) Input Watts | 37 |
|  | 37THD | <10 | <20PowerFactor- |
| Percentage | >99 | >95Warranty –Years | 5 |

10/19/2004

5MinimumStarting Temp-Deg                              -5F                    50

Summary: The Edison Price fixture has better ballast based on lower THD (TotalHarmonic Distortion) and a higher power factor (The higher the power factor theless volts ampsused-energy). Input watts are only that energy that isconverted into heat. The Edison Price ballast has a much lower operatingtemperature and can be used in a wide variety of areas including outdoors in asoffit. The photometrics are radically different: The EPL fixture hasmuch higher efficiency but because of this also hashigher brightness at 45degrees. This specific EPL fixture has a 40 degree shielding and the CLPfixture has a 45 degree shielding. The lower shielding angle also allows a wider spacing ratio.

Best regards,

Anita

Anita Jorgensen
Principal
Mather Jorgensen Lighting Design
55 Prince Street
New York, NY 10012
Tel. 212-343-0454
Fax 212-925-3303
ajorgensen@mjld.net
http://www.mjld.net/

10/19/2004

**EXHIBIT  Q**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| **ELECTRICAL CONTRACTORS, INC.** ) | **CIVIL ACTION** |
| **Plaintiff** ) | **NO. 05-30105-KPN** |
| ) | |
| **v.** ) | |
| ) | |
| **BARGMANN, HENDRIE + ARCHETYPE, INC.,** ) | |
| **GWATHMEY SIEGEL & ASSOCIATES ARCHITECTS,** ) | |
| **LLC., AND SCENIC TECHNOLOGIES, a division of** ) | |
| **PRODUCTION RESOURCE GROUP, LLC** ) | |
| **Defendants** ) | **OCTOBER 6, 2005** |

## AFFIDAVIT OF WILLIAM FLYNN, Jr.

STATE OF CONNECTICUT )
                   ) ss.  October 6, 2005
COUNTY OF HARTFORD )

       William J. Flynn, Jr., being duly sworn, hereby subscribes to the following:

       1.     I am over the age of eighteen years and believe in the obligation of an oath.

       2.     At all times relevant hereto, I have been the Vice-President of the plaintiff,

Electrical Contractors, Inc. ("ECI"). In that capacity, I supervised and participated in the bidding

and performance of ECI's work for the Naismith Memorial Basketball Hall of Fame Project, and

am thoroughly familiar with all of the issues raised by ECI in this lawsuit.

       3.     I am very familiar with the matters and circumstances involved in ECI's

1

Complaint in this lawsuit and the allegations of the Complaint are true to the best of my knowledge and belief.

4.    I am familiar with the Motion for Summary Judgment recently filed in this lawsuit by the defendants, as well as plaintiff's opposition to same, and believe that the following facts support the denial of that motion.

5.    The Project specifications and plans were developed by the City and its agents, the defendant architects in this case, and were furnished to ECI by the City for purposes of bidding and performing the electrical work on the Project. The Project specifications and plans were made part of the subcontract between ECI and Peabody, and also were subject to the requirements and provisions of Mass.G.L. c.30, §39M.

6.    In §2.27, ¶AD, at pp. 16000-92 & 93, the specifications require, in part, the following:

> 1. LED-based lighting fixtures to use Chromacore™ Technology, shall be of one manufacturer to insure compatibility. It shall be manufactured by Color Kinetics, Inc. or an approved equal.

The specifications for the LED-based lighting fixtures was in fact an illegal "proprietary" specification that violated the provisions of Mass.G.L. c.30, §39M(b), including but not limited to the following:

> (a) The specifications were not written so as to provide for full competition for each item of material to be furnished under the contract;
>
> (b) The specifications failed to provide for either a minimum of three named brands of material or a description of material which can be met by a minimum of three manufacturers;
>
> (c) The specifications failed to provide sufficient information by which the

electrical subcontractor could submit and procure an "equal" product, as defined under the statute;

(d) The awarding authority failed to provide sound reasons in the public interest, stated in writing in its public records after reasonable investigation, for failing to adhere to the statutory prescriptions.

7.    Commencing in November 2000, and continuing through the end of 2001, ECI repeatedly complained to Peabody, the City, and the defendant architects that the listed manufacturer for the LED lighting, Color Kinetics, was creating problems in procurement and imposing demands at variance with the contract specifications. ECI specifically requested that it be allowed to pursue alternate manufacturers of these products that could accomplish the same design intent. ECI was instructed by Peabody and the City, through its project architect, that no substitution for the Color Kinetics products would be entertained. As a result, ECI was forced to purchase the LED lighting from Color Kinetics, through its distributor and sole manufacturer's representative, at a substantially increased price from what it would have cost ECI to either procure a comparable product from another manufacturer, or what it would have cost to purchase the same Color Kinetics system if there had been open competition on these items.

8.    The actual components of the Color Kinetics system were not designed or detailed in the bid documents, but rather were developed during the course of the project in 2001. An installable design of the Color Kinetics system was not finalized until well into the late summer and early fall of 2001. Accordingly, ECI could not procure the various components of that system until the design was finalized

3

9.     As a further result of these illegal "proprietary" specifications, the manufacturer's representative for the Color Kinetics product was permitted to act as a sole source of procurement for the product, and also refused to break out separate pricing for the Color Kinetics product apart from the entire lighting fixture package, which included dozens of other products as well. Thus, ECI was forced to purchase all of the light fixtures specified for the Project through the factory representative for Color Kinetics, thereby causing ECI to unnecessarily expend hundreds of thousands additional dollars to purchase the fixtures on a sole source procurement basis. ECI continued to attempt to avoid this "monopoly" procurement system throughout the project, and did not know until the end of 2001 that its efforts in this regard would be defeated, for the most part, by the defendants' actions in reviewing and rejecting a multitude of lighting fixture submittals.

10.     Throughout 2001, ECI likewise was directed by the defendant architect that substitutions would not be allowed on numerous other electrical items, and in fact many of ECI's attempts to substitute either "equal" products, or products listed in the specifications as acceptable, were wrongfully rejected by the architect. In many instances, when ECI attempted to submit and purchase items that had been explicitly listed in the specifications and plans, these items were wrongfully rejected by the architect because they were not the "first" listed or "preferred" item. Moreover, in many instances the architect forced ECI to provide additional features to the lighting fixtures that were not called for in the contract specifications or plans. Again, this was an ongoing process that continued through the end of 2001.

4

11.    Most, if not all, of ECI's damages as aforesaid would have been avoided, or significantly reduced, in the summer and fall of 2001 had the architect adhered to the law of public bidding in reviewing and accepting/rejecting ECI's product submittals as to the general fixture products and the components of the Color Kinetics system. It was not until the last six months of 2001 that the architect' acts, errors and omissions in this regard ensured that ECI would suffer the damage complained of in this lawsuit.

12.    The foregoing is supported by the various correspondences that is being submitted in conjunction with plaintiff's objection to the present motion for summary judgment, as well as other project records.

Further, Affiant sayeth not.

William J. Flynn, Jr.

On October 6, 2005, before me, appeared William J. Flynn, Jr., who subscribed and swore before me to the truth of the foregoing.

Steven B. Kaplan
Commissioner of the Superior Court

5

## CERTIFICATE OF SERVICE

This is to certify that on October 6, 2005 a copy the foregoing was filed electronically with this Court and served by mail upon any counsel or party unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system, or by mail to anyone unable to accept electronic fling. A copy of the foregoing also was sent, postage prepaid, on the 6th day of October, 2005, to all counsel and parties of record as follows:

Kenneth B. Walton, Esq.
David H. Corkum, Esq.
Donovan Hatem, LLP
Two Seaport Lane
Boston, MA  02110


**STEVEN B. KAPLAN**
Steven B. Kaplan